# IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-32547 |
| | § | |
| SPORTS PRO DEVELOPMENT, LLC, | § | |
| | § | CHAPTER 7 |
| DEBTOR. | § | |

## MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING. REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THERE WILL BE A HEARING ON THIS MOTION ON FEBRUARY ____, 2021 AT _____ __.M. IN COURTROOM #____, 515 RUSK STREET, HOUSTON, TEXAS 77002 OR HELD ELECTRONICALLY IF SO ORDERED.**

TO THE HONORABLE EDUARDO V. RODRIGUEZ, UNITED STATES BANKRUPTCY JUDGE:

Rene Etcharren ("Etcharren") and SM Monterrey, LLC and World Soccer Enterprises, LLC (referred to as "SMM"), creditors and interested parties in the above-referenced Chapter 7 case, file this Motion to Dismiss this action because this bankruptcy was filed without authority, despite Debtor's Representative's false representations under oath; thus, this Court lacks subject matter jurisdiction. In support of this Motion, Etcharren and SMM state as follows:

# INTRODUCTION

Debtor, Sports Pro Development, LLC ("SPD"), filed bankruptcy on May 8, 2020. Under oath, Debtor's Representative, Juan Carlos Padilla ("Padilla"), filed his initial representations of Debtor's Members May 22, 2020 (ECF 7, Pg. 53) and in support thereof, in July of 2020, submitted a Written Consent allegedly executed by the Members authorizing Padilla to file this Bankruptcy. (Exhibit A). However, the majority Members, Joaquin Beltran Vargas ("Beltran") and Tonatiuh Aguayo ("Aguayo"), never authorized the retention of counsel or the filing of this bankruptcy. (Exhibits B and C, respectively). As the Members did not provide the authority to file bankruptcy, this Court lacks subject matter jurisdiction which can be raised at any time.

# FACTUAL BACKGROUND

1. As many Creditors listed in this Bankruptcy, Etcharren and SMM sued SPD and Padilla in state court for breach of contract, fraud after Debtor failed to repay Promissory Notes made for the benefit of Debtor's business of promoting professional soccer games and for misappropriation, respectively. With respect to Etcharren, Padilla additionally knowingly wrote bad checks payable to Etcharren off the SPD account. These state court actions all related to Debtor's and Debtor's Representative, Padilla's, deceptive and fraudulent business practices.

2. Contemptuous conduct relating primarily to failure to participate meaningfully in discovery and failure to produce documents pursuant to state court orders led to the issuance of multiple Show Cause orders in state court in the Etcharren and SMM matters and Orders of Contempt. (ECF 61, Exhibit J).

3. The day prior to one such Show Cause hearing, Debtor filed this Bankruptcy action, by and through Padilla, allegedly with the Written Consent of 80% of the Membership Interest. This filing was in bad faith and done fraudulently as the Members did not give authorization and

in fact, did not even know Padilla was going to file bankruptcy for SPD. (Exhibits B and C). SPD's members, at the relevant time were Joaquin Beltran Vargas (67.5% ownership), Tonatiuh Aguayo (12.5% ownership) and Soccer Scouting International LLC (20% ownership). (Exhibit D, 2004 Exam Excerpts, pg.108, lines 9-24). Soccer Scouting International, LLC is an entity wholly owned by Padilla who is also manager, director and Registered Agent. (Exhibit E, PIR of SOS.[1]). Soccer Scouting did not sign the Written Consent. (Ex. A).

4.     In addition to lacking authority, Debtor's May 8, 2020 initial bankruptcy filing was done without any supporting financial evidence required. (ECF 1). While Debtor did in July 2020 ultimately produce some documents in support of the bankruptcy, the documents produced were either fraudulent in the case of the Written Consent or evidence that Debtor played so fast and loose with corporate records that the Debtor is not entitled to avail itself of the protection of the Bankruptcy Code (See also Alternative Motion to Dismiss for Fraud) or any other corporate protection. Examples of fast and loose documentation include:

a. Unsigned and undated Operating Agreement (ECF 15-1)
    i. At the 2004 Exam on November 16, 2020, Debtor Representative admitted there was no signed Operating Agreement. (Ex. D, 2004 Excerpts, Pg. 23, lines 17-19).
b. No Corporate Books or records exist (Ex. D, 2004 Excerpts, Pg. 22, line 24-pg. 23, line 6).
    i. No Corporate documents showing who became a member and when or rescinding interest and giving it to Soccer Scouting International. (Ex. D, 2004 Excerpts, Pg. 69, lines 8-17).
c. Tax returns with no filing confirmation
    i. Admittedly, no Filed taxes for 2019 (Ex. D, 2004 Excerpts, Pg. 65, line 22- pg. 66, line 8).
    ii. Padilla does not know if the 2018 Taxes were even filed. (Ex. D, Pg. 65, lines 19-21).

---

[1] In 2019, Padilla filed a Public Information Report with the State giving his address as Manager, Director and most importantly, Registered Agent, at 4008 Gandara Bend, Austin TX, despite having sold that house in 2015 some four years earlier. Id. While this may not be determinative of this dismissal, if is further evidence of the corporate shell games Padilla plays with not only the Courts but also the Secretary of State, ensuring that any official notifications will be significantly delayed or never reach their destination.

        iii.  Unsupported Line Items in taxes. (*e.g.,* Ex. D, Pg. 79, lines 20-23 – Does not know if "Startup Costs" are supported by invoices or expense reports despite being the only manager.).

d. K-1s never sent to alleged Members (Ex. B and Ex. C); (Ex. D., Pg. 73, line 25- pg. 74, line 2). As the K-1s were never sent, these amounts remain unreported and taxes, if due, were certainly not paid by the Members.

e. There are a multitude of transfers to and from Debtor's bank account into the accounts of companies owned by Padilla without documentation, including Soccer Builders Pro.

        i.  Padilla testified at the 2004 Exam and in the Initial Meeting of Creditors that transfers were done to <u>avoid</u> the legal garnishment placed on Debtor's account. (Ex. D., Pg. 190, line 9- pg. 191, line 10 and Audio Recording of Mtg of Creditors).

f. Padilla, when confronted with unexplained cash deposits and withdrawals, stated that he could not account for some payments because the payments were made in cash so that investors could avoid taxes potentially due and owing to the IRS. (Ex. D, Pg. 199, lines 9-17). Indeed, Padilla declared that he has done that in "35 cases." Id. at lines 20-21.[2]

g. Padilla has admitted that he is continuing this exact same business under Soccer Builders Pro ("SBP"). (Audio Recording Init. Mtg. Cred. Dated 6/29/2020); (Ex. D, Pg. 95, lines 8-11).

        i.  Documents show that Padilla was signing the Teaming Agreement in February of 2020 using the same address, letterhead, and signing emails as SPD (Ex. 21 and Ex. 22 to 2004 Exam attached to Ex. D; see also Ex. D, Pg. 101, lines 4-11), but diverting and depositing the money in the Soccer Builder's account. (Ex. 20 and Ex. 21 to Ex. D).

        ii.  Used SPD's email account, Jcp.spd@gmail.com, for Padilla's other businesses: (Ex. D, Pg. 45, lines 5-8); (Ex. D, Pg. 102, line 13-pg. 103, line 6), changes to state that SPD's email is his personal email and ran all business out of SPD's email.

h. Undocumented or Unsigned corporate contracts/failure to maintain signed copies. (Ex. D, Pg. 89, line 21- pg. 90, line 3).

i. Bank Statements with no supporting check records rendering it impossible to tell where the funds went. (Ex. D, Pg. 30, line 24-pg. 31, line 12).

j. Unsupported large "loans" from sources that cannot be identified: (Ex. D, Pg. 75, lines 5-15).

        i.  Payments reflected on the balance sheet as payment for an undocumented loan and no explanation for why a payment to an individual appears in balance sheets. (Ex. D, Pg. 78, lines 3-23).

        ii.  Payments to Soccer Scouting International, owned by Padilla, before it was a Member. (Ex. D, Pg. 84, lines 12-21).

k. Spoliation of evidence: After instruction by Trustee at Initial Mtg of Creditors and multiple requests at State Court level for the same, Padilla "lost" all emails, texts, audio recordings with Creditors in July of 2020 when his phone was "destroyed." (Ex. D, Pg. 19, line 11-pg. 20, line 1).

---

[2] Mr. Etcharren and SMM cannot speak to other investors, but both categorically deny that this occurred.

# ARUMENTS AND AUTHORITIES

## I.

## DISMISSAL IS WARRANTED FOR LACK OF SUBJECT MATTER JURISDICTION

### A.  Subject Matter Jurisdiction May Be Raised by Movants

Lack of subject matter jurisdiction can be raised at any time in a case. *Kontrick v. Ryan*, 540 U.S. 443, 455, 124 S. Ct. 906, 915 (2004); *CNA v. U.S.*, 535 F.3d 132, 145-46 (3d Cir. 2008). Rule 12 of the Federal Rules of Civil Procedure provides that the lack of subject matter jurisdiction may be raised by a motion to dismiss. Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 9032; *Settlers' Hous. Serv. Schaumburg Bank & Trust Co.* (*In re Settlers' Hous. Serv.),* 540 B.R. 624, 630 (N.D. Ill. 2015) (a Rule 12(b)(1) motion challenges the court's subject matter jurisdiction, and the court has authority to determine whether it had jurisdiction to hear a particular case). The court may properly consider whatever evidence has been submitted in determining if jurisdiction exits. *Id*. Sworn statements are particularly regarded as serious business since the system of bankruptcy administration will collapse if debtors are not forthcoming. *In re Tully*, 818 F.2d at 112. If subject matter jurisdiction is lacking, the court must dismiss the action. Fed. R. Civ. P. 12(h)(3).

### B.  Debtor's Representative Had No Authority to File Bankruptcy for the LLC

It is axiomatic that there must be authorization for an LLC to file bankruptcy. *In re Mid-South Bus. Assocs., LLC,* 555 B.R. 565, 578 (N.D. Miss. 2016) (court lacks subject matter jurisdiction when bankruptcy petition is filed without proper corporate authority), citing to the United States Supreme Court case, *Price v. Gurney*, 324 U.S. 100, 106, 65 S. Ct. 513, 89 L. Ed. 776 (1945), which is, of course, binding authority. In *Price*, the Supreme Court held that if the trial court "finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative to dismiss the

petition." *Id.* at 106. See also *Catalyst Lifestyles Sport Resort, LLC. V. Sherrard*, 2019 U.S. Distr. LEXIS 86036, 2019 WL 2208840 (N.D. Ind. 2019) ("The authority to file a bankruptcy petition on behalf of a corporation must derive from state corporate governance law and the corporate bylaws. *Id.* at \*10 citing *Keenihan v Heritage Press,* 19 F. 3d 1255, 1258 (8th Cir. 1994) (citations omitted). "The same is true for an LLC." *Id.* citing *In re NNN 123 N. Wacker, LLC,* 510 B.R. 854,858 (N.D. III. 2014) (lack of corporate authority to file is an independent ground for dismissal of a bankruptcy case).

In this instance, Padilla admitted under oath that there are no signed copies of the Operating Agreement. (Ex. D., Pg. 23, lines 14-19). The only copy provided of any alleged Operating Agreement is not amended, is unsigned and was filed by Member Beltran as attached to his Proof of Claim (ECF 15-1) and dated years before Aguayo was a member. Even if this Court should look to the unsigned and undated Operating Agreement, in §8.01 of the same, it states that the company must be wound up upon the written consent of a "Required Interest" which is defined on page 4 as the votes of Members having 75% of the Ownership of all Members. (ECF 15-1). At the time of this bankruptcy filing, May 8, 2020, there were allegedly three members, Beltran at 67.5%, Aguayo at 12.5% and Soccer Scouting International, as per the Bankruptcy filing and Secretary of State records and Padilla's admission at the 2004 Examination.[3]

Padilla admitted that bankruptcy filing required the vote of the membership of the LLC. (Ex. D, Pg. 108, line 9-pg. 109, line 3). The Written Consent, submitted by Padilla, in relevant part allegedly provides the Manager with authority to retain bankruptcy counsel and to pursue all remedies available for the filing for bankruptcy protection in the United States Federal courts. (Ex.

---

[3] The only signed document related to any interest transfer is a Subscription Agreement submitted by Aguayo in Proof of Claim (ECF 16-1), for "issuance" of "units" by SPD from SPD. Again, a curious circumstance.

A). The Written Consent falsely alleges that Beltran and Aguayo voted and executed the document. Soccer Scouting International was not even listed and Padilla signed only as Manager. Both Beltran and Aguayo have submitted Declarations under oath attached hereto that they did not authorize the bankruptcy and were not even told about the bankruptcy until after it had been filed. (Exhibits B and C). Padilla even admits that the signatures on the Written Consent are his and not the Member's own signatures. (Ex. D, Pg. 58, lines 2-5). As Beltran and Aguayo did not authorize this bankruptcy, it must be dismissed for lack of subject matter jurisdiction. *Price,* 324 U.S. at 106, 65 S.Ct. at 516.

Even if this Court should choose to disregard Padilla's admission and the unsigned Operating Agreement, Texas law requires that the Members approve the filing of a Chapter 7 bankruptcy, which did not happen here. Tex. Bus. Org. Code §101.356 states that (c) … "a fundamental business transaction of a limited liability company, or an action that would make it impossible for a limited liability company to carry out the ordinary business of the company, must be approved by the affirmative vote of the majority of all of the company's members." Certainly, the filing of bankruptcy is an action that makes it impossible for a limited liability company to carry out the ordinary business of the company and, thus, requires the membership's approval. The Written Consent filed with this Court was fraudulent and done for purposes of delay of the multitude of state court actions, many of which included Padilla, individually. Importantly, because the Membership did not provide authority to file the May 8, 2020 bankruptcy and statutorily this decision would be one for the members, this Court lacks subject matter jurisdiction.

Padilla alleged without any evidentiary support that he spoke with each member by phone individually, and although he cannot recall the date, Padilla self-servingly stated that "it was before the filing the bankruptcy." (Ex. D, Pg. 56, lines 14-23). While arguably this Court could consider

this as conflicting testimony between the Members and the Manager, the Members' statements must trump Padilla's statement because only the Members had authority and they stated that they were not apprised of the bankruptcy so could not have authorized the same.  Further, the totality of the circumstances surrounding this Written Consent, and this entire action, demonstrate the lack of veracity of Padilla's self-serving statements. Padilla received nothing in writing from the Members indicating their authorizations (Ex. D, Pg. 59, lines 21-25) and Padilla admits to signing their names. Certainly, for something so important as availing themselves of the U.S. Federal Bankruptcy Court, a writing would exist and is required.  A comparison shows that Padilla even tried to make the signatures look authentic, no doubt hoping that no one would investigate.  In short, Padilla submitted a Written Consent under oath purporting to be the signatures of the actual members, that contains no reference such as "by permission" or initialed or any indicia of anything other than being the member's own signatures.  (Ex. A). It was only at the November 16, 2020 2004 Exam that Padilla concocted the story that the members orally provided authorization because by then he was aware that Beltran and Aguayo had been told about the bankruptcy of which they were previously unaware.

In addition, Padilla dated the document March 1, 2020 but fully admits that it was not March 1st that the discussions allegedly took place. (Ex. D, Pg. 60, lines 17-25). March 1st could not have been when the document was signed because Padilla didn't even get it from his personal attorney Livingston until later. (Ex. D, Pg. 61, lines 18-20). Other inconsistencies include that no membership meeting was called or noticed, Padilla doesn't recall when the calls took place, and Padilla has submitted many signed documents in this matter that he now contends are not accurate

or "real", all of which evidence that these alleged pre-filing discussions were fabricated.[4] Padilla further alleges that he spoke with both Aguayo and Beltran after the filing and that Aguayo stated that he won't have any part of any documents "or any situation" and his lawyer was going to be involved from this point forward. Both Beltran and Aguayo have the same lawyer. (Ex. D, Pg. 63, lines 16-24). Clearly, Aguayo and Beltran are not consenting to the bankruptcy action and by providing the Declarations under oath, proves that authorization was not given. As stated earlier, Soccer Scouting International, LLC did not vote. Given the Declarations and totality of the circumstances surrounding the alleged Written Consent, this bankruptcy should be dismissed as unauthorized,

## CONCLUSION AND PRAYER

Through this fraudulently filed bankruptcy, Debtor/Padilla is attempting to erase prior bad acts of obtaining money from creditors/investors under false pretenses. Padilla did not have the legal authority to file this bankruptcy, committed perjury in his filings and testimony, "quit" his "management" position at SPD and absconded to Ecuador leaving SPD's Creditors unpaid while

---

[4] Despite months in Federal Court seeking documents and years in State Court seeking documents and Motion practice, Padilla testified that many of the financial documents in response to the Federal Subpoena Duces Tecum are not the accurate, real or the final documents. This alone should be punishable by dismissal. Padilla admits that the $17 million figure Debtor listed as the amount of liabilities is not the "real amount that SPD owes." (Ex. D, Pg. 198, lines 11-19; Pg. 249, lines 4-16 disclaiming a signed contract for payment as incorrect; Pg. 250, lines 8-14; Pg. 250, lines 15- pg. 251, line 9 denying the accuracy of a Ticketron document that showed revenue to SPD; Pg. 252, line 5- pg. 253, line 25 denying that the forms Padilla produced are the real numbers for the Leon v Toluca games; pg. 254, lines 16-25, again admitting that the "real numbers" or final numbers have not been produced; pg. 255, lines 1-9 admitting that the document produced was not the "real number" for the event; pg. 211, line 16-pg. 212, line 4 feigning ignorance to the fact that he didn't realize that producing an email as a one page pdf would not include the attachments. No such attachments have been provided. Padilla admitted under oath that he drafted Promissory Notes which he intentionally made unenforceable by using an inflated interest rate so that when a creditor attempted to enforce the agreement, he would assert a defense of usury and even perhaps the ability to assert a counterclaim. (Ex. D, Pg. 200, line 24-pg. 202, line 14).

continuing the same scheme under a different name. Such behavior clearly justifies dismissal of this action.

Creditors Etcharren and SMM pray that this Court dismiss this action based on fraudulent filing of a written consent which thus deprives this Court of subject matter jurisdiction and for wholly failing to comply with corporate formalities.

Respectfully submitted,

RENNE LAW, PLLC

By: */s/Christine Renne*
Christine M. Renne
State Bar No. 00794518
SD TX No. 424187
808 W. Dallas Street, Suite F
Conroe, TX 77301
Telephone: (832) 764-8660
Facsimile: (832) 442-5140
Email: crenne@crennelaw.com

**Attorney for Creditors,**
**Rene Etcharren and**
**SM Monterrey Group, LLC**

## CERTIFICATE OF SERVICE

This is to certify that on March 1, 2021, a true and correct copy of the foregoing Motion to Dismiss was served via the Court's CM/ECF notification system.

By: */s/Christine Renne*
Christine Renne

## WRITTEN CONSENT OF THE MEMBERS IN LIEU OF SPECIAL MEETING
### OF
### SPORTS PRO DEVELOPMENT, LLC

Pursuant to the Texas Business Organizations Code, as amended, and the Limited Liability Company Operating Agreement (the "Operating Agreement") of SPORTS PRO DEVELOPMENT, LLC (the "Company"), as amended, the undersigned, being all or a quorum of the Members of the Company who would be entitled to vote on the resolutions hereinafter set forth as if the same had been submitted to a special meeting of the members of the Company, do hereby consent to the adoption of the following resolutions, which shall be given the same force and effect as if the same had been adopted at a special meeting of the members of the Company duly called and held for the purpose of acting upon proposals to adopt such resolutions and direct that this written consent be filed by the Secretary of the Company in the minute book of the Company:

RESOLVED, that Juan Carlos Padilla shall continue as the Manager of the Company and shall retain and continue to have all powers and authorities granted to Managers of a limited liability company under the Texas Business Organizations Code; and

RESOLVED, FURTHER, that the Manager shall be and is hereby authorized to retain bankruptcy counsel and to pursue all remedies available and appropriate to the Company by filing for bankruptcy protection in the United States Federal courts; and

RESOLVED, FURTHER, that the Operating Agreement of the Company shall be amended as necessary to accurately reflect the Membership Interests of the Members of the Company, and to correct any errors or omissions contained in the existing or prior Operating Agreement.

IN WITNESS WHEREOF, the undersigned Members have executed this Written Consent in Lieu of Special Meeting effective as of March 1, 2020.

_____
Joaquin Beltra Vargas, Member

_____
Tonatiuh Aguayo, Member

_____
Juan Carlos Padilla, Manager

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-32547 |
| | § | |
| **SPORTS PRO DEVELOPMENT, LLC** | § | |
| | § | **CHAPTER 7** |
| **DEBTOR** | § | |
| | § | |

**UNSWORN DECLARATION OF JOAQUIN BELTRAN
PURSUANT TO 28 U.S.C. § 1746**

1.  My name is Joaquin Beltran. I am fully competent to make this unsworn declaration. I have personal knowledge of the facts set forth in this unsworn declaration.

2.  I am a 38.7% owner of Sports Pro Development, LLC ("Sports Pro") and have been such since February 2016. At no time did I participate in the management, the day to day operations of Sports Pro or Sports Pro's decision to incur debt. Since acquiring my interest in Sports Pro, I have not received a Schedule K-1 or any other documents for tax purposes nor have I ever received an accounting of Sports Pro's operations. I have not received any tax returns for Sports Pro.

3.  Attached hereto as Exhibit A is a Written Consent. The signature above my name on this document is not my signature. I did not authorize this Written Consent.

4.  I did not authorize Sports Pro to file bankruptcy and did not learn of the bankruptcy until after it was filed.

5.  I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed in ___Zihuatanejo, Mexico___

on October 30, 2020.

_____
JOAQUIN BELTRAN

## WRITTEN CONSENT OF THE MEMBERS IN LIEU OF SPECIAL MEETING
### OF
### SPORTS PRO DEVELOPMENT, LLC

Pursuant to the Texas Business Organizations Code, as amended, and the Limited Liability Company Operating Agreement (the "Operating Agreement") of SPORTS PRO DEVELOPMENT, LLC (the "Company"), as amended, the undersigned, being all or a quorum of the Members of the Company who would be entitled to vote on the resolutions hereinafter set forth as if the same had been submitted to a special meeting of the members of the Company, do hereby consent to the adoption of the following resolutions, which shall be given the same force and effect as if the same had been adopted at a special meeting of the members of the Company duly called and held for the purpose of acting upon proposals to adopt such resolutions and direct that this written consent be filed by the Secretary of the Company in the minute book of the Company:

RESOLVED, that Juan Carlos Padilla shall continue as the Manager of the Company and shall retain and continue to have all powers and authorities granted to Managers of a limited liability company under the Texas Business Organizations Code; and

RESOLVED, FURTHER, that the Manager shall be and is hereby authorized to retain bankruptcy counsel and to pursue all remedies available and appropriate to the Company by filing for bankruptcy protection in the United States Federal courts; and

RESOLVED, FURTHER, that the Operating Agreement of the Company shall be amended as necessary to accurately reflect the Membership Interests of the Members of the Company, and to correct any errors or omissions contained in the existing or prior Operating Agreement.

IN WITNESS WHEREOF, the undersigned Members have executed this Written Consent in Lieu of Special Meeting effective as of March 1, 2020.

_____

Joaquin Beltra Vargas, Member

_____

Tonatiuh Aguayo, Member

_____

Juan Carlos Padilla, Manager

**EXHIBIT C**

| | |
|---|---|
| IN RE: | § CASE NO.  20-32547 |
| | § |
| **SPORTS PRO DEVELOPMENT, LLC** | § |
| | § **CHAPTER 7** |
| **DEBTOR** | § |
| | § |

## UNSWORN DECLARATION OF TONATIUH AGUAYO
## PURSUANT TO _28_U.S.C. § 1746

    1.     My name is Tonatiuh Aguayo.  I am fully competent to make this unsworn declaration.  I have personal knowledge of the facts set forth in this unsworn declaration.

    2.     I am a 12.5% owner of Sports Pro Development, LLC ("Sports Pro") and have been such since February 2016.  At no time did I participate in the management, the day to day operations of Sports Pro or Sports Pro's decision to incur debt.  Since acquiring my interest in Sports Pro, I have not received a Schedule K-1 or any other documents for tax purposes nor have I ever received an accounting of Sports Pro's operations. I have not received any tax returns for Sports Pro.

    3.     Attached hereto as <u>Exhibit A</u> is a Written Consent.  The signature above my name on this document is not my signature.  I did not authorize this Written Consent.

    4.     I did not authorize Sports Pro to file bankruptcy and did not learn of the bankruptcy until after it was filed.

    5.     I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed in Monterrey, Mexico, on October 30, 2020.

_____

_____             TONATIUH AGUAYO

8014197 v1 (72613.00002.000)

**EXHIBIT C**

## WRITTEN CONSENT OF THE MEMBERS IN LIEU OF SPECIAL MEETING
### OF
### SPORTS PRO DEVELOPMENT, LLC

Pursuant to the Texas Business Organizations Code, as amended, and the Limited Liability Company Operating Agreement (the "Operating Agreement") of SPORTS PRO DEVELOPMENT, LLC (the "Company"), as amended, the undersigned, being all or a quorum of the Members of the Company who would be entitled to vote on the resolutions hereinafter set forth as if the same had been submitted to a special meeting of the members of the Company, do hereby consent to the adoption of the following resolutions, which shall be given the same force and effect as if the same had been adopted at a special meeting of the members of the Company duly called and held for the purpose of acting upon proposals to adopt such resolutions and direct that this written consent be filed by the Secretary of the Company in the minute book of the Company:

RESOLVED, that Juan Carlos Padilla shall continue as the Manager of the Company and shall retain and continue to have all powers and authorities granted to Managers of a limited liability company under the Texas Business Organizations Code; and

RESOLVED, FURTHER, that the Manager shall be and is hereby authorized to retain bankruptcy counsel and to pursue all remedies available and appropriate to the Company by filing for bankruptcy protection in the United States Federal courts; and

RESOLVED, FURTHER, that the Operating Agreement of the Company shall be amended as necessary to accurately reflect the Membership Interests of the Members of the Company, and to correct any errors or omissions contained in the existing or prior Operating Agreement.

IN WITNESS WHEREOF, the undersigned Members have executed this Written Consent in Lieu of Special Meeting effective as of March 1, 2020.

_____
Joaquin Beltra Vargas, Member

_____
Tonatiuh Aguayo, Member

_____
Juan Carlos Padilla, Manager

EXHIBIT D [1]

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


IN RE:                                Case No. 20-32547
                                          Chapter 7

SPORTS PRO DEVELOPMENT, LLC,

    Debtor.
_____

DEPOSITION OF
JUAN CARLOS PADILLA
APPEARING REMOTELY
November 16th, 2020


        PURSUANT TO NOTICE and Fed. R. Bankr. P. 2004
and 7030, the videoconference 2004 Examination of JUAN
CARLOS PADILLA, whose identity has been verified by the
court reporter, was taken on behalf of creditors on
November 16th, 2020, commencing at 10:26 a.m. Central
Time, before Christine E. Morrow, Registered
Professional Reporter, NCRA 2909, appearing remotely
via Zoom.

```
 1                    APPEARANCES

 2  FOR CREDITORS RENE ETCHARREN, SM MONTERREY GROUP, LLC,
    AND WORD SOCCER ENTERPRISE, LLC:
 3
    CHRISTINE M. RENNE, ESQ.
 4  Renne Law, PLLC
    808 W. Dallas Street, Suite F
 5  Conroe, Texas 77301
    Telephone: (832) 764-8660
 6  Email: crenne@crennelaw.com

 7
    FOR CREDITOR GB SQUARED, LLC:
 8
    ISAAC J. TAWIL, ESQ.
 9  P.O. Box 720001
    McAllen, Texas 78504
10  iketawil97@gmail.com

11
    FOR CREDITOR GUADALUPE PAULINA DIAZ:
12
    LUIS F. HESS, ESQ.
13  Luis F. Hess PLLC
    282 Ed English Dr. Bldg 6 Unit D
14  The Woodlands, Texas 77385
    Telephone:  (281) 205-8540
15  luis@luishesslaw.com
    and
16  JUAN C. LUNA, ESQ.
    Mexican Counsel for Guadalupe Diaz and BlancAlps
17  luna@lawgistic.com
    and
18  MR. SAN MIGUEL

19
    FOR CREDITOR EDUARDO CAMARENA:
20
    FRANCISCO RAMIREZ, ESQ.
21  Francisco Ramirez & Associates, P.C.
    P.O. Box 16383
22  Sugar Land, Texas 77496
    Telephone: (713) 303-8005
23  Email: lawyers@francisco-ramirez.com

24

25
```

```
 1                  APPEARANCES (Cont.)

 2   FOR CREDITORS RUBEN LARA AND ANGELA LARA:

 3   WILLIAM H. LUCK, JR., ESQ.
     1412B Stonehollow Drive
 4   Houston, Texas 77339
     Telephone: (281) 358-7611
 5       Cell: (713) 962-1573
     Email: bill.luck@sbcglobal.net
 6

 7   FOR LAMBRINA CPA:

 8   RICHARD J. WHITE, ESQ.
     Buckley, White, Castaneda & Howell, LLP
 9   2401 Fountainview, Suite 901
     Houston, Texas 77057
10   Telephone: (713) 789-7700
         Cell: (713) 703-7331
11   Email: rjwhite@bwchlaw.com

12
     FOR JUAN CARLOS PADILLA:
13
     PHILLIP R. LIVINGSTON, ESQ.
14   Phillip R. Livingston, PC
     2950 Unity Drive, #37056
15   Houston, Texas 77237
     Telephone: (713) 783-6919
16       Cell: (713) 858-2999
     Email: prlivingston@sbcglobal.net
17

18   FOR DEBTOR SPORTS PRO DEVELOPMENT, LLC:

19   MICHAEL LEBOLD, ESQ.
     Racusin & Wagner, LLP
20   510 Woodway Tower
     4900 Woodway Drive
21   Houston, Texas 77056
     Telephone: (713) 626-1450
22   Email: mfl@racusinlaw.com

23
     ALSO PRESENT:
24   Fabian Rosado, Right Start Entertainment, LLC  Creditor
     Jorge Villalobos, SM Monterrey  Creditor
25   Matthew Archibald, Exhibit Custodian
```

1          Q.    Okay.  And in it we asked for all

2    communications, text messages, emails, posting on

3    social media between you and any creditor, that you

4    listed as a creditor in this bankruptcy; correct?

5          A.    Will you repeat?

6          Q.    So, have you produced all the email and

7    text messages between you and any creditor in this

8    matter?

9          A.    I produced what I was able to -- to pull

10   up.

11         Q.    Have you produced any social media

12   between you and any creditor or WhatsApp between you

13   and any creditor?

14         A.    No.

15         Q.    Why can't you produce text messages?

16         A.    Because I don't have, anymore, that

17   phone.

18         Q.    When did you get rid of that phone?

19         A.    I don't know the exact date, but it was

20   I think July or August.

21         Q.    Of this year?

22         A.    Yes.

23         Q.    July or August of 2020?

24         A.    Yes.

25         Q.    What happened to the phone?

1        A.   It was destroyed.

2        Q.   How was it destroyed?

3        A.   Fell down from a third floor.

4        Q.   Who is your service provider?

5        A.   Right now, T-Mobile.

6        Q.   Who was it in July of 2020?

7        A.   Well, it wasn't anymore because I wasn't

8 able to pay the bill, but it was AT&T.

9        Q.   Did you ever go to AT&T and request a

10 copy of your text messages?

11       A.   No.

12       Q.   And as in July of 2020, all 17 lawsuits

13 had been filed against you; correct?

14       A.   Probably, yeah.

15       Q.   And so you knew as of that date that all

16 the text messages had been requested; correct?

17       A.   I don't know.

18       Q.   So, had you ever known in any state

19 court cases, any discovery served against you

20 requesting for text messages between you and creditors?

21       A.   I don't remember.

22       Q.   Where was your phone destroyed?

23       A.   In a hotel.  My baby throw it away.

24       Q.   What hotel?

25       A.   Hilton.

1          A.    Yes.

2          Q.    You did produce it?  It's in the

3  documents?

4          A.    Oh.  I thought you asked if I can do it,

5  like live recording right now in my i-cell phone, so I

6  didn't understand the question very well.  Can you

7  repeat?

8          Q.    Yes.  Do you have Realtime Chat on your

9  old phone?

10          A.    I don't know what you mean by Realtime.

11  Yeah.  I mean, I did have.

12          Q.    You were also asked to produce all

13  electronically or video-recorded communications and --

14  well, actually let me break that question down.

15              You were asked to produce all

16  video-recorded communications between you and any

17  creditors.  Have you done any of those?

18          A.    I don't have any.

19          Q.    Do you have any audio recordings of

20  any -- of you and any creditor?

21          A.    No.

22          Q.    What happened to those?

23          A.    In the other phone.

24          Q.    We asked you to produce all corporate

25  books and minutes of meetings of the members or

1  meetings of the managers from SPD, debtor, from

2  inception to present.  Why haven't those been produced?

3       A.   Because we don't have any.

4       Q.   So you have absolutely no corporate

5  minutes?

6       A.   No.

7       Q.   Do you have any of the organizational

8  documents for SPD?

9       A.   I think we have produced the corporate

10  documents, that I have already.

11       Q.   Okay.  So if it's been produced, that's

12  all you have; correct?

13       A.   Yes.

14       Q.   Have you ever seen a signed operating

15  agreement for SPD?

16       A.   No.

17       Q.   Was there ever a signed operating

18  agreement?

19       A.   No.

20       Q.   Have you produced all the letters

21  written by any attorney to any creditors by SPD?

22       A.   I produced the ones that I had access to

23  in my computer, yes.

24       Q.   What about the marketing materials for

25  SPD that were used to host, promote any of the games

1　where I have the box, to make the scan, because

2　there's -- there's a lot of documents and wire

3　transferred proofs that I need to get to a place where

4　they can scan it.

5　　　　　Q.　When did you first move to Ecuador?

6　　　　　A.　I haven't moved to Ecuador.  I have been

7　traveling.

8　　　　　Q.　Okay.  When did you first travel to

9　Ecuador?

10　　　　　A.　Last week of August.

11　　　　　Q.　And before that were you at your house

12　in The Woodlands, Texas?

13　　　　　A.　Yes.

14　　　　　Q.　And so, prior to that time you could

15　have obtained those documents in that box; correct?

16　　　　　A.　Probably.

17　　　　　Q.　Did you know at that time that the wire

18　transfers had been requested?

19　　　　　A.　No.

20　　　　　Q.　You never saw any document requests

21　asking for wire transfers and payment information?

22　　　　　A.　No.  I saw that we have to send the bank

23　statements, which I did for the banks that we handle.

24　　　　　Q.　Well, let me ask you something.  Wells

25　Fargo Bank attaches check images.  You didn't produce

1  any of the check images, did you?

2          A.    No.

3          Q.    Why not?

4          A.    I don't have them.

5          Q.    Okay.  Did you ever go to Wells Fargo

6  and ask for the images?

7          A.    I didn't went because they were closed,

8  but I communicated and tried to get them from the

9  executive of the bank.

10          Q.    Okay.  And what did you do to try and

11  obtain them?

12          A.    Sent an email.

13          Q.    What did you do to try and obtain them?

14  How many times did you contact Wells Fargo to ask for

15  the check images?

16          A.    For the check images, I don't remember.

17  But I sent probably between five to eight emails

18  requesting bank statements and information.

19          Q.    In what time period?

20          A.    Between from probably May to July.

21          Q.    Was it pursuant to this bankruptcy or

22  was it pursuant to a state court action?

23          A.    For this, the bankruptcy.

24          Q.    Okay.  Can you tell me what your

25  educational level is?

1    Q.   You do have emails with Mr. Jambrina --

2  or I should say SPD has emails with Mr. Jambrina;

3  correct?

4    A.   Yes.

5    Q.   What is the SPD email address, please?

6    A.   Jcp.spd@gmail.com.

7    Q.   Has SPD used any other email?

8    A.   No.

9    Q.   Has that email address been turned over

10  in this case?

11    A.   Yes.  I produced the password and the

12  login information.

13    Q.   Who did you produce that do, please?

14    A.   To my lawyer, the SPD lawyer, Michael

15  Lebold.

16       MR. LEBOLD:  That was produced to the

17  trustee.

18       MS. RENNE:  The password has been

19  produced?

20       MR. LEBOLD:  The password has been

21  produced to the trustee.

22       THE WITNESS:  So, none of the

23  information has been reviewed then?

24  BY MS. RENNE:

25    Q.   No.  Some of it, the ones that were

1  together?

2          A.   No.

3          Q.   So it was individually to each one?

4          A.   Correct.

5          Q.   Was it roughly around the same time?

6          A.   Yeah.

7          Q.   And was it roughly around the date of

8  March 1st?

9          A.   Yes.  It was before filing the

10 bankruptcy.

11         Q.   Okay.  So, and this bankruptcy was filed

12 May 8th, 2020; correct?

13         A.   I think, yeah.  I don't know.

14         Q.   So, but was your phone call with Joaquin

15 Beltran Vargas, was it on or about March 1st of 2020,

16 the date this document was signed?

17         A.   I don't remember the date, but it was

18 before filing the bankruptcy.

19         Q.   Okay.  And same question.  Do you recall

20 that this phone call took place on or about March 1st,

21 2020, with Mr. Aguayo?

22         A.   I don't remember the exact date, but it

23 was before the bankruptcy filing.

24         Q.   Well, if this document was filed

25 March 1st, 2020, you had talked with them already

1    court and to proceed with them.

2         Q.   And so, they were in agreement with this

3    and they signed this document?

4         A.   No.  I signed it with their

5    authorization.

6         Q.   Okay.  So they gave you their

7    authorization to sign for them?

8         A.   Correct.

9         Q.   Were Mr. Beltran and Mr. Aguayo, were

10   they involved in management of SPD during the time

11   frame of 1918 [sic] -- or to 2020?

12        A.   No.

13        Q.   Did you create reports for them?

14        A.   Well, we have at least one conversation

15   or two conversations every six months where I present

16   the upcoming games and the games that we have produced.

17   It was not like a special report.  It was more like a

18   presentation.

19        Q.   And did you tell them about all the

20   loans that you were taking out with the company?

21        A.   Yes.

22        Q.   So they knew about the loans?

23        A.   Yeah.  Actually they helped bring in

24   creditors as well.

25        Q.   Which creditors did Mr. Aguayo bring in,

1  please?

2          A.   No, they -- we couldn't close the deal

3  with any of the ones he brought, but he at least

4  presented four or five --

5          Q.   What about the same question for

6  Mr. Beltran Vargas, which creditors did he bring into

7  SPD?

8          A.   From the list that you have, none.

9  Because he brought one in -- wait, I think his was 2014

10 or '15, which has been paid already.  And I need a

11 minute to think if he brought one of the others.  No.

12         Q.   So you were responsible for bringing in

13 all the other individuals who lent or invested money

14 into SPD; correct?

15         A.   Correct.

16         Q.   And is it your testimony that they knew

17 about this bankruptcy prior to you filing it?

18         A.   Yes.

19         Q.   And that they agreed to this bankruptcy?

20         A.   Yes.

21         Q.   Do you have any emails related to that?

22         A.   I don't know.

23         Q.   Did you have any emails where they

24 actually gave you the authorization to sign for them?

25         A.   No.  It was by phone call.

1    Q.    And you don't recall what date that was?

2    A.    No.  It was March-something.

3    Q.    Is there a way you could look up the

4  date?  Can you get the records from AT&T?

5    A.    I can try.

6    Q.    That would have been on your old phone;

7  correct?

8    A.    No.  Actually I think it was in the new

9  line that I have right now.

10    Q.    I thought you said you lost your phone

11  in July of 2020?

12    A.    I did.  It was destroyed.  I didn't lost

13  it.  It was destroyed.  And I told you that I wasn't

14  able to pay and the AT&T line was disconnected at the

15  beginning of the year.  I keep that equipment, but now

16  it's not available.

17    Q.    Well, this was signed in March of 2020;

18  correct?

19    A.    Yeah.

20    Q.    And so the phone call would have taken

21  place prior to your signing March 1st; correct?

22    A.    No.  It was after.  We explained to

23  them -- well, I explained to them the date that we were

24  putting [sic] the document, but the phone call was

25  after March 1st.

1      Q.   And so, who prepared this document?

2      A.   I don't remember.  It was Phil or

3  Michael -- no, not Michael.  I think it was Phil.  I'm

4  not remembering 100 percent.  But it was one of the

5  people helping assisting.

6      Q.   When did you first decide to file

7  bankruptcy?

8      A.   It was when the COVID exploded and I

9  don't remember the date, but when we have to cancel two

10 games that we had prepared for March, that's when we

11 decide, the week after that.  That probably will be

12 February, late February.

13     Q.   That you decided to file bankruptcy?

14     A.   Correct.

15     Q.   And did you get this document on or

16 about March 1st?

17     A.   Can you repeat?

18     Q.   Did you get this document from

19 Mr. Livingston on or about March 1st?

20     A.   No.  After that.

21     Q.   Have you spoken with Mr. Beltran after

22 the filing of bankruptcy?

23     A.   Yes.

24     Q.   When was your first phone call after the

25 filing of bankruptcy May 8th?

1          A.    I don't remember the exact date, but it
2    was late May.
3          Q.    What was -- what was the conversation?
4          A.    That he was receiving phone calls of
5    creditors threatening him.  He wants to understand the
6    process, how we going with the bankruptcy, what are the
7    steps to follow, and basically that.
8          Q.    What did you tell him what were the
9    steps to bankruptcy?
10         A.    That we need to put together a lot of
11   documents, and there should be a hearing coming soon.
12   That's it.  And basically the procedures we need to
13   take.
14         Q.    Did you get any documents from
15   Mr. Beltran?
16         A.    No.
17         Q.    Did you ask him for documents, from
18   Mr. Beltran?
19         A.    No.
20         Q.    Does he have documents that are
21   responsive to this?
22         A.    I don't know.
23         Q.    What did you -- did you tell him that
24   the purpose of the bankruptcy was so that you could get
25   rid of the creditors?

1           A.    I never said I want to get rid of the

2   creditors.  That is not correct.

3           Q.    Well, what did you tell him about what

4   would happen during bankruptcy?

5           A.    I didn't say anything about it.

6           Q.    But you just said --

7           A.    I don't know what's going to happen.

8           Q.    Same question.  Did you have a phone

9   call with Mr. Aguayo after you filed bankruptcy?

10          A.    Yes.

11          Q.    How soon after filing?  Do you know?

12          A.    Probably a week, two weeks.

13          Q.    How many phone calls have you had with

14  him?

15          A.    Two or three, no more.

16          Q.    What were the purpose of the phone

17  calls?

18          A.    Basically the same situation as

19  Mr. Vargas, that he was receiving phone calls with a

20  lot of threats and a lot of uncomfortable situations.

21  And he -- at that point I can note that he was advised

22  with a lawyer, and he told me basically that he won't

23  be part of any documents or any situation, that the

24  lawyers is going to be involved from that point.

25          Q.    Have you had any recent -- other than

1          Q.    '19 or '20?

2          A.    No.

3          Q.    Okay.  Did you send Mr. Aguayo any

4    financial information from the years 2016 to 2020?

5          A.    No.

6          Q.    Did you make any payments to

7    Mr. Beltran?

8          A.    No.

9          Q.    Did you make any payments to Mr. Aguayo?

10         A.    No.

11         Q.    I want to show you -- has SPD filed

12    taxes for 2016?

13         A.    Yes.

14         Q.    So SPD has filed taxes for the year

15    2016?

16         A.    Correct.

17         Q.    Has SPD filed taxes for year 2017?

18         A.    Yes.

19         Q.    Has SPD filed taxes for the year 2018?

20         A.    I think we did.  I am not 100 percent

21    certain, but I am.

22         Q.    Has SPD filed taxes for 2019?

23         A.    No.

24         Q.    Why not?

25         A.    Because I don't have the money to pay

1  Jambrina, so they were not able to produce.

2         Q.   I want to show you now what I have

3  marked Exhibit 2I.  This was a record that has been

4  produced in this matter, and it's noted at the bottom

5  SPD BK 00131, as something filed in this case.

6              Can you tell me why this document

7  remains unsigned?

8         A.   No.

9         Q.   Are you aware that all of your tax

10 documents that were submitted in this bankruptcy case

11 are unsigned?

12        A.   No.

13        Q.   Who filed your taxes?

14        A.   Jambrina.

15             COURT REPORTER:  Is this document being

16 marked as an exhibit to this deposition?

17             MS. RENNE:  Yes.  This is going to be

18 marked as Exhibit No. 10 for purposes of the

19 deposition.

20             (Creditors' Exhibit 10 marked for

21 identification)

22 BY MS. RENNE:

23        Q.   If you will look at the very top of this

24 document, there is some small notations that says May

25 8th, 2020; correct?  Can you see that?

1          A.    Yes.

2          Q.    What is your understanding of what a K-1

3    is?

4          A.    A participation on each member.

5          Q.    And does that accurately reflect the

6    ownership interest in 2017?

7          A.    Yes.

8          Q.    When did Mr. Aguayo become a member?

9          A.    I think it was 2017 actually.

10          Q.    And you don't have any documents, any

11    corporate documents that show his becoming a member;

12    correct?

13          A.    No.

14          Q.    And you don't have any corporate

15    documents rescinding your membership interest and

16    giving it to Soccer Scouting International, do you?

17          A.    No.

18          Q.    And again, the date on this document,

19    which is part of the same tax return, is O5-08-2020 at

20    5:28 p.m.  Do you see that?

21          A.    Yes.

22          Q.    And now --

23          A.    I think that was the date everything was

24    filed.  I don't know, I could be wrong.  But I think

25    that day was the day everything was filed to the

1  members?

2          A.   You keep saying, did you.  Can you refer

3  to SPD, please?  Hello?  Hello?

4          Q.   Yes, you are cutting out for me.  I did

5  not hear your answer.

6          MS. RENNE:  Court reporter, can you

7  please read his answer back to me?

8          (Answer read back)

9  BY MS. RENNE:

10         Q.   Mr. Padilla, can you hear me?

11         A.   Yes.

12         MR. LIVINGSTON:  Ms. Renne, this is

13  Phillip Livingston again --

14 BY MS. RENNE:

15         Q.   Did SPD ever send --

16         MS. RENNE:  Yes?

17         MR. LIVINGSTON:  Yeah.  When you get to

18 a point where we can take a break, it's been like an

19 hour and a half.  If we can get -- you know, whenever

20 you get to point.

21         MS. RENNE:  Okay.

22         MR. LIVINGSTON:  Thank you.

23         MS. RENNE:  Okay.  Yes.

24 BY MS. RENNE:

25         Q.   So, Mr. Padilla, did SPD ever send these

1 K-1s to Mr. Beltran or Mr. Aguayo?

2          A.    I don't know.

3          Q.    How much money did Mr. Aguayo invest in

4 SPD?

5          A.    I think it was 100,000 and 10 --

6 $110,000.

7          Q.    And same question for Mr. Beltran.  How

8 much money did he invest?

9          A.    $125,000.

10          MS. RENNE:  I'm just going to have

11 marked now Exhibit No. 12, which would be Exhibit --

12 actually 2J on my list.

13          (Creditors' Exhibit 12 marked for

14 identification)

15 BY MS. RENNE:

16          Q.    I want to show you what has been

17 produced --

18          EXHIBIT CUSTODIAN:  2J what?

19          MS. RENNE:  Sorry.  Go down to 2J SPD, I

20 might have two 2Js.  I do.  The very next one down, the

21 cash flows for all years.

22 BY MS. RENNE:

23          Q.    So, this was another document that you

24 produced as being as part of your tax return, the

25 statement of cash flows, and in it I have highlighted

1  that he's listed as a negative 220.  Are you indicating

2  that he loaned SPD 220 on top of the 110 or this all

3  part and parcel?

4          A.   I don't know.

5          Q.   And then two down, you see loan from

6  third party, 3.4 millions dollars.  Is that just one

7  party or is that just a grouping of loans?

8          A.   I don't know.

9          Q.   What about this other loan liability,

10 1.959 million dollars, this other loan.  Is that from

11 one person or is that just some other lumping of loans

12 together?

13         A.   I don't know.  But my answer to both

14 it's going to be several lenders because no one put

15 that kind of money --

16         Q.   Okay.  And so, you don't know why it's

17 all just grouped together, do you?

18         A.   No, I don't.

19         Q.   Did you produce all of the documents

20 that support these figures to Jambrina?

21         A.   Yes, probably I did.

22         Q.   You didn't just give him the number, did

23 you?  You gave him the actual documents?

24         A.   Some of them, yeah.

25         Q.   Did you ever keep QuickBooks on your

1 draws?

2        A.    What do you mean?

3        Q.    Was she allowed to take draws from SPD?

4        A.    No.

5        Q.    Do you know why she's still listed as,

6 under financing activities, as getting 19 -- close to

7 20,000 in draws?

8        A.    Yeah.  Because my brother, we have a

9 loan from him in 20 -- can't remember the exact date.

10 I think it was 2015, again -- or 2016.

11        Q.    And has that loan document been

12 produced?

13        A.    No.  It's -- there is no document.

14        Q.    Did the other members know that you were

15 paying your ex-sister-in-law -- or SPD was paying the

16 ex-sister-in-law $20,000?

17        A.    I never paid her.

18        Q.    Well, it shows a draw.  So, there was no

19 cash that exchanged hands?  It was just --

20        A.    No, I never pay her.

21        Q.    Do you know why it's listed on this

22 document?

23        A.    No.  No, I really don't.

24        Q.    And did you get $13,522 in draws that

25 year?

1    A.    Yeah.  Probably some credit cards that
2  we used to pay, personal, of money that I put --
3  sometimes I need to lend money also.
4    Q.    And Soccer Scouting International, did
5  they receive 47,786 from SPD?
6    A.    I have to probably review, because I
7  stated in the previous hearing that we need to move
8  money from one company to another because of the
9  garnishments that you were having at that point.
10    Q.    Sir, is it your contention that you made
11  a loan of 113,000 to the company?
12    A.    Well, yeah.  Through the year, yeah.  I
13  put a lot of money there, my personal --
14    Q.    Was there any loan document drawn up for
15  that?
16    A.    No.  No, but for the records, I always
17  did that with a check or a wire transfer in the same
18  bank.  So everything is reflected in the bank
19  statements.
20    Q.    And same thing, startup costs.  How were
21  these startup costs, were there invoices, expenses,
22  reports that you could identify these startup costs?
23    A.    I don't know.
24    MS. RENNE:  I think now is probably a
25  good time to take a break.  If we want to do, what do

1          A.    No.

2          Q.    But you, sir, you got a draw in 2016 of

3   at least 13,000?

4          A.    Yes.

5          Q.    And Soccer Scouting International got a

6   draw of $47,786?

7               MR. LEBOLD:   Objection.   I think you

8   have your lines confused.

9               MS. RENNE:   Excuse me.   Thank you for

10  clearing that up.   Okay.   Let me rephrase the question.

11  BY MS. RENNE:

12         Q.    And Soccer Scouting International

13  received a draw of $43,210?

14         A.    I don't remember.

15         Q.    Why was Soccer Scouting International

16  getting a draw if they weren't even a member yet?

17         A.    I don't remember.   Because at that

18  point -- if I'm correct -- remembering correctly, I

19  don't -- we don't have bank account for Soccer Scouting

20  in 2016, so that's why I'm confused.   I honestly don't

21  know the answer.

22              MS. RENNE:   Okay.   I'll now have marked

23  as Exhibit No. 15, which is my 2L.

24              EXHIBIT CUSTODIAN:   2KA was 15.

25              MS. RENNE:   Let's see.   Yeah, okay.   Is

1        A.    No.

2        Q.    Why just his?

3        A.    Because of it.

4        Q.    Because what?

5        A.    There is no reason.  Because it happened

6   with him.  That's it.

7        Q.    Okay.  Now, I'm looking too at the notes

8   that were produced in the Dropbox, and then I'm looking

9   at this list.  And, for example, who's Cruz Palafox?

10  It's the fourth down, after Gutierrez, which is the

11  first one highlighted.  There's a loan to Lara, a loan

12  to Carrera, a loan to Cosecsa, and Palafox.

13       A.    I'm sorry.  I don't see it.  Oh,

14  Palafox.  It's Cruz Palafox, yeah, it's -- Cruz

15  Palafox, that's one you're asking?

16       Q.    Yeah.  Do you have that promissory note?

17       A.    No, I don't have it.  He has the

18  original.

19       Q.    Did you pay it off?

20       A.    Not yet.

21       Q.    And what about -- two below Martinez,

22  you have Ezequiel Ortuno?

23       A.    Correct.

24       Q.    Do you have that loan document?

25       A.    No.  There's no document with him.

1    Q.   So, they just lent SPD $35,000 with no

2  documentation?

3    A.   Yes.

4    Q.   What about this Factorway LLC?  Do you

5  have those documents?

6    A.   I did have.  I should have those

7  documents in my email --

8    Q.   Now, when --

9    A.   -- have been paid off.

10   Q.   Now, when Factorway -- that's a company;

11  correct?

12   A.   Correct.

13   Q.   When you borrowed money from them you

14  had to provide them with financial information, didn't

15  you?

16   A.   Did you hear me?

17        COURT REPORTER:  No.

18        MS. RENNE:  No, we didn't.

19        THE WITNESS:  I said, no.

20  BY MS. RENNE:

21   Q.   You didn't provide a company with any

22  financial information; they just lent you money,

23  $212,000?

24   A.   No.  We presented -- we present the

25  games that were coming, with the projection of each

1      Q.   What is it?

2      A.   A teaming agreement.

3      Q.   With whom?

4      A.   With Austin Bold, Circuit of The

5  Americas.

6      Q.   Okay.  This is dated February 14, 2020?

7      A.   Correct.

8      Q.   Now, you represent that Soccer Builders

9  Pro is doing business as SPD, a Texas LLC; isn't that

10  correct?

11      A.   Yes.

12      Q.   And you actually, right under witnesses,

13  you said, whereas SPD is organizing.  So, you were

14  representing that SPD was still doing business;

15  correct?

16           MR. LIVINGSTON:  I'm objecting to the

17  question, to the form of the question.

18           COURT REPORTER:  What was your answer?

19           THE WITNESS:  No answer.  I heard the

20  objection and I stopped talking.

21  BY MS. RENNE:

22      Q.   You used the SPD name for this contract,

23  didn't you?

24      A.   Yeah, but that is February.  You said

25  I'm still doing SPD right now, and I said, no.

1  the corner, and this was the wire instructions that you

2  provided; correct?

3          A.    Probably is.

4          Q.    And the 6700 Woodlands Parkway, Suite

5  230-234, that's the address of SPD, isn't it?

6          A.    And also Soccer Builders.

7          Q.    Okay.  So, they used the same address,

8  they used the same letterhead, apparently; correct?

9  And you're giving instructions, wire instructions;

10 correct?

11         A.    Correct.

12         Q.    That game didn't go forward, did it?

13         A.    No.  We have to cancel because of COVID.

14         Q.    Okay.  What game was that supposed to

15 be?

16         A.    Rayados versus Toluca.

17         Q.    So who is Quinn Branson?

18         A.    I don't know.

19         Q.    Who's Morgan Waggoner?

20         A.    I don't know.

21         Q.    Who is Tim Prukop, P-R-U-K-O-P?

22         A.    I think he's one of the members that

23 we -- Austin Bold.

24                (Creditors' Exhibit 22 marked for

25 identification)

1  BY MS. RENNE:

2          Q.   Okay.  Now I'll show you what's marked

3  as Exhibit 2S, and it's an email from

4  jcp.spd@gmail.com.  And that's your email; correct?

5          A.   Yes.

6          Q.   And this email was not produced by you.

7  However --

8          A.   Because the relationship isn't with

9  Soccer Builders.

10          Q.   He just fell off the screen so I can't

11  see the witness.

12          A.   I'm here.

13          Q.   You are using SPD -- SPD's email?

14          A.   No.  That's a personal email with an SPD

15  letter.  It's a Gmail.  It's not a corporate email at

16  all.

17          Q.   I asked you at the beginning of this

18  2004 Examination what was SPD's email and this is the

19  address you gave me.

20          A.   That's one I use for everything on SPD,

21  but it's a personal email.  It's not a corporate email.

22          Q.   What is your personal email address?

23          A.   That's the one.

24          Q.   Okay.  And you look down here to how you

25  sign it:  Kind regards, Juan Padilla, President, Sports

1 Pro Development, LLC.

2          A.    That's correct.

3          Q.    And you still maintain that it was not

4 SPD?

5          A.    Come on, Ms. Renne.  There's a signature

6 in the email, but anyway, you can go forward.

7          Q.    Now I will turn your attention to

8 Exhibit 2T, which will be Exhibit --

9               MS. RENNE:  We're having the first one,

10 the one I just showed you, marked as Exhibit 20, and

11 then this one will be 21, 2T will be 21.

12               EXHIBIT CUSTODIAN:  Correction.  2T is

13 23.

14               MS. RENNE:  Thank you.

15               (Creditors' Exhibit 23 marked for

16 identification)

17 BY MS. RENNE:

18          Q.    Again, this is from Tim Prukop to you,

19 and he's asking Juan Padilla at jcp.spd@gmail.com to

20 get the money back from the Rayados game that was

21 cancelled.  Do you remember getting this email.

22          A.    Yes.

23          Q.    Did you return the money?

24          A.    No.

25               MS. RENNE:  Exhibit 2A -- sorry, 2U.

1    BY MS. RENNE:

2            Q.   We ready?  Thank you.  Okay.  Again, is

3    your phone face-down?

4            A.   It is.

5            Q.   And are you using your computer?

6            A.   Yes.

7            Q.   And that's the MacBook; right?

8            A.   Yes.

9            Q.   Okay.  So, I'm just going to clean up

10   one or two things, and then I can move on to your

11   filing with the bankruptcy court.

12            With regards to the written consent,

13   Soccer Scouting was a 20 percent member; correct?

14            A.   Correct.

15            Q.   Okay.  And Mr. Beltran was a

16   67.5 percent member?

17            A.   Correct.

18            Q.   And Mr. Aguayo was a 12.5 percent

19   member?

20            A.   Yes.

21            Q.   Okay.  So in order to file this

22   bankruptcy, you had to have their written consent prior

23   to filing; correct?

24            A.   Yes.

25            Q.   Because they were 80 percent members and

1  you were just a -- Soccer Scouting was just a

2  20 percent; correct?

3          A.   Yes.

4          Q.   I had asked you about games in '14 and

5  games in '15.  And how many games did you have in '16?

6          A.   Four.

7          Q.   How many games in '17?

8          A.   I think there were 13.

9          Q.   Okay.  And how many in '18?

10         A.   Twenty-one.

11         Q.   How many in '19?

12         A.   In '19?  None.

13         Q.   How many in 2020?

14         A.   None.

15         Q.   Are you looking at something,

16  Mr. Padilla?

17         A.   Yes.  Actually the games I want to

18  confirm.  In 2016 were four; 2015, three; 2017 --

19  sorry, was 11 in 2017.

20         Q.   What document are you referring to?

21         A.   An Excel sheet that is already in the

22  Dropbox, as usual, but you haven't seen it.

23         Q.   Okay.  And what median are you looking

24  on?

25         A.   I'm sorry.  2018 that was correct, and

1  you filed in the bankruptcy court.

2                 Is Matthew on the screen?  Can you

3  share?

4                 EXHIBIT CUSTODIAN:  I'm here.  What

5  document?

6                 MS. RENNE:  Yes, it's actually 3,

7  Exhibit 3 assets.

8                 (Creditors' Exhibit 27 marked for

9  identification)

10 BY MS. RENNE:

11                Q.   Okay.  Do you remember seeing this

12 document?

13                A.   Probably.

14                Q.   So, if you look, right under the form it

15 says declaration under penalty of perjury for

16 nonindividual debtors.  Did I read that correctly?

17                A.   Yes.

18                Q.   And if you scroll down on this first

19 page it's got a signature, and it's dated May 22, 2020;

20 correct?

21                A.   It has my name, not my signature.

22                Q.   Prior to filing, did you review this

23 document?

24                A.   Probably I did.

25                Q.   Can you -- you aren't sure, though?

1          A.    Yes.

2          Q.    Is that correct?  And then when we drop

3    down a little bit, on 5-2 we see that you transferred

4    7,500 into your everyday checking account.  And that

5    money goes back to SPD Entertainment and SPD Builders.

6          A.    Uh-huh.

7          Q.    You have any agreement --

8          A.    I don't see it.

9          Q.    Okay.  If you look at the last three

10   entries, actually last four entries on this page, you

11   transferred to your personal account, a transfer to

12   Sports Pro Builders, a transfer of 10,000 to SPD

13   Entertainment, and a transfer to your Cash Wise Visa?

14         A.    Correct.

15         Q.    First, have you produced that Cash Wise

16   Visa?

17         A.    I think we did send the bank statements.

18   I'm not sure.  I'm not 100 percent sure, but I think I

19   asked that to the executive at Wells Fargo.  I don't

20   know if they produced it, but I think they did.

21         Q.    And were there written agreements for

22   the money to be transferred between these entities?

23         A.    No.  I explained that to you in the 341

24   hearing, that we need to move money when we have these

25   amounts at this time, we started having all the threats

1  of the garnishments and that stuff.  So, we moved it,

2  but it returned.

3          If you'd move forward a little bit more

4  or the month, the money returned from my account from

5  SPD Entertainment, or there were payments made from SPD

6  Entertainment or Soccer Builders for one of the game

7  providers like hotels, stadiums, et cetera.

8          Q.  And that was to get out from underneath

9  the garnishment of the Wells Fargo account?

10          A.  Yeah.  That's the reason we move it.

11          Q.  Okay.  Now, if you go down to page three

12  of this, you'll see an May 3, Fox Capital made a

13  payment into SPD's account.  And that same day

14  apparently a wire transfer was made to a Juan Olvera.

15  Is that one of the creditors?

16          A.  Yes.  Correct.

17          Q.  Do you know the very next entry, do you

18  know what that check is for, that 7,500?

19          A.  No.  No, I don't remember.

20          Q.  And then we see those payments, those

21  are the daily payments you're talking about; correct?

22  To Kalamata, Fox, Green, and TVT?

23          A.  Yes.

24          Q.  And then three days later, is that the

25  same Claudia Olvera -- oh, no.  Is this -- is the

1        Q.    Is that because they were paid off?

2        A.    They were paid, but not totally.

3        Q.    Okay.  And how much did SPD pay to

4  Cosecsa in the year 2019?

5        A.    I don't know what that number, but you

6  can find it in all the banks statements.  You will find

7  it.  All of them were wire transfers so you can

8  identify them very well.

9        Q.    And how long had SPD been doing business

10  with Cosecsa?

11       A.    Three years.

12       Q.    Three years.  Since about 2017?

13       A.    Correct.

14       Q.    And were there a series of documents for

15  these transfers?

16       A.    Yeah.

17       Q.    So you would have no reason to dispute

18  if SPD paid to Cosecsa over $3.2 million over the

19  course of about three years, two years?  I'm sorry.

20  Let me ask that question again.

21            Over the course of two years would you

22  dispute if Cosecsa was paid $3.2 million by --

23       A.    What do you mean by dispute?

24       Q.    If there are payments to Cosecsa out of

25  these accounts in the amount of over $3.2 million,

1  between June of 2017 and June of 2019, would you have

2  any reason to deny that?

3          A.   No.

4          Q.   I'm looking in the notes and I don't see

5  any records of any agreements with Cosecsa.

6          A.   Look at the final documents that we put

7  in the Dropbox.

8          Q.   I am.  So, who are the -- who are the

9  people behind Cosecsa, the key people that you

10  communicate with regularly?

11          A.   It's only one guy -- well, two guys.

12  Miguel Fernandez, with an F, and his assistant Victor

13  Ourrieta, O-U-R-R-I-E-T-A.

14          Q.   And so, if you were -- if SPD was still

15  making payments to Cosecsa as late as -- well, the

16  records stop, off the Wells Fargo account, in June of

17  2019.  Has SPD made any payments since June 2019 to

18  Consecsa?

19          A.   No.

20          Q.   Does SPD still owe money to Cosecsa?

21          A.   We have an agreement now.

22          Q.   That reduced to writing?

23          A.   No.

24          Q.   Who is your agreement with?

25          A.   With Miguel Fernandez.

1          A.    That the PO box that I mentioned that we

2    have for two months only.  If you look at the address,

3    that's the address that you asked me before.  I don't

4    know why they list it like that.  They probably thought

5    I owned that building or something.  I don't know.

6          Q.    Okay.  But just -- with Kalamata

7    Capital, did you sign that?

8          A.    No.  I didn't sign anything with TW

9    Office Suites.  I don't know what that is or where that

10   come from.

11         Q.    Okay.  And on page 37 you list the total

12   liabilities just a little over 17 million; is that

13   correct?

14         A.    Well, that's all the money that we have

15   raised through the whole years.  It's not the real

16   amount that SPD owes.

17         Q.    Do you know what the real amount that

18   SPD owes is?

19         A.    No.

20         Q.    So, how did you come about just listing

21   certain creditors?

22         A.    Because we put the documents, the

23   amounts that the lawsuits have, and I can put an

24   example if you allow me, because then you get mad at

25   me.  Can I put an example?  Okay.

1          Q.    I --

2          A.    -- Kalamena (phonetic) is claiming

3  $2.8 million, and the actual money that I received from

4  him, or SPD, was 1.7, which we have paid 1.5.  So, he's

5  demanding 2.8, I don't know from where, so that's

6  why -- and that example is only one for like, 25 or 30.

7  So, I really think the amounts that is really owed is

8  no more than 4 or 5 for him.

9          Q.    Okay.  And what are -- you're basing

10 that on the records that you produced?

11         A.    And the payments we have made.

12         Q.    And the payments are reflected in the

13 bank statements that you produced; correct?

14         A.    Correct.  And some of the funds were

15 made in cash.  Like, for example, to your client Rene

16 Etcharrent, he requested to have cash payments to avoid

17 tax payments.

18              MS. RENNE:  I am just objecting.  That

19 is nonresponsive.

20              THE WITNESS:  -- and like that, there

21 are 35 cases.

22              MS. RENNE:  So, moving back to number

23 35, and I'm going to object to the last part of his

24 answer as nonresponsive.

25

1  BY MS. RENNE:

2          Q.   Again, when we go through this we just

3  see movement between SPD Entertainment, Soccer Builders

4  plus to make payment for SPD, insufficient funds.  And

5  then on 5-14, this 35 -- if you go down to page four of

6  this, on 5-14 there are two e-deposits; one for 19,680

7  and one for 50,000.  Was that for cash?

8          A.   I can't recall that.  Probably the

9  19,000, yeah, that may be cash.  The 50,000, no, for

10 sure.

11         Q.   So that could be a payment from an

12 investor; correct?

13         A.   There were no investors.  They are

14 lenders.  They don't invest.  They are serious lenders.

15              MS. RENNE:  I'm just going to object to

16 the last part of the answer as nonresponsive.

17              THE WITNESS:  Why do you --

18 BY MS. RENNE:

19         Q.   You aren't a lawyer.  You are not a

20 lawyer, are you, Mr. Padilla?

21         A.   No, I know that I am not, but I'm not

22 allowed -- you are supposed to do your work and do

23 right, the things the right way.

24         Q.   Mr. Padilla, you wrote a number of those

25 agreements, didn't you?

1          A.   I did.

2          Q.   And you knew that as of 2019 that you

3    were going to contend that those notes were usurious

4    because you were already using that as a defense in

5    some of the cases; isn't that correct?

6          A.   Probably is.

7          Q.   And as of March 2019 some of the

8    lawsuits have been filed, and as of April 2019 some

9    answers have been filed to those lawsuits; correct?

10         A.   I think so.

11         Q.   And in all of those answers -- for

12   example, in the Etcharren case you've made a claim of

13   usury; correct?

14         A.   Probably.

15         Q.   In the -- in the Alfaro case you made a

16   claim of usury?

17         A.   I don't know.  Probably.

18         Q.   Camarena (phonetic) you've made a claim

19   of usury?

20         A.   I think we did.

21         Q.   Diaz you made a claim of usury?

22         A.   I think we did.

23         Q.   Tinker Road you claimed usury?

24         A.   I think we did.

25         Q.   Ruben Lara, claim of usury?

1          A.    Probably is.

2          Q.    Walter Chavarria claim of usury?

3          A.    Probably is.

4          Q.    Jose Covero (phonetic), claim of usury?

5     I don't need to -- is that a yes?

6          A.    Probably is.

7          Q.    And yet despite this, you've written

8     agreements since those dates with interest rates well

9     over 20 percent, haven't you?

10          A.    Yes.

11          Q.    And you did this knowing that that's

12    what you were going to try and claim as a defense in

13    the case, isn't it?

14          A.    Probably is.

15          Q.    Going back to our exhibit, what were the

16    dates of the games in 2019?

17          A.    May I look at the file in my computer?

18          Q.    You don't know which games were held in

19    2019?

20          A.    Yeah, I know, but I don't remember the

21    exact date.  But I know that we produced games in July

22    and in September.

23          Q.    Okay.  So you probably had more than one

24    in July and more than one in September?

25          A.    If I'm correct, we had three in July and

1  the one he sent to me to fill out.

2          Q.   And so, you -- so, the next one I

3  believe, again, it's from you to Adrian Garibay, which

4  is on page two.  And again, somewhere in your email you

5  have 14,992 emails.  And you outline how much you need

6  to deposit for each of these games; isn't that correct?

7          A.   Correct.

8          Q.   And again, there -- attachment's not

9  there, but it's Chase, so I guess SPD must have

10 deposited this amount; is that correct?

11         A.   Yes.

12         Q.   And these figures are pretty specific.

13 This 12,641, it's based upon financial documents; isn't

14 it?

15         A.   And it's ticket sales.

16         Q.   And so, where is this information now,

17 if you were able to extrapolate how much you owed?

18         A.   So, for every game we have to present a

19 closeout and you have to put the receipts of the

20 payment, the IG report, and the final sales report from

21 the State.  That's how you back up these amounts.

22         Q.   And I'm asking where are all those

23 reports that were sent to the United States Soccer

24 Federation for all of these games?

25         A.   In the email.  I mean, I -- as you were

1    asking at the beginning, I sent all of this as PDFs,

2    but I didn't know that you cannot open them.  So, I

3    need to send separately all those reports for each

4    game.  We can do that without a problem.

5          Q.    Yeah.  Because it's your contention that

6    these games in 2019 were not profitable; isn't that

7    right?  Didn't you submit a statement saying that?

8          A.    Correct.  They were not.

9          Q.    And in 2020 there weren't any games; is

10   that correct?

11         A.    Correct.

12         Q.    2018, three games, were they profitable?

13         A.    Some of them, yes.  We produced 21

14   games.  We have the first semester of 2018, was a good

15   year, and then the second semester was not.

16         Q.    Okay.  And when you were making

17   presentations to lenders or investors, whichever you

18   want to call them, were you telling them about this

19   decline in revenue?

20         A.    Yes.

21         Q.    You were?  And you were telling them

22   that you had already pledged some of the game proceeds

23   to other lenders or investors?

24         A.    No.

25         Q.    Why didn't you tell them that?

1          A.   They didn't ask.

2               MS. RENNE:  I'm going to look now, again

3    it's in 87 USSF International, and have this one

4    marked.

5               (Creditors' Exhibit 35 marked for

6    identification)

7    BY MS. RENNE:

8          Q.   Again, this is just more documents that

9    were not actually attached.  And it's discussing, you

10   know, payments made to the USSF, and it's all based

11   upon how many -- you know, the bond is based upon what

12   you anticipate you're going to make; correct?

13         A.   No.

14         Q.   What --

15         A.   This email shows the documentation you

16   need to get the game approval and the money that you

17   have to pay.  That it's -- every single game you have

18   to pay a deposit of a bond, referees' fee and

19   application fee.

20         Q.   And so, what was the bond based upon?

21         A.   They have a straight number 7,500.

22         Q.   Okay.  So, it's a flat rate?

23         A.   Yes.

24         Q.   Okay.  Are you current with the U.S.

25   Soccer Federation?

1          A.   You said a couple of questions, so it's

2    not a couple; right?

3               MR. HESS:  I'll pass the witness so that

4    some other people can also ask questions for the

5    moment.

6               THE WITNESS:  I have five minutes.  I'm

7    sorry, Ms. Renne, but if we can continue this on

8    another occasion, I'm open to doing it.  But for

9    respect, I have people waiting for me for the last 30

10   minutes.

11              MS. RENNE:  Well, with all due respect,

12   the court has ordered you to be here --

13              THE WITNESS:  -- that's why I'm asking

14   you the time frame.

15              MS. RENNE:  Okay.  I'm going to

16   introduce just one or two last exhibits next in order,

17   and I ask that Exhibit 82 Results be pulled up.

18              (Creditors' Exhibit 43 marked for

19   identification)

20              DIRECT EXAMINATION (Cont.)

21   BY MS. RENNE:

22         Q.   This appears to be a -- some sort of

23   summary from November 14, 2018.  Do you recognize this

24   document?

25         A.   Yes.  It was for a game in Albuquerque,

1   New Mexico.  It seems to be a settlement for a game

2   that we have in Albuquerque, New Mexico, but it's not

3   signed and that amount is not accurate.

4           Q.   Well, let me just go down then to the

5   next page, because this one is signed by you on

6   January 9th of 2019; correct?

7           A.   Correct.

8           Q.   And it shows net due to SPD Sports

9   $522,000?

10          A.   Correct.  But that wasn't -- later and

11  that was not the final, so they have mistake in their

12  system and we have to redo it.

13          Q.   Okay.  And did you produce the one that

14  was redone?

15          A.   No, but I have it.  I produced it to the

16  U.S. Federation, so I have it.

17          Q.   Okay.  Well, isn't it motivated --

18  aren't you -- wouldn't SPD be motivated to have a lower

19  amount to the U.S. Soccer Federation so that their

20  percentage is lower?

21          A.   It's not that I can -- they can call the

22  state at any time and compare the amounts.

23          Q.   Well, I'm looking at expenses of 33,000.

24  How far off are the expenses?

25          A.   Where was that?

1         Q.   Okay.  If you look on page two, the

2   expenses total expenses --

3         A.   Yes, that's one of the mistakes we have

4   in that settlement.

5         Q.   What's missing from there?

6         A.   I don't know.  I have to, I don't know,

7   remember by memory.

8         Q.   Okay.  What's wrong with any of the

9   revenue input?

10        A.   That they doubled it.  They put together

11  the consignment and the ticket sales in the ticket box

12  office.  So they double the amount and it was wrong.

13        Q.   Okay.  And you have that to produce?

14        A.   Yeah.  I can send it to you.

15        Q.   Let's go down to page three because now

16  we've got a Ticketon, I was able to find one Ticketon.

17  And the online sales are listed, box office sales are

18  listed, consignment stores --

19        A.   Yeah?

20        Q.   And it shows a net revenue of 390,000

21  for that game?

22        A.   I don't remember.  I don't see -- do you

23  have one that was signed?

24        Q.   I don't know if you've produced it or

25  not, but --

1      A.   No.   I think -- no, because that's a --
2  they produce that the day of the game, but then we have
3  to return the tickets that were not sold outside and
4  the amounts go down.
5      Q.   And where is that reflected?
6      A.   I have it -- I have to produced the one
7  that is -- normally the last one, so I can see the one
8  that I produced to the U.S. Soccer Federation and send
9  it to you without a problem.
10      Q.   Okay.   And, but you didn't go ahead and
11  redo it with Ticketon.   Ticketon didn't go ahead and
12  agree to redo it, didn't they?
13      A.   No, they -- as I said, they give me
14  these the day of the game.   So once the game is almost
15  done, I go to the box office and they give me these,
16  because it's like the preliminary settlement.   But then
17  we return the tickets that were not sold outside, so
18  obviously the amount goes down of revenue.
19      Q.   Well, tickets sold, that's -- they
20  wouldn't enter tickets that weren't sold in their
21  amount, and then take it back from you --
22      A.   Well, you see -- if you see there, it
23  says box office sales, online sales, and there is a
24  line that's consignment sales.   That are ones that we
25  need to wait like two weeks after we can pull all the

1  tickets that were outside selling in the different

2  outlets.  So we return it and instead of being 100,000,

3  it's probably 30.  And that game didn't -- didn't go

4  well in the consignment sales at all.

5          Q.    So, now let's go down to page four, and

6  I found an Event Settlement for Ecuador.  It appears to

7  be dated September 11, 2018.

8          A.    Correct.

9          Q.    -- gross ticket sales in the amount of

10  300 and some thousand, net ticket sales 274,000.

11  Again, expenses here for the game are listed at 49,000.

12          A.    Yeah.  But those are the expenses only

13  related with the stadium, not the total expenses on my

14  end.  So, this is a settlement with the stadium not a

15  settlement of the entire event.  Does that make sense?

16          Q.    Yeah.  Absolutely.  And so, the

17  settlement here with the stadium is -- is that, do you

18  owe 122,000 to the stadium or do they owe you 122,000?

19          A.    No.   They owe SPD that amount.  And it

20  says -- over there it says grand total due to promoter.

21          Q.    Here we have the Leon versus Toluca.

22  And again, we have the expenses and revenue, tickets

23  sold?

24          A.    I'm not seeing it.

25          Q.    Okay.  Sorry.  Go down to page five.  My

1    apologies.  I forgot to tell the handler.

2              A.   But that is not the settlement.  That is

3    an operation sheet.

4              Q.   So, that's operations?

5              A.   Yeah.  That is the form that we use to

6    project the events.  So, if you see the different

7    options or the different ticket sales amounts, and

8    that's what we can expect.

9              Q.   Okay.  And then over here in the -- over

10   here on the side, and it shows what's paid and hasn't

11   been paid; correct?

12             A.   Correct.

13             Q.   And it shows even after -- even if you

14   had paid the full amount of 353, it would be a profit

15   of 211; correct?

16             A.   If you sold 11,000 tickets.

17             COURT REPORTER:  He's froze.  It's

18   froze.

19             MS. RENNE:  I know.

20             MR. LIVINGSTON:  It looks like he's

21   back.

22   BY MS. RENNE:

23             Q.   Okay.  Where are the real numbers for

24   this then for the Leon versus Toluca game?

25             A.   Have them.

1      Q.   Go to page six and seven -- or rather

2   six first.  November 17th game 2018.  Are these numbers

3   accurate?

4              EXHIBIT CUSTODIAN:  We lost him.

5              MR. LIVINGSTON:  I think we lost him.

6              THE WITNESS:  It was disconnected.  Can

7   you hear me?

8              MS. RENNE:  Yes.

9              MR. LIVINGSTON:  You're back.

10  BY MS. RENNE:

11     Q.   So, on page six, are those numbers

12  accurate?

13     A.   All of these are predictions.

14     Q.   Okay.  Who put that together?

15     A.   I did.

16     Q.   What was the purpose of it?  Was it to

17  show investors?

18     A.   No.  I always produce this for my

19  control, for knowing how much we need to expect and how

20  much --

21     Q.   Okay.

22     A.   -- was the real revenue.

23     Q.   Where are the real numbers?

24     A.   I have them.  All of them I have.  I can

25  send it to you, the final numbers.

1            Q.   Why weren't they produced already?

2            A.   I don't know.

3            Q.   Okay.  Last page seven.  This appears to

4 be for November 17, 2018.  Are these the real numbers?

5            A.   No.  That's the settlement with the

6 stadium, again.  That is not real numbers for the

7 entire event.  And, yes, that's it.  What game was it?

8            Q.   The Tigres versus Pumas?

9            A.   Tigres versus Pumas, yes.

10          Q.   Okay.  And so, they owe you over

11 $41,000?

12          A.   Right.

13          Q.   And again, we can figure out the

14 expenses --

15          A.   These are only the expenses related with

16 the stadium.

17          Q.   And where were the other related to

18 everything --

19          A.   I have it in a file.  I have a file for

20 every single game that I send to Jambrina.  I explained

21 that to you before.

22          Q.   And that hasn't been produced yet;

23 correct?

24          A.   They should be.  Because I sent

25 everything to him and he sent everything he has.



EXHIBIT D

Page 1 of 3
Statement Period: February 01 - February 29, 2020



**Account Information & Customer Service**
1-(877) 968-7962



P.O. Box 7889 The Woodlands, TX 77387



Visit Us Online at www.woodforest.com

Like Us On   Follow Us on 

00000047 TW100T03012008171600 3 000000000  2097431158

SOCCER BUILDERS PRO LLC
** RETURNED MAIL

## Summary of Accounts

| ACCOUNT TYPE AND NUMBER | BALANCE FORWARD | TOTAL DEBITS | TOTAL CREDITS | CLOSING BALANCE |
|---|---|---|---|---|
| Business Simple Checking 1315010643 | 0.15 | 271,929.68 | 275,118.00 | 3,188.47 |

## Business Simple Checking 1315010643

### Transactions

| Date | Credits | Debits | Balance | Description |
|---|---|---|---|---|
| 02-02 | 68.00 | | 68.15 | Online Transfer Credit | OL XFER |
| 02-04 | | 32.00 | 36.15 | INSUFFICIENT ITEM FEE |
| 02-04 | | 32.00 | 4.15 | INSUFFICIENT ITEM FEE |
| 02-05 | 50.00 | | 54.15 | Online Transfer Credit | OL XFER |
| 02-07 | | 32.00 | 22.15 | INSUFFICIENT ITEM FEE |
| 02-18 | 275,000.00 | | 275,022.15 | TRF WT Fed#=20200218K3B75B1C0001 WIRE CR |
| 02-18 | | 35,000.00 | 240,022.15 | Online Transfer Debit | OL XFER |
| 02-18 | | 8,000.00 | 232,022.15 | CASH CK #Check |
| 02-18 | | 12,500.00 | 219,522.15 | CHECK |
| 02-18 | | 35,000.00 | 184,522.15 | CHECK 218 |
| 02-18 | | 30,000.00 | 154,522.15 | CHECK 219 |
| 02-18 | | 20.00 | 154,502.15 | TRF    0208004804 WIRE TRANS  FEE |
| 02-19 | | 366.67 | 154,135.48 | POS DB PAYPAL *REYESAL 4029357733 CA 000000000383148 |
| 02-19 | | 5,000.00 | 149,135.48 | POS DB PAYPAL *PUBLIOOSSDE 4029357733 CA 000000000382682 |
| 02-19 | | 10,000.00 | 139,135.48 | TRF WT Fed#= BNF=PHILLIP R. LIVI WIRE DB |
| 02-19 | | 20,000.00 | 119,135.48 | CHECK 238 |
| 02-19 | | 4,929.79 | 114,205.69 | ACH-ONLINE PMT 004939910127081 CAPITAL ONE |
| 02-19 | | 29,891.27 | 84,314.42 | ACH-ACH PMT Juan C Padilla AMEX EPAYMENT |
| 02-19 | | 50,000.00 | 34,314.42 | Check #234 |
| 02-19 | | 35.00 | 34,279.42 | TRF    0112095901 WIRE TRANS  FEE |
| 02-20 | | 15,000.00 | 19,279.42 | TRF WT Fed#= BNF=FRANCISCO DEL C WIRE DB |
| 02-20 | | 35.00 | 19,244.42 | TRF    0112221401 WIRE TRANS  FEE |
| 02-22 | | 3,750.00 | 15,494.42 | POS DB PAYPAL *CPROCTOR11 4029357733 CA 000000000190190 |
| 02-24 | | 10.00 | 15,484.42 | Return Mail Fee    RML FEE |
| 02-25 | | 1,000.00 | 14,484.42 | Check #239 |
| 02-26 | | 2,083.95 | 12,400.47 | POS DB EVI*L AUBERGE DU LAKE CHARLES LA 000000000698975 |
| 02-28 | | 9,000.00 | 3,400.47 | CASH CK #Check |
| 02-28 | | 200.00 | 3,200.47 | CHECK 240 |
| 02-29 | | 12.00 | 3,188.47 | MAINTENANCE FEE    SVC CH* |

| | Total for This Statement | Total for This Year |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Insufficient Items Fees | $96.00 | $224.00 |

**EXHIBIT**

**20**

## MEMBER FDIC ⌂ EQUAL HOUSING LENDER • AN EQUAL OPPORTUNITY EMPLOYER

## Business Simple Checking 1315010643

### Checks Cleared

| Date | Check No | Amount | Date | Check No | Amount | Date | Check No | Amount |
|------|----------|--------|------|----------|--------|------|----------|--------|
| 02-18 | Check | 8,000.00 | 02-18 | 218 | 35,000.00 | 02-19 | 238* | 20,000.00 |
| 02-18 | Check | 12,500.00 | 02-18 | 219 | 30,000.00 | 02-25 | 239 | 1,000.00 |
| 02-28 | Check | 9,000.00 | 02-19 | 234* | 50,000.00 | 02-28 | 240 | 200.00 |

* Denotes a break in check sequence                                9 Check(s) Paid for a Total of $165,700.00

### Account Summary

| | | | |
|---|---|---|---|
| Average Balance | $11,031.81 | Minimum Balance on 02/01/2020 | $0.15 |
| Average Collected Balance | $11,031.81 | Number of Days in Cycle | 29 |

### Daily Closing Balance Summary

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 02-01 | 0.15 | 02-18 | 154,502.15 | 02-25 | 14,484.42 |
| 02-02 | 68.15 | 02-19 | 34,279.42 | 02-26 | 12,400.47 |
| 02-04 | 4.15 | 02-20 | 19,244.42 | 02-28 | 3,200.47 |
| 02-05 | 54.15 | 02-22 | 15,494.42 | 02-29 | 3,188.47 |
| 02-07 | 22.15 | 02-24 | 15,484.42 | | |

### Account Item Images Total of 9



02/18/2020        Ck # 0        $8,000.00



02/18/2020        Ck # 0        $12,500.00



02/28/2020        Ck # 0        $9,000.00



02/18/2020        Ck # 218        $35,000.00



02/18/2020        Ck # 219        $30,000.00



02/19/2020        Ck # 234        $50,000.00



02/19/2020        Ck # 238        $20,000.00

02/25/2020        Ck # 239        $1,000.00

## Business Simple Checking 1315010643

### Account Item Images 9 (continued)



02/28/2020          Ck # 240          $200.00

---

## SIMPLE WAYS TO LOWER YOUR FEES

**Track your balance, deposits and spending habits carefully. Sign up for Daily Email Notifications.**
*We will send a daily message to your email account with transaction and balance information, including when you have overdrawn your account. There is no charge for this service.*

**Link a secondary account to your checking account.**
*When you overdraft your checking account, any available money will be automatically transferred first from your secondary account to avoid overdrawing your account. A sweep fee applies for each automatic transfer. Refer to the **Schedule of Fees** for complete details.*

**Consider opting-out of overdraft coverage for ATM and everyday debit card transactions.**
*ATM and everyday debit card transactions that would overdraw your account are declined and would not incur a fee. You can also request to opt-out of all overdraft coverage. **For complete details please speak with a Woodforest retail banker.***

---

### In Case Of Errors Or Questions About Your Electronic Transfers For Consumer Accounts Only

Telephone us at **877-968-7962** or write us at the address on the front of this statement as soon as possible, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you **no later than** 60 days after we sent you the FIRST statement on which the error or problem appeared.

- Tell us your name and account number.
- Describe the error transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you have use of the money during the time it takes us to complete our investigation.

### Billing Rights Summary
### In Case Of Errors Or Questions About Your Revolving Credit

If you think there is an error on your statement, write to us at Woodforest National Bank, ATTN: Loan Dept., PO Box 7889, The Woodlands, TX 77387-7889. In your letter, give us the following information:

- Account information: Your name and account number
- Dollar amount: The dollar amount of the suspected error.
- Description of the problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement. You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question. While we investigate whether or not there has been an error, the following are true:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

### In Case Of Errors Or Questions About Your Statement

Please examine this statement upon receipt and report any differences in writing to the bank. If no differences are reported in writing within 30 days, the account will be considered correct.

Please notify us in writing of your change of address.



### ACCOUNT RECONCILIATION

THIS IS PROVIDED TO HELP YOU BALANCE YOUR STATEMENT.

| | CHECKS OUTSTANDING | | |
|---|---|---|---|
| $ ___<br>YOUR BALANCE AS SHOWN ON THIS STATEMENT | NO. | AMOUNT | $ ___<br>CHECKBOOK BALANCE (AT STATEMENT DATE) |
| $ ___<br>ADD (+) DEPOSITS NOT SHOWN ON THIS STMT (IF ANY) | | | $ ___<br>SUBTRACT (-) ACTIVITY CHARGE (IF ANY) |
| $ ___<br>TOTAL | | | $ ___<br>SUB-TOTAL |
| $ ___<br>SUBTRACT (-) CHECKS OUTSTANDING (IF ANY) | | | $ ___<br>SUBTRACT (-) OTHER CHARGES (IF ANY) |
| $ ___<br>BALANCE | TOTAL | $ | $ ___<br>BALANCE |

† SHOULD AGREE WITH YOUR CHECKBOOK BALANCE †

EXHIBIT D

**Account Title:** SOCCER BUILDERS PRO LLC   **Account Number:** XXXX0643

**Current Available:** $288.52                    **Balance Date:** 3/18/2020 10:09:07 AM CST

Please note that pending transactions can post for a different amount than listed and may not include fees assessed today.

### Pending Transactions as of 3/18/2020 10:09:07 AM CST

There are no pending transactions at this time.

### Posted Transactions from 2/29/2020 to 3/18/2020

| Date | Code | Serial | Amount | Balance | Description |
|------|------|--------|--------|---------|-------------|
| 3/13/2020 | 935 | | -$783.95 | $288.52 | POS- EVI*L AUBERGE DU LAKE CHARLES LA 000000000703188 |
| 3/6/2020 | 706 | | -$700.00 | $1,072.47 | ONLINE TRANSFER DEBIT |
| 3/3/2020 | 935 | | -$1,416.00 | $1,772.47 | POS- WM SUPERCENTER # WOODLANDS TX 000000000775536 |
| 2/29/2020 | 76 | | -$12.00 | $3,188.47 | SERVICE CHARGE |



<u>**Wire Instructions**</u>

**Beneficiary/Company: SOCCER BUILDERS PRO LLC**

Account Number: **1315010643**

Routing Number/ABA: **113008465**

Address: 6700 Woodlands Parkway suite 230-234 The Woodlands TX 77382 USA

Phone Number: (832)800-55-44

Bank Name: **Woodforest National Bank**

Bank Address: 10555 Kuykendahl Rd The Woodlands Texas 77382

SWIFT CODE: WONAUS44

6700 Woodlands Parkway suite 230-234 The Woodlands,
Texas, 77382.

Phone (832) 589 60 24

EXHIBIT

21



**Mail** — ☐ ✕

**Concerns**

**JP**   **Juan Carlos Padilla <jcp.spd@gmail.com>**
2/26/2020 10:01 AM

To: Quinn Branson; Morgan Waggoner; Tim Prukop

Hello Quinn hope is well

I was exploring Ticketmaster and I have some concerns that I want to ask for your help to solve:

1. The image online is not correct, actually there is one like in the home page, and another once you get in the event to buy tickets, can you please let us know the specs to modify?, it is my concern that in the one that is on the part of buying tickets another team logos appear and that is not good, please help on this!!
2. You can not see the Map and zoom in on the actual tickets you are buying, I think you can do it every time, but I tried to do it and is not possible
3. I need to have the sales report daily please, can you set up that for me?
4. Finally, at what time can we pick up te tickets on Friday

Sorry to bother you with this but this are items very very important

Thank you and have a great day


--
Kind regards,

*Juan C. Padilla*
*President*
*832-589-6024*


**Sports Pro Development LLC**

EXHIBIT

22

exhibitsticker.com



# Texas Franchise Tax Public Information Report

Comptroller of Public Accounts FORM 05-102 (Rev.9-11/30)

■ Tcode 13196 Franchise

*To be filed by Corporations , Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

| ■ Taxpayer number | ■ Report year |
|---|---|
| 3 2 0 5 3 5 7 2 9 3 2 | 2 0 1 9 |

**You have certain rights** under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381or (512) 463-4600.

Taxpayer name **SOCCER SCOUTING INTERNATIONAL, LLC**

Mailing address **4008 GANDARA BND**

| City | State | ZIP Code | Plus 4 |
|---|---|---|---|
| AUSTIN | TX | 78738 | |

Secretary of State (SOS) file number or Comptroller file number **0801959279**

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office **4008 GANDARA BND AUSTIN, TX 78738 7151**

Principal place of business **4008 GANDARA BND AUSTIN, TX 78738 7151**

*Please sign below!* Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

3205357293219

**SECTION A** Name, title and mailing address of each officer, director or manager.

| Name **JUAN CARLOS PADILLA** | Title **MANAGER** | Director ● YES | Term expiration | m m d d y y |
|---|---|---|---|---|
| Mailing address **4008 GANDARA BND** | City **AUSTIN** | State **TX** | ZIP Code **78738** | |

| Name | Title | Director ○ YES | Term expiration | m m d d y y |
|---|---|---|---|---|
| Mailing address | City | State | ZIP Code | |

| Name | Title | Director ○ YES | Term expiration | m m d d y y |
|---|---|---|---|---|
| Mailing address | City | State | ZIP Code | |

**SECTION B** Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C** Enter the information required for each corporation or LLC, if any, that owns an interest of 10 percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|

Registered agent and registered office currently on file. *(see instructions if you need to make changes)* ○ Blacken circle if you need forms to change the registered agent or registered office information.

Agent: **JUAN CARLOS PADILLA**

| Office: **4008 GANDARA BEND AUSTIN** | City **AUSTIN** | State **TX** | ZIP Code **78738** |
|---|---|---|---|

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ **MAXIMILIANO JAMBRINA** | Title **Electronic** | Date **11-15-2019** | Area code and phone number **( 713 ) 574 - 2377** |
|---|---|---|---|

**Texas Comptroller Official Use Only**

| VE/DE ○ | PIR IND ○ |
|---|---|

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re** | § | **Case No. 20-32547** |
| | § | **Chapter 7** |
| **SPORTS PRO DEVELOPMENT, LLC,** | § | |
| | § | |
| **Debtor.** | § | |

## <u>DECLARATION OF CHRISTINE M. RENNE</u>

1. My name is Christine M. Renne. I am over the age of years (21) years, have never been convicted of a felony or crime of moral turpitude, have personal knowledge of the facts to which I testify and know of no facts or circumstances which would disqualify me from making an oath or giving an affidavit. I understand that I am making the declaration under penalty of perjury.

2. I am counsel for Creditors, Rene Etcharren, SM Monterrey, LLC and World Soccer Enterprises, LLC in the above-styled matter.

3. On November 17, 2020 this Court entered an Order awarding $6,370.38 in fees and expenses to the undersigned against Debtor and Juan Carlos Padilla, jointly and severally. (ECF 80) To date, Juan Carlos Padilla has not complied with this Order. No attempt has been made to contact me or address this matter. On December 10, 2020 counsel for Mr. Padilla represented in an email that his client had been informed of the Court's Order.

4. This Court also Ordered that Debtor comply with the Subpoena Duces Tecum that had been served. While some records were produced Debtor's representative testified to many documents that had been withheld and to which he had access. Aside from three boxes of random documents and unopened mail, the other information has not been produced as of the filing of this Declaration and was not produced in accordance with this Court's Order and prior to the 2004 Examination.

5. Attached to the Motion are the following and with the exception of the Exhibit mark are true and correct copies of:

**Exhibit D** – Are true and correct excerpts from the 2004 Examination in this matter that was not completed. Three of the many exhibits are attached to the excerpts.

**Exhibit E** – This is a true and correct copy of a Public Information Report record that were pulled from the Texas Secretary of State by and through SOS Direct Login.

**Exhibit G** – This is a true and correct copy of a letter I received from Debtor's Counsel that has been admitted into evidence with the Motion for Sanctions.

**Exhibit H** – This is a true and correct copy of a document that Padilla produced pursuant to the Subpoena duces tecum.

**Exhibit I** – These are true and correct copies of photos of the three boxes produced after the 2004 Examination despite this Court's Order to produce records before the examination. The records were in no order and contained many unopened envelopes.

**Exhibit J** – This is a true and correct copy of a bank statement Debtor's representative produced in this bankruptcy matter and shared through Dropbox in July of 2020.

**Exhibit K** – This is true and correct copy documents that I pulled from the Texas Secretary of State kept in the ordinary course of business and by and through SOS Direct Login.

**Exhibit L** - This is true and correct copy of a statement from Woodforest Bank that the Debtor produced in July of 2020 and shared through Dropbox.


6.    My name is Christine Michele Renne. My date of birth is May 12, 1964, and my office address is 808 W. Dallas Street, Suite F, Conroe, TX 77301; 832-764-8660. I hereby swear under penalty of perjury under the laws of the United States that the foregoing is true and correct and is based upon my personal knowledge. Today's date is February 19, 2021

FURTHER AFFIANT SAYETH NOT.

Christine M. Renne