**IN THE UNITED STATES BANKRUPTCY**
**COURT FOR THE SOUTHERN DISTRICT OF**
**TEXAS HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 20-32547** |
| | § | |
| **SPORTS PRO DEVELOPMENT, LLC,** | § | |
| | § | **CHAPTER 7** |
| **DEBTOR.** | § | |

## MOTION TO DISMISS BASED UPON DEBTOR'S FRAUD
**(Alternative Basis for Dismissal,**
**See also Motion to Dismiss for Lack of Subject Matter Jurisdiction,**
**ECF No. 81, Incorporated Herein by Reference)**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING. REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THERE WILL BE A HEARING ON THIS MOTION ON MARCH \_\_\_\_, 2021 AT _____ \_\_.M. IN COURTROOM #\_\_\_\_, 515 RUSK STREET, HOUSTON, TEXAS 77002 OR HELD ELECTRONICALLY IF SO ORDERED.**

TO THE HONORABLE EDUARDO V. RODRIGUEZ, UNITED STATES BANKRUPTCY

JUDGE:

Rene Etcharren ("Etcharren") and SM Monterrey, LLC and World Soccer Enterprises,

LLC (referred to as "SMM"), creditors and interested parties in the above-referenced Chapter 7

case, file this Motion to Dismiss due to the fraudulent actions of Debtor and its representative. In

support of this Motion, Etcharren and SMM state as follows:

## INTRODUCTION

Debtor, Sports Pro Development, LLC ("SPD"), filed bankruptcy on May 8, 2020. In support thereof, in July of 2020, Debtor's Representative, Padilla, submitted a Written Consent allegedly executed by the Members authorizing Padilla to file this Bankruptcy. (Exhibit A). However, the majority Members, Joaquin Beltran Vargas ("Beltran") and Tonatiuh Aguayo ("Aguayo"), never authorized the retention of counsel or the filing of this bankruptcy. (Exhibits B and C, respectively). Even if Debtor could get around the lack of authority, this bankruptcy action must be dismissed because Padilla, as manager and representative, knowingly and intentionally committed fraudulent acts prior to, in the filing of, and during this bankruptcy. As a result, this Court should dismiss this case based on fraud, Padilla playing so fast and loose (bad faith) with financial records and destruction of evidence that Debtor is not, as a matter of law, entitled to the protections of the Bankruptcy Code. The requirement of good faith is to prevent abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes, both of which has been done here.

## FACTUAL BACKGROUND

1.     As many Creditors listed in this Bankruptcy, Etcharren and SMM sued SPD and Padilla in state court for breach of contract, for fraud after Debtor failed to repay Promissory Notes made for the benefit of Debtor's business of promoting professional soccer games and for misappropriation, respectively. With respect to Etcharren, Padilla additionally knowingly wrote bad checks payable to Etcharren off the SPD account. These state court actions all related to Debtor's and Debtor's Representative, Padilla's, deceptive and fraudulent business practices.

2.     Contemptuous conduct relating primarily to failure to participate meaningfully in discovery and failure to produce documents pursuant to state court orders led to the issuance of

multiple Show Cause orders in state court in the Etcharren and SMM matters and Orders of Contempt. (ECF 61, Exhibit J).

3.    The day prior to one such Show Cause hearing, Debtor filed this Bankruptcy action, by and through Padilla, allegedly with the Written Consent of 80% of the Membership Interest. This filing was in bad faith and done fraudulently as the Members, Joaquin Beltran Vargas (67.5% ownership) and Tonatiuh Aguayo (12.5% ownership) did not give authorization and in fact, did not even know Padilla was going to file bankruptcy for SPD. (Exhibits B and C). (Exhibit D, 2004 Exam Excerpts, pg.108, lines 9-24). Soccer Scouting International, LLC is an entity wholly owned by Padilla. (Exhibit E, PIR of SOS.[1]).  Soccer Scouting did not sign the Written Consent.  (Ex. A).

4.    In addition to lacking authority, Debtor's May 8, 2020 initial bankruptcy filing was done without any supporting financial evidence required. (ECF 1). While Debtor did in July 2020 ultimately produce some documents in support of the bankruptcy, the documents produced were either fraudulent in the case of the Written Consent or evidence that Debtor played so fast and loose with corporate records that the Debtor is not entitled to avail itself of the protection of the Bankruptcy Code.  Examples of fast and loose documentation include:

a.  No signed Operating Agreement.  (Ex. D, 2004 Excerpts, Pg. 23, lines 17-19).
b.  No corporate books exist (Ex. D, 2004 Excerpts, Pg. 22, line 24-pg. 23, line 6) and no corporate documents listing Membership Interest. (Ex. D, 2004, Pg. 69, lns 8-17).
c.  Tax returns with no filing confirmation
   i.   No filed taxes for 2019 (Ex. D, 2004, Pg. 65, line 22- pg. 66, line 8).
   ii.  No knowledge of 2018 taxes being filed.  (Ex. D, Pg. 65, lines 19-21).  Creditor's efforts to acquire the same have been futile.
   iii. Unsupported Line Items in taxes.  (*e.g.,* Ex. D, Pg. 79, lines 20-23).
d.  K-1s never sent to alleged Members (Ex. B and Ex. C); (Ex. D., Pg. 73, line 25-pg. 74, line 2).

---

[1] In 2019, Padilla filed a Public Information Report with the State giving his address as Manager, Director and most importantly, Registered Agent, at 4008 Gandara Bend, Austin TX, despite having sold that house in 2015 some four years earlier.  Id.  While this may not be determinative of this dismissal, if is further evidence of the corporate shell games Padilla plays with not only the Courts but also the Secretary of State, ensuring that any official notifications will be significantly delayed or never reach their destination.

e.  There are a multitude of transfers to and from Debtor's bank account into accounts of companies owned by Padilla without documentation, including Soccer Builders Pro. Padilla testified at the 2004 Exam and in the Initial Meeting of Creditors that transfers were done to <u>avoid</u> the legal garnishment placed on Debtor's account. (Ex. D., Pg. 190, line 9- pg. 191, line 10 and Audio Recording of Mtg of Creditors).

f.  Unexplained cash deposits and withdrawals, which Padilla stated could not be accounted for because some payments were made in cash so that investors could avoid taxes potentially due and owing to the IRS. (Ex. D, Pg. 199, lines 9-17). Indeed, Padilla declared that he has done that in "35 cases." Id. at lines 20-21.[2]

g.  Padilla admitted that he is continuing this exact same business under Soccer Builders Pro ("SBP"). (Audio Rec. Init. Mtg. Cred. 6/29/2020); (Ex. D, Pg. 95, lns 8-11).

   i.  Documents show that Padilla was signing the Teaming Agreement in February of 2020 using the same address, letterhead, and signing emails as SPD (Ex. 21 and Ex. 22 to 2004 Exam attached to Ex. D; see also Ex. D, Pg. 101, lines 4-11), but diverting and depositing the money in the Soccer Builder's account. (Ex. 20 & Ex. 21 to Ex. D).

   ii.  Used SPD's email account, Jcp.spd@gmail.com, for Padilla's other businesses: (Ex. D, Pg. 45, lines 5-8); (Ex. D, Pg. 102, line 13-pg. 103, line 6), changes to state that SPD's email is his personal email and ran all business out of SPD's email.

h.  Unsigned corporate contracts/failure to maintain signed copies. (Ex. D, Pg. 89, line 21- pg. 90, line 3).

i.  Bank Statements with no supporting check records. (Ex. D, Pg. 30, line 24-pg. 31, line 12).

j.  Unsupported large "loans" from unidentified sources: (Ex. D, Pg. 75, lines 5-15).

   i.  Payments reflected on the balance sheet as payment for an undocumented loan and no explanation for why a payment to an individual appears in balance sheets. (Ex. D, Pg. 78, lines 3-23).

   ii.  Payments to Soccer Scouting International, owned by Padilla, before it was a Member. (Ex. D, Pg. 84, lines 12-21).

k.  Spoliation of evidence: After instruction by Trustee at Initial Mtg of Creditors and multiple requests at State Court level for the same, Padilla "lost" all emails, texts, audio recordings with Creditors in July of 2020 when his phone was "destroyed." (Ex. D, Pg. 19, line 11-pg. 20, line 1).

5.  Despite being the Debtor's Representative and admittedly the only one running the scheme for Debtor, Padilla attempted to "resign" as Debtor Representative during the course of this bankruptcy and left for Ecuador under the auspices of work for a soccer club that coincidentally immediately lost their financial records and is now seeking investors. (ECF 68-1 and 68-3).

---

[2] Mr. Etcharren and SMM cannot speak to other investors, but both categorically deny that this occurred.

6.      A Motion for Contempt, Show Cause and to Compel attendance and production of documents was filed and heard November 2, 2020 because of Padilla and counsel's failure to appear at the 2004 and produce subpoenaed records. (ECF 59 and 61). Upon Motion, this Court Ordered Debtor's Representative to appear at the 2004 Examination and ordered the production of documents.  (ECF 71).  As a result of their egregious behavior, this Court awarded sanctions for the failure to appear and failure to produce. (ECF 80). Debtor's Representative, individually, has wholly disregarded the Order to pay sanctions and it remains unpaid.  (Exhibit F, Decl. C. Renne). Further, although Padilla did produce some documents, after hours of questioning, Padilla admitted that the few select financial documents that were produced pursuant to the subpoena were not even accurate or complete.  (Ex. D, 2004 Excerpts, Pg. 248, line 22- pg. 249, line 16; pg. 250, lines 8-14; pg. 252, lines 5-20; pg. 253, lines 23-25; pg. 254, lines 11-25; pg. 255, lines 1-7; pg. 211, line 16-pg. 212, line 4 promising reports that were never produced; pg. 214, line 17-pg. 215, line 1). (Ex. D, Pg. 248, lines 6-10).  Padilla also testified that many financial documents remain unproduced and admitted that the attachments to the emails remained unproduced.  (Ex. D, Pg. 211, line 22- pg. 212, line 4).

7.      While Padilla produced bank statements showing that millions of dollars flowed through the account, sometimes in the millions of dollars a month, large sums cannot be traced. In addition, although Debtor allegedly engaged in hosting and promoting Internationally Friendly soccer games, Debtor cannot produce the finalized financial records of the games because the ones that were produced were not accurate according to Padilla. *Id.*  Debtor had an affirmative duty to create books and records accurately documenting its business affairs, which it failed to do. *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999). Indeed, based upon the significant money involved and sophistication of business entities and transactions, Debtor is held to an even

higher level of record keeping scrutiny than an ordinary debtor. *Id.* at 970. While the bankruptcy court may not expect flawless record keeping, there must be sufficient accurate information to, at a bare minimum, explain and account for SPD's extensive losses. See e.g., *Harrington v. Simmons (In re Simmons),* 513 B.R.161, 168-169 (C.D. Mass. 2014) (debtor's financial history must be traceable with complete accurate information showing what property has passed through debtor's hands; thus, failure to maintain records establishing clear picture is unjustifiable). The absence of such necessary records documenting Debtor's finances which Padilla alone managed is both shocking and disturbing. *Id.* at 171. *Id.* Creditors are not required to sift through such an impenetrable chaotic maze of transactions in an attempt to reconstruct the flow of Debtor's assets. *In re Scott*, 172 F.3d at 969-970; *Boroff v. Tully (In re Tully*), 818 F. 2d 106, 111 (1st Cir. 1987) (no such mythical requirement that creditors search through paperwork jungle in hope of finding overlooked needle in documentary haystack).

## ARUMENTS AND AUTHORITIES

### I.
### DISMISSAL IS WARRANTED DUE TO DEBTOR'S REPRESENTATIVE'S FRAUD, BAD FAITH AND/OR IMPROPER PURPOSE TO DELAY[3]

A Chapter 7 bankruptcy case may be dismissed under 11 USCS § 707(a) "for cause" when the case was filed in bad faith. *See e.g., Krueger v. Torres (In re Krueger*), 812 F.3d 365 (5th Cir. 2016), cert denied *Krueger v. Torres*, 137 S. Ct. 314, 196 L. Ed. 2d 229, 2016 U.S. LEXIS 6106 (U.S., Oct. 11, 2016). This is so because "[e]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution and confirmation of bankruptcy proceedings." *Id.*, 812 F.3d at 370 quoting *Little Creek Dev. Co. v. Commonwealth Mortg. Co. (In re Little Creek*), 779 F.2d 1068, 1071, 1072 (5th Cir. 1986) (good

---

[3] This Motion is filed in the Alternative to the Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF No. 81, filed March 1, 2021, which is incorporated by reference as if set forth fully herein.

faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons only available to those with "clean hands."). Additionally, courts have broad discretion in determining what is "cause" for dismissal under 11 U.S.C. § 707(a) and anything deemed an abuse of the bankruptcy process in the court's conscience is sufficient. *Krueger*, 812 F.3d at 370 quoting *In re Little Creek*, 779 F.2d at 1072. "This can include 'prepetition bad-faith conduct,' post-petition bad faith conduct, or petitions that simply serve no legitimate bankruptcy purpose." *Id.*, 812 F.3d at 370-371 (internal citations omitted). See also *Md. Port Admin. V. Premier Auto. Servs. (In re Premier Auto Servs.)*, 492 F.3d 274, 280 (4th Cir. 2007) (bad faith is shown where petition is filed to cause hardship or to delay creditors merely for the purpose of invoking automatic stay); *In re Boca Vill. Ass'n*, 422 B.R. 318, 327 (S.D. Fla. 2009) (bad faith of corporate Chapter 7 debtor provided cause for dismissal under §707(a) where debtor's officers orchestrated scheme to conceal assets, hid funds in account under another name, spent funds that should have been disbursed to creditor and created new entity for funds right before filing bankruptcy).

State court actions cannot be allowed to be "creatively refashioned" into a bankruptcy matter for the sole purpose of delay, as has been done here. See *In re Premier Auto Servs*, 492 F.3d at 285. Indeed, "a corporate Chapter 7 debtor does not have carte blanche to manipulate the provisions of the Bankruptcy Code to pursue goals contrary to the purpose and spirit of Chapter 7. When it appears under the totality of the circumstances that a 'debtor has taken advantage of the court's jurisdiction in a manner abhorrent to the purposes of Chapter 7,' a court can dismiss a Chapter 7 case for bad faith constituting cause under §707(a)." *In re Boca Vill. Ass'n*, 422 B.R. at 324 (internal citation omitted). Furthermore, dishonesty is indicative of bad faith. *Id.* at 326.

In judging whether there is cause to dismiss this instant action, this Court may properly consider the "totality of the circumstances" of Debtor's entire course of conduct by and through it's only actor Padilla -- before, during and after the filing of this Chapter 7 petition. *Krueger.* at 374. By so doing, the Court will fail to find the requisite honest and forthright invocation of the Bankruptcy Code's protections. *Id.* at 371-372. Indeed, the Court will find nothing but dishonesty, bad faith conduct, and abuse of the court process. As in *Krueger*, Padilla's actions here "formed a concerted scheme to use the bankruptcy process as both a shield from legitimate state court actions and a sword to retake control" of SPD's business through newly created entities leaving SPD's creditors cheated and emptyhanded. *Id.* at 374. Again, like in *Krueger*, the record is replete with evidence that Padilla filed bankruptcy for illegitimate purposes, misled the courts and other parties, engaged in contemptuous litigation practices and lied under oath. Like Krueger, Padilla also used false addresses, and what mail Padilla admits to receiving, Padilla just simply forwarded to counsel and then claimed to not have notice of certain court actions to avoid being served with legal process including show cause orders for contempt (despite speaking to counsel at least twice a week).   (Ex. D, Pg. 226, line 9-pg. 227, line 9).

The bankruptcy process is designed to grant "honest but unfortunate" Chapter 7 debtors a discharge of their debts in order to facilitate a financial fresh start. *In re Simmons*, 513 B.R. at 168 citing *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed. 2d 755 (1991); *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) ("discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor"). Such a "fresh start" is, however, limited by clear policy "to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or the reality of their affairs." *In re Tully*, 818 F.2d at 110. This is so due to the practical reality that debtors are the gatekeepers of their own documents and

information. Creditors are not required, as they have been in this instant case, "to engage in a laborious tug-of-war to drag the simple truth [out of the Debtor and] into the glare of daylight." *Id.*

Indeed, the bankruptcy code is designed to ensure that debtors put forward complete, truthful and reliable information to enable the parties in interest to make decisions based on fact rather than fiction. *Id.* When fiction is offered, as it has been by Padilla as Debtor's Representative here, the theme sounds of Sir Walter Scott's "[oh what a] tangled web we weave, when first we practice to deceive." Under such circumstances, the quest for bankruptcy protection is rightfully denied. *Id.* at 107 quoting W. Scott, Marmion, canto VI, st. 17 (1808) (holding debtor as principal with full knowledge of intricacies of business deal he put together committed fraud by failing to disclose significant assets in bankruptcy process).

Padilla was at all times the only person with full knowledge of all his business dealings for Debtor and all the other entities Padilla has used to divert SPD's revenues away from their rightful investors and lenders which led to countless state court actions. Padilla has used this bankruptcy proceeding for the sole illegitimate purpose of delaying all the state court claims against Debtor, Padilla and his other entities to give Padilla more time to reestablish his business in a foreign country using different entities "safe" from SPD's creditors' reach. Debtor's intentionally bad record keeping, intentional improper acts such as intentionally drafting void or illegal agreements (pre-petition conduct), inaccuracies in the initial filing documents, destruction of evidence, and Debtor's abuse of the discovery process has led to unreasonable delay in both bankruptcy and state court actions (post-petition conduct).  As a corporate debtor cannot get discharges for debts, there is no other purpose for this filing other than delay as the only asset listed in $162.85. Dismissal is clearly warranted as is more fully explained below.

### A. Debtor's Egregious Deficiencies in Records and Errors in Initial Filing

#### 1. Record Keeping So Deficient Financial Picture Cannot Be Ascertained

Padilla and SPD erroneously place the burden on its Creditors to speculate, organize and reconstruct Debtor's extensive financial affairs and transactions from boxes of random papers. *See e.g., In re Beaubouef,* 966 F.2d 174, 179 (5th Cir. 1992) ("Full disclosure of assets and liabilities in the schedules required to be filed by one seeking relief under Chapter 7 is essential, because the schedules 'serve the important purpose of ensuring that adequate information is available for the Trustee and creditors without need for investigation to determine whether the information provided is true.'"). Despite its attempt, Debtor's alleged insolvency cannot be used as an excuse to avoid its obligation to provide records to illuminate that financial condition. *Meridian Bank v. Alten,* 958 F.2d 1226, 1232, 1230 (3rd Cir. 1992) (Debtors cannot be allowed to withhold or conceal assets "under cover of a chaotic or incomplete set of books or records."). See also *In re Juzwiak*, 89 F.3d at 428 (holding disorder and nature of furnished ledgers, checks, statements and tax return, which although voluminous did not reflect the sources of debtor's funds, did not allow for meaningful tracking of debtor's dealings with any degree of completeness or accuracy); *Vetri v. Meadowbrook Mall Company*, 174 B.R. 143 (M.D. Fla. 1994)(bank statements, canceled checks and deposit slips showing significant deposits and withdrawals but neither identifying source of funds nor use of monies withdrawn held inadequate to show debtor's financial condition and justified denial of bankruptcy protection). Furthermore, a debtor's unsubstantiated oral testimony regarding the source of its funds deposited or the details of certain transactions is not a valid substitute for concrete written records. *In re Juzwiak*, 89 F.3d at 430.

The lack of any corporate books and records, unsigned documents, and disregard for following any protocol *vis a vis* corporate structure is just the proverbial tip of the iceberg of the

procedural and financial "irregularities" with this Debtor requiring dismissal. This Court should note at the outset that there is little if any financial accountability for 2019 and the first half of 2020. As is set forth in detail above and in the Motion to Compel (ECF 61), the significant withdrawals, deposits and checks cannot be identified. Debtor's representative could not state with certainty the source of $3.4 million dollar entry on a tax return (Ex. D, Pg. 75, lines 5-8), could not identify the source of edeposits other than to say that if it was under $40,000, it was cash from an unidentified sponsor or vendor and probably a check if it was over that amount, although the records clearly show that the source is frequently not identified. (Ex. D, Pg. 181, line 11- pg. 182, line 3; Pg. 184, line 10-pg. 185, line 6; Pg. 200, lines 2-10). While Debtor contends that a spreadsheet exists identifying each check, the only document that provides any information is a Quickbook entry that input certain names next to certain check; however, many entries remain blank. In addition, given the lack of candor of debtor's representative and the repeated unanswered promise to pay and defaults, Creditors are justifiably loathe to rely upon the word of Padilla or the accuracy of a self-serving entry. Simply put, Creditors are left to try and piecemeal the financials of this company and reconstruct the business dealings of this Debtor. This bankruptcy was a sham to buy time, stop the state court actions, deter creditors, and to shift the operations to running under a different name, which amounts to bad faith. Debtor now seeks to use the excuse of poor record keeping rather than the reality that Debtor intentionally played fast and loose with financial record reporting to avoid paying true creditors.

## 2. Bad Faith in Debtor's Initial Filing

When a debtor testifies his Chapter 7 information is false, denial of discharge is appropriate. See e.g., *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380 (5th Cir. 2001) (affirming denial of discharge where debtor testified in deposition some information in his Chapter

7 schedules and statements were false). In its initial filing, Debtor under oath claims over $17,000,000 in debts accrued, although during 2004 questioning Debtor's representative admitted that the $17 million figure is <u>not the "real"</u> number and that he does not even know what the real number <u>is</u>. (ECF 7; Ex. D, Pg. 198, lines 11-19). Creditors do not know and cannot ascertain this real number because the few financial game "summaries" that were produced, according to Debtor's Representative, are not the "right" numbers because the documents had to be "recalculated" for some unarticulated error and were not produced despite the subpoena. (*i.e.,* Ex. H, Settlement for Nov. 14, 2018 Game signed by both parties showing $522,894.42 due to SPD; see also Ex. D, Pg. 248, line 22- pg. 249, line 16). Thus, despite the signed records establishing that for one game alone $522,894.42 was due to SPD, and despite SPD's statement of expenses being far less, Padilla dismisses the records as not being accurate, although the inaccuracies are not known. Padilla expects this Court and the Creditors to just blindly adopt that SPD "lost" $17 million in the course of part of the second half of 2018 and the four games in 2019.[4] There were no records submitted for 2019. Debtor must satisfactorily explain its losses, which it has failed to do. "Vague and indefinite explanation of losses that are based upon estimates uncorroborated by documentation are unsatisfactory." *Meridian Bank,* 958 F.2d at 1233.

Equally deplorable is Debtor's complete disregard for the seriousness of his offenses and haphazard entries on Debtor's initial filings. Despite claiming in the initial filing under oath to owing a creditor, Tinker Road, $350,000, Debtor testified under oath at the 2004 that the Creditor

---

[4] Padilla admits that in 2020 there were no games, which he attributes to COVID. Padilla admits that only four games were held in 2019 for which he has little to no explanation other than it was by "agreement." What we do know now is that one of the Clubs Santos, despite SPD not listing them as a creditor, filed a Proof of Claim with this Court because SPD failed to make payment to the soccer team. Attached to proofs of claim are invoices for 2019, thus indicating that the real reason the games did not go forward was because Debtor had not made payments for games. If he was not paying the teams, those amounts he lists as expenses for the games cannot be accepted as true expenses because they were not paid.

was really only owed $140,000-$150,000 because undocumented payments had been made. (Ex. D, Pg. 173, line 25-pg. 174, line 3). Again, Debtor's defense was to blame his counsel for the filing although admitting to dismissively reviewing the same. (Ex. D, Pg. 111, lines 11-24). Of course, we remind the Court that Debtor only retained Counsel "a la carte" to file the bankruptcy, but not to attend the 2004 or respond to motions, thus, demonstrating his sole intent to delay state court actions and to deter creditors from pursuing their claims, rather than any good faith right to bankruptcy protection. (Exhibit G and ECF 61, Ex. A to Motion to Compel).

Equally egregious is that in an attempt to excuse Debtor's lack of accurate figures, Debtor claims that many of these creditors have been paid sums that are not reflected in the financials because on at least 35 occasions, Debtor made large cash payments so that creditors could avoid a taxable event. (Ex. D, Pg. 199, lines 14-21). This begets the obvious conclusion that blaming the victim and participating in a scheme to defraud the IRS is not an acceptable defense and amounts to unclean hands justifying dismissal of this bankruptcy case.[5]

All of this alleged SPD debt was accrued through the acquisition of cash from unsuspecting investors, enticed to invest and/or loan money after Debtor showed projections of profits based on prior games, and secured with promissory notes for payment by Debtor and its representative, the payment of which was never received. Of course, while fraudulently enticing creditors with proceeds from the games which he claimed were successful, the tax records (which may or may not have been filed) show unsubstantiated escalating losses in the millions every year. This deception has resulted in over 15 different state court cases for which Debtor now as part of a plan seeks to, at the very least, dissuade creditors from pursuing. (Ex. D, Pg. 258, lines 2-19, admitting that he told an investor for Soccer Builders Pro that he had a plan to rid SPD of the debt; Ex. D,

---

[5] Creditors Etcharren and SMM vehemently deny these allegations.

Pg. 95, lines 8-11, 22-25 and Pg. 101, lines 4-11 admits that he is engaging in the same scheme under a different name (although uses the two interchangeably); Ex. D, Pg. 102, line 13-pg. 103, line 6 – same email, signed it as President of SPD despite having the money wired to SBP).

**B. Examples of Debtor's Bad Faith Pre-Petition Conduct**

Padilla also admitted under oath that he drafted Promissory Notes which he intentionally made unenforceable by using an inflated interest rate so that when a creditor attempted to enforce the agreement, he would have a defense of usury and even perhaps the ability to assert a counterclaim. (Ex. D, Pg. 200, line 24-pg. 202, Line 14). Padilla, despite knowing the usury laws, has been wasting corporate assets allegedly by making interest payments only on contracts calling for interest rates of 25%. (Ex. D, Pg. 131, lines 9-24); (Ex. D, Pg. 117, line 25-pg. 119, line 4). One loan had an interest rate of 36%. (Ex. D, Pg. 143, lines 11-20). At the relevant times, Padilla was represented by counsel. Again, this type of conduct evidences the fraud and bad faith actions of Debtor and should not garner the protections of the Bankruptcy Code.

Debtor cavalierly admits that Debtor signed contracts and/or addendums with Creditors that "probably says" that they would cover the debts with the proceeds of future receipts, but then did not turn over the receipts. (Ex. D, Pg. 122, lines 11-18). Debtor could not be certain what he promised in the agreements to lenders. In addition, Debtor signed confessions of judgment and did not tell the other investors or lenders that the confessions of judgment had been signed. (Ex. D, Pg. 122, line 19- pg. 123, line 4).

Debtor also admitted to entering into settlement agreements when it knew Debtor did not have the money to make the payments. (Ex. D, Pg. 135, line 5-8). Debtor "assumed" that when games resumed, Debtor would make payments despite promising these amounts many times over and not even tracking how many times he has promised the proceeds. (Ex. D, Pg. 135, line 8- pg.

136, line 10).  To re-emphasize the number of times these same proceeds were promised: 1) Debtor admitted that proceeds were promised contractually (see above, Pg. 122-123), 2) Debtor settled pre-petition with certain creditors alleging that proceeds from games would be used to finance the settlement; 3) Debtor admitted under oath that he has since "settled" with many Creditors in this bankruptcy promising them payments from future games but not reducing it to writing (Ex. D, Pg. 140, line 15-pg. 141, line 6), 4) Debtor is using Soccer Builders and/or Cosecsa to entice other investors and promising payment from proceeds of future games, which will also be the games in which the proceeds were promised to creditors in this case.  Given that Debtor now claims that the games did not generate enough of a profit to pay back the first investors and/or were not profitable, it is an impossibility that the next series of games will engender such profits that all these past creditors can be repaid, thus, establishing that Padilla is intentionally making false promises. When asked if he had disclosed that the proceeds were already promised, Padilla stated smugly that he did not disclose that he had previously promised the game proceeds to others, because "they didn't ask."  (Ex. D, Pg. 212, line 21-pg. 213, line 1).

### C. Other Bad Faith Acts Pre and Post-Petition Requiring Dismissal of this Action

In addition to the above-listed bad acts, other acts and deficiencies include:

Pre-Petition Bad Faith Additional Examples:

One entry showed that Padilla wired $65,000 to his bank account in Mexico. In the 2004 Examination, Padilla alleged that it was to repay a lender, but admitted that he has produced nothing that can link the payment from Debtor to his personal bank account to any payment to a creditor, although he then tries to deflect this by saying that he will try and acquire the records in an effort to buy more time.  (Ex. D, Pg. 218, line 25- pg. 219, line 14).

Padilla admits that in February of 2019, he gave checks to Mr. Etcharren because it was the only way he would do the deal. (Ex. D, Pg. 235, lines 4-9).  And that as Debtor's representative, he transferred the money out of Debtor's account and into Soccer Builders Pro "probably" so that the checks could not be honored.  (Ex. D, Pg. 235, lines 20-24).

Padilla's admitted purpose in many of the transfers between accounts was to purposefully avoid the garnishment placed on the Wells Fargo Account. (Ex. D, Pg. 190, line 21-pg. 191, line 10).

Padilla admits to renegotiating contract terms and amounts orally and there are no records of what is really owed. (Ex. D, Pg. 125, line 1- pg. 126, line 8 in reference to representation to Court in the bankruptcy filings that $66,400 is owed, Padilla testified that $66,400 is not what was lent based on a phone call agreement).

Debtor admits to making payments to an entity named Cosecsa. In fact, the amounts could be as high as $3.2 million in payments through June of 2019 when the records end. (Ex. D, Pg. 193, line 24-pg. 194, lines 7 and 20-23). While Padilla claims it was for a loan, Debtor has not produced any loan agreement and admits that the agreement was not reduced to writing. (Ex. D, Pg. 194, lines 22-23). Padilla has admitted that he is affiliated with Cosecsa to produce the games. (Ex. D, Pg. 168, lines 7-19).

Padilla admits to payments made to creditors in past nine months, but Padilla does not know the amount or out of what account. (Ex. D, Pg. 129, line 25-pg. 130, line 9). If Padilla cannot track these amounts, Creditors can certainly not.

Let us not forget that Padilla has admitted to writing usurious contracts intentionally to avoid payment. (Ex. D, Pg. 200, line 24-pg. 202, line 14).

Additional Post-Petition Bad Faith Additional Examples:

Padilla testified that he has been negotiating settlements directly with all creditors, except Etcharren and SMM. (Ex. D, Pg. 128, line 20 – pg. 129, line 11 and referencing a text with a creditor that remains unproduced). As stated above, he testified that he has oral agreements with all these creditors that when COVID is gone, he will renegotiate and start paying from the proceeds of future games. (Ex. D, Pg. 140, line 15-pg. 141, line 9).

Under oath, Padilla stated that the interest rates are not what they are and stated that the promissory note with Mr. Etcharren is 20% every two months, when in fact the document clearly states that it is only 9%. (Ex. D, Pg. 142, line 15-pg. 143, line 2).

Under oath, Padilla submitted that SPD owes Tinker Road $350,000, but in reality, Debtor admitted that the amount owed is closer to $140,000-150,000. (Ex. D, pg. 173, line 25-pg. 174, line 3).

As the law clearly provides, the bankruptcy process is designed to facilitate a financial fresh start for "honest but unfortunate" Chapter 7 debtors. The evidence is clear that such a debtor is not present in this instant case. Thus, Creditors ask this Court to enforce the inherent policy of the Bankruptcy Code "'to make certain that those who seek the shelter of the Bankruptcy Code do

not play fast and loose with their assets or the reality of their affairs.'" *In re Tully*, 818 F.2d at 110. Debtor has done both and more and is therefore not entitled to benefit from the bankruptcy process.

### D. Abuse of the Discovery Process by Debtor's Representative

Fraudulent intent may be established by circumstantial evidence or by inference drawn from a course of conduct. *Hatton v. Spencer (In re Hatton),* 204 B.R. 477, 484 (E.D. Virg. 1977). A pattern of concealment and nondisclosure permits an inference of fraud. *Id.* Additionally, a reckless indifference to the truth constitutes the functional equivalent of fraud. *Id.* Thus, a debtor's "extremely casual attitude towards the bankruptcy act's disclosure requirements indicates a 'reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering' which is the functional equivalent of fraud." *Id.* Furthermore, while any single error or omission may be the result of an innocent mistake, "[w]ith multiple inaccuracies, however, 'the cumulative effect of all the falsehoods together evidences a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required.'" *Id.*

As explained above, the cavalier indifference to truth and lack of full disclosure of Debtor's Representative with regard to its pre-petition conduct and actions in bankruptcy court clearly establish fraudulent intent justifying dismissal of this action. However, there is additional egregious conduct demonstrating the laborious and muddy "tug of war" Debtor has drug its Creditors through in their quest to simply discover the truth, which is summarized below. (This Court should also look at the record of show cause orders in both state court and this bankruptcy that have been wholly disregarded. see also ECF 61, Ex. J May 2020 Show Cause Order State Court for violating February 25, 2020 Order.)

> May 8, 2020 –    Bankruptcy Filed (ECF 1)
> June 29, 2020 -   Cont'd Mtg of Creditors – Irregularities noted on Filings

| | |
|---|---|
| July 5, 2020 – | Select Documents produced per Trustee's order at Creditor's Meeting |
| Aug. 14, 2020 – | Notice of 2004 and **Subpoena Duces Tecum** (ECF 25 and 26). SDT required because of irregularities and deficiencies in production. |
| Aug. 31, 2020 – | Creditors are informed that Debtor's Counsel was "not retained" to attend the 2004 and would not attend. (Exh. G and ECF 61, Ex. A) |
| Sept. 11, 2020 – | Date reset for 2004 Examination because Padilla's *personal* counsel declared he is unavailable. Creditors cooperate and reschedule but state documents must still be produced (ECF 38) |
| Sept. 14, 2020 – | Debtor failed to produce Documents pursuant to SDT (ECF26). Debtor's counsel sent a self-serving email saying "documents" were in Dropbox, but then had to admit that no new documents had been placed in dropbox other than July's deficient production. (ECF 61, Ex. F). |
| Oct. 1, 2020 - | Debtor's counsel sent another email referencing his "a la carte" representation to file the bankruptcy. |
| Oct. 2, 2020 – | DEBTOR'S REPRESENTATIVE WHOLLY FAILED TO APPEAR AT 2004. No counsel appears. Creditor's counsel called Debtor Representative's personal counsel while on the record, but no response was ever received. See Certificate of Non-Appearance (ECF 61, Ex I). |
| Oct. 22, 2020 | Motion for Contempt, Sanctions and to Compel Attendance and production was filed with this Court. (ECF 61) |
| Nov. 2, 2020 | Hearing on Motion for Contempt and Sanctions. (ECF 64;related 61) |
| Nov. 2, 2020 | Court Ordered Debtor's Representative to Appear, Debtor's counsel to appear, and Ordered the Production of Documents. (ECF 71) |
| Nov. 9, 2020 | Debtor did provide a supplemental production that had to be reviewed in preparation of the 2004. |
| Nov. 16, 2020 | Court Ordered 2004: After several hours, Padilla testified that the few financial documents provided showing revenue and expenses for a handful of games was not accurate or final. For example, Ex. H, Settlement for Nov. 11, 2018 Game showing $522,000 to SPD; see also Ex. D, Pg. 248, line 22- pg. 249 lines 16. In addition, <u>PDF emails were produced but without any attachments which Padilla contended contained the other financial records.</u> These have not been produced. Padilla also testified he had three boxes of documents at his house that had not been produced despite this Court's Order and despite state court orders dating back to 2/25/20 for their production no later than 3/20/20. Padilla asked for an additional two weeks to provide the documents. |
| Nov. 17, 2020 | Court Orders Sanctions against Debtor's Representative and Debtor jointly and severally. (ECF 81). This Order has not been complied with and amount remains due and owing. (Ex. F) |
| Dec. 18. 2020 | Three boxes were made available to Counsel. The boxes were in no order, not labeled or bates numbered, contained random pieces of paper, most material was from 2016/2017, check ledger was from 2014, large volumes of unopened mail and no meaningful accounting records of invoices or "files." (Ex. I, photos of boxes & examples of documents). |

Debtor has made two productions to this Court, one in July and one as ordered in November 2020 pursuant to a valid subpoena. Of the July documents, the tax returns had no indicia of filing (except for 2015), dated by the accountant woefully past IRS deadlines, by admission never in compliance with sending K-1s to members, unsupported by documents and only supported by self-serving statements of the representative.[6] Debtor's bank records end in October of 2019 for Wells Fargo bank and only two statements from Prosperity Bank were provided to establish the $162.85 in assets. The WFB records are replete with sizeable transactions between Debtor's account and SBP's account with the primary explanation being that it was done to avoid legal garnishment. (Exhibit J, Example of WFB statements.) Of course, at the same time that Debtor's bank records stop, Debtor Representative's other entity, Soccer Builder's Pro (a defunct entity with the Texas Secretary of State) commences the exact same operation receiving cash from investors to host the same International Friendly games. (Exhibit K, SBP Forfeiture and Exhibit L, Woodforest Bank Statement Oct. 2019). While the purpose of a 2004 Examination is to provide explanation of the irregularities, including but not limited to large transactions between Padilla's entities, large deposits and withdrawals without account, and lack of check images, this 2004 instead just compounded the irregularities and frustrated the purpose by allowing hours of questions to proceed while knowingly producing allegedly inaccurate and not final financial documents. This amounted to just another delay tactic with the intended purpose of requiring Creditors to throw good money after bad on wasted legal fees. Debtor's Representative and personal counsel should be held accountable for this mountain of evasiveness, which should not be tolerated by any Court.

---

[6] Debtor did sign a release for copies of tax returns but provided the right to online copies (Form 8821) to Lebold, his bankruptcy counsel. Copies had to be requested via USPS and there is no turn-around time listed. Counsel is working with Lebold to get copies, but Mr. Lebold was unable to do so.

### E. Debtor Intends to Keep Running This Fraudulent Operation

Before this bankruptcy was filed, Debtor's Representative was filtering funds through Soccer Builders Pro, a forfeited Texas entity in which he was the sole member, and improperly using it as d/b/a of sorts for Debtor. However, he continued to use SPD letterhead, signed by SPD, used SPD's address and email. At the Initial Meeting of Creditors, he so admitted. (Audio Recording of Initial Mtg of Creditors dated June 29, 2020 and then confirmed in the 2004, Ex. D, Pg. 94, line 21- pg. 95, line 24, admitting that contract was with SPD; pg. 96, lines 7-12 admitting that money went to SBP; pg. 100, line 25- pg. 101, line 11; see also Exs. 20-22 to Ex. D). Padilla fully admits that he is currently engaging in the exact same scheme, just using a different name and at least one other entity, Cosecsa. Padilla has not decided what entity he will use for these new deals leaving open the possibility it will be SPD. (Ex. D, Pg. 163, line 22- pg. 164, line 4). In summary, this Debtor and its representative have demonstrated no regard for the U.S. legal system and flagrantly demonstrate they will continue to perpetrate this fraudulent scheme and engage in the same tactics of enticing lenders and/or investors into their tangled web of borrowing money allegedly for games with little or no intention or ability to repay the unsuspecting.

### CONCLUSION AND PRAYER

Creditors, Etcharren and SMM, pray that this Court dismiss this action based on bad faith conduct of Debtor/Debtor's Representative, including but not limited to such tactics as intentionally failing to keep adequate corporate records, intentionally producing false and misleading documents, destruction of evidence, intentionally abusing discovery and failing to comply with Court Orders.

Respectfully submitted,

RENNE LAW, PLLC

By: */s/Christine Renne*
Christine M. Renne
State Bar No. 00794518
SD TX No. 424187
808 W. Dallas Street, Suite F
Conroe, TX 77301
Telephone: (832) 764-8660
Facsimile: (832) 442-5140
Email: crenne@crennelaw.com

**Attorney for Creditors,**
**Rene Etcharren and**
**SM Monterrey Group, LLC**

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on March 1, 2021, a true and correct copy of the foregoing Motion to Dismiss was served via the Court's CM/ECF notification system.

By: */s/Christine Renne*
Christine Renne

## WRITTEN CONSENT OF THE MEMBERS IN LIEU OF SPECIAL MEETING
## OF
## SPORTS PRO DEVELOPMENT, LLC

Pursuant to the Texas Business Organizations Code, as amended, and the Limited Liability Company Operating Agreement (the "Operating Agreement") of SPORTS PRO DEVELOPMENT, LLC (the "Company"), as amended, the undersigned, being all or a quorum of the Members of the Company who would be entitled to vote on the resolutions hereinafter set forth as if the same had been submitted to a special meeting of the members of the Company, do hereby consent to the adoption of the following resolutions, which shall be given the same force and effect as if the same had been adopted at a special meeting of the members of the Company duly called and held for the purpose of acting upon proposals to adopt such resolutions and direct that this written consent be filed by the Secretary of the Company in the minute book of the Company:

RESOLVED, that Juan Carlos Padilla shall continue as the Manager of the Company and shall retain and continue to have all powers and authorities granted to Managers of a limited liability company under the Texas Business Organizations Code; and

RESOLVED, FURTHER, that the Manager shall be and is hereby authorized to retain bankruptcy counsel and to pursue all remedies available and appropriate to the Company by filing for bankruptcy protection in the United States Federal courts; and

RESOLVED, FURTHER, that the Operating Agreement of the Company shall be amended as necessary to accurately reflect the Membership Interests of the Members of the Company, and to correct any errors or omissions contained in the existing or prior Operating Agreement.

IN WITNESS WHEREOF, the undersigned Members have executed this Written Consent in Lieu of Special Meeting effective as of March 1, 2020.

_____
Joaquin Beltra Vargas, Member

_____
Tonatiuh Aguayo, Member

_____
Juan Carlos Padilla, Manager

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-32547 |
| | § | |
| **SPORTS PRO DEVELOPMENT, LLC** | § | |
| | § | **CHAPTER 7** |
| DEBTOR | § | |
| | § | |

### UNSWORN DECLARATION OF JOAQUIN BELTRAN
### PURSUANT TO 28 U.S.C. § 1746

1.    My name is Joaquin Beltran. I am fully competent to make this unsworn declaration. I have personal knowledge of the facts set forth in this unsworn declaration.

2.    I am a 38.7% owner of Sports Pro Development, LLC ("Sports Pro") and have been such since February 2016. At no time did I participate in the management, the day to day operations of Sports Pro or Sports Pro's decision to incur debt. Since acquiring my interest in Sports Pro, I have not received a Schedule K-1 or any other documents for tax purposes nor have I ever received an accounting of Sports Pro's operations. I have not received any tax returns for Sports Pro.

3.    Attached hereto as Exhibit A is a Written Consent. The signature above my name on this document is not my signature. I did not authorize this Written Consent.

4.    I did not authorize Sports Pro to file bankruptcy and did not learn of the bankruptcy until after it was filed.

5.    I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed in   Zihuatanejo, Mexico

on October 30, 2020.

_____
JOAQUIN BELTRAN

8014220 v1 (72613.00002.000)

## WRITTEN CONSENT OF THE MEMBERS IN LIEU OF SPECIAL MEETING
## OF
## SPORTS PRO DEVELOPMENT, LLC

Pursuant to the Texas Business Organizations Code, as amended, and the Limited Liability Company Operating Agreement (the "Operating Agreement") of SPORTS PRO DEVELOPMENT, LLC (the "Company"), as amended, the undersigned, being all or a quorum of the Members of the Company who would be entitled to vote on the resolutions hereinafter set forth as if the same had been submitted to a special meeting of the members of the Company, do hereby consent to the adoption of the following resolutions, which shall be given the same force and effect as if the same had been adopted at a special meeting of the members of the Company duly called and held for the purpose of acting upon proposals to adopt such resolutions and direct that this written consent be filed by the Secretary of the Company in the minute book of the Company:

RESOLVED, that Juan Carlos Padilla shall continue as the Manager of the Company and shall retain and continue to have all powers and authorities granted to Managers of a limited liability company under the Texas Business Organizations Code; and

RESOLVED, FURTHER, that the Manager shall be and is hereby authorized to retain bankruptcy counsel and to pursue all remedies available and appropriate to the Company by filing for bankruptcy protection in the United States Federal courts; and

RESOLVED, FURTHER, that the Operating Agreement of the Company shall be amended as necessary to accurately reflect the Membership Interests of the Members of the Company, and to correct any errors or omissions contained in the existing or prior Operating Agreement.

IN WITNESS WHEREOF, the undersigned Members have executed this Written Consent in Lieu of Special Meeting effective as of March 1, 2020.

_____
Joaquin Beltra Vargas, Member

_____
Tonatiuh Aguayo, Member

_____
Juan Carlos Padilla, Manager

**EXHIBIT C**

| | |
|---|---|
| IN RE: | § CASE NO. 20-32547 |
| | § |
| **SPORTS PRO DEVELOPMENT, LLC** | § |
| | § CHAPTER 7 |
| DEBTOR | § |
| | § |

## UNSWORN DECLARATION OF TONATIUH AGUAYO
## PURSUANT TO _28_ U.S.C. § 1746

1.　　My name is Tonatiuh Aguayo. I am fully competent to make this unsworn declaration. I have personal knowledge of the facts set forth in this unsworn declaration.

2.　　I am a 12.5% owner of Sports Pro Development, LLC ("Sports Pro") and have been such since February 2016. At no time did I participate in the management, the day to day operations of Sports Pro or Sports Pro's decision to incur debt. Since acquiring my interest in Sports Pro, I have not received a Schedule K-1 or any other documents for tax purposes nor have I ever received an accounting of Sports Pro's operations. I have not received any tax returns for Sports Pro.

3.　　Attached hereto as <u>Exhibit A</u> is a Written Consent. The signature above my name on this document is not my signature. I did not authorize this Written Consent.

4.　　I did not authorize Sports Pro to file bankruptcy and did not learn of the bankruptcy until after it was filed.

5.　　I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed in Monterrey, Mexico, on October 30, 2020.

_____
_____　　　　　TONATIUH AGUAYO

8014197 v1 (72613.00002.000)

**EXHIBIT C**

## WRITTEN CONSENT OF THE MEMBERS IN LIEU OF SPECIAL MEETING
### OF
### SPORTS PRO DEVELOPMENT, LLC

Pursuant to the Texas Business Organizations Code, as amended, and the Limited Liability Company Operating Agreement (the "Operating Agreement") of SPORTS PRO DEVELOPMENT, LLC (the "Company"), as amended, the undersigned, being all or a quorum of the Members of the Company who would be entitled to vote on the resolutions hereinafter set forth as if the same had been submitted to a special meeting of the members of the Company, do hereby consent to the adoption of the following resolutions, which shall be given the same force and effect as if the same had been adopted at a special meeting of the members of the Company duly called and held for the purpose of acting upon proposals to adopt such resolutions and direct that this written consent be filed by the Secretary of the Company in the minute book of the Company:

RESOLVED, that Juan Carlos Padilla shall continue as the Manager of the Company and shall retain and continue to have all powers and authorities granted to Managers of a limited liability company under the Texas Business Organizations Code; and

RESOLVED, FURTHER, that the Manager shall be and is hereby authorized to retain bankruptcy counsel and to pursue all remedies available and appropriate to the Company by filing for bankruptcy protection in the United States Federal courts; and

RESOLVED, FURTHER, that the Operating Agreement of the Company shall be amended as necessary to accurately reflect the Membership Interests of the Members of the Company, and to correct any errors or omissions contained in the existing or prior Operating Agreement.

IN WITNESS WHEREOF, the undersigned Members have executed this Written Consent in Lieu of Special Meeting effective as of March 1, 2020.

Joaquin Beltra Vargas, Member

Tonatiuh Aguayo, Member

Juan Carlos Padilla, Manager

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


IN RE:                              Case No. 20-32547
                                       Chapter 7

SPORTS PRO DEVELOPMENT, LLC,

        Debtor.
_____

DEPOSITION OF
JUAN CARLOS PADILLA
APPEARING REMOTELY
November 16th, 2020


        PURSUANT TO NOTICE and Fed. R. Bankr. P. 2004

and 7030, the videoconference 2004 Examination of JUAN

CARLOS PADILLA, whose identity has been verified by the

court reporter, was taken on behalf of creditors on

November 16th, 2020, commencing at 10:26 a.m. Central

Time, before Christine E. Morrow, Registered

Professional Reporter, NCRA 2909, appearing remotely

via Zoom.

```
 1                    APPEARANCES

 2  FOR CREDITORS RENE ETCHARREN, SM MONTERREY GROUP, LLC,
    AND WORD SOCCER ENTERPRISE, LLC:
 3
    CHRISTINE M. RENNE, ESQ.
 4  Renne Law, PLLC
    808 W. Dallas Street, Suite F
 5  Conroe, Texas 77301
    Telephone: (832) 764-8660
 6  Email: crenne@crennelaw.com

 7
    FOR CREDITOR GB SQUARED, LLC:
 8
    ISAAC J. TAWIL, ESQ.
 9  P.O. Box 720001
    McAllen, Texas 78504
10  iketawil97@gmail.com

11
    FOR CREDITOR GUADALUPE PAULINA DIAZ:
12
    LUIS F. HESS, ESQ.
13  Luis F. Hess PLLC
    282 Ed English Dr. Bldg 6 Unit D
14  The Woodlands, Texas 77385
    Telephone:  (281) 205-8540
15  luis@luishesslaw.com
    and
16  JUAN C. LUNA, ESQ.
    Mexican Counsel for Guadalupe Diaz and BlancAlps
17  luna@lawgistic.com
    and
18  MR. SAN MIGUEL

19
    FOR CREDITOR EDUARDO CAMARENA:
20
    FRANCISCO RAMIREZ, ESQ.
21  Francisco Ramirez & Associates, P.C.
    P.O. Box 16383
22  Sugar Land, Texas 77496
    Telephone: (713) 303-8005
23  Email: lawyers@francisco-ramirez.com

24

25
```

```
1                    APPEARANCES (Cont.)

2   FOR CREDITORS RUBEN LARA AND ANGELA LARA:

3   WILLIAM H. LUCK, JR., ESQ.
    1412B Stonehollow Drive
4   Houston, Texas 77339
    Telephone: (281) 358-7611
5        Cell: (713) 962-1573
    Email: bill.luck@sbcglobal.net
6

7   FOR LAMBRINA CPA:

8   RICHARD J. WHITE, ESQ.
    Buckley, White, Castaneda & Howell, LLP
9   2401 Fountainview, Suite 901
    Houston, Texas 77057
10  Telephone: (713) 789-7700
         Cell: (713) 703-7331
11  Email: rjwhite@bwchlaw.com

12

    FOR JUAN CARLOS PADILLA:
13
    PHILLIP R. LIVINGSTON, ESQ.
14  Phillip R. Livingston, PC
    2950 Unity Drive, #37056
15  Houston, Texas 77237
    Telephone: (713) 783-6919
16       Cell: (713) 858-2999
    Email: prlivingston@sbcglobal.net
17

18  FOR DEBTOR SPORTS PRO DEVELOPMENT, LLC:

19  MICHAEL LEBOLD, ESQ.
    Racusin & Wagner, LLP
20  510 Woodway Tower
    4900 Woodway Drive
21  Houston, Texas 77056
    Telephone: (713) 626-1450
22  Email: mfl@racusinlaw.com

23
    ALSO PRESENT:
24  Fabian Rosado, Right Start Entertainment, LLC  Creditor
    Jorge Villalobos, SM Monterrey  Creditor
25  Matthew Archibald, Exhibit Custodian
```

1   Q.   Okay.  And in it we asked for all

2   communications, text messages, emails, posting on

3   social media between you and any creditor, that you

4   listed as a creditor in this bankruptcy; correct?

5   A.   Will you repeat?

6   Q.   So, have you produced all the email and

7   text messages between you and any creditor in this

8   matter?

9   A.   I produced what I was able to -- to pull

10  up.

11  Q.   Have you produced any social media

12  between you and any creditor or WhatsApp between you

13  and any creditor?

14  A.   No.

15  Q.   Why can't you produce text messages?

16  A.   Because I don't have, anymore, that

17  phone.

18  Q.   When did you get rid of that phone?

19  A.   I don't know the exact date, but it was

20  I think July or August.

21  Q.   Of this year?

22  A.   Yes.

23  Q.   July or August of 2020?

24  A.   Yes.

25  Q.   What happened to the phone?

1     A.   It was destroyed.

2     Q.   How was it destroyed?

3     A.   Fell down from a third floor.

4     Q.   Who is your service provider?

5     A.   Right now, T-Mobile.

6     Q.   Who was it in July of 2020?

7     A.   Well, it wasn't anymore because I wasn't

8 able to pay the bill, but it was AT&T.

9     Q.   Did you ever go to AT&T and request a

10 copy of your text messages?

11     A.   No.

12     Q.   And as in July of 2020, all 17 lawsuits

13 had been filed against you; correct?

14     A.   Probably, yeah.

15     Q.   And so you knew as of that date that all

16 the text messages had been requested; correct?

17     A.   I don't know.

18     Q.   So, had you ever known in any state

19 court cases, any discovery served against you

20 requesting for text messages between you and creditors?

21     A.   I don't remember.

22     Q.   Where was your phone destroyed?

23     A.   In a hotel.  My baby throw it away.

24     Q.   What hotel?

25     A.   Hilton.

1          A.     Yes.

2          Q.     You did produce it?  It's in the

3    documents?

4          A.     Oh.  I thought you asked if I can do it,

5    like live recording right now in my i-cell phone, so I

6    didn't understand the question very well.  Can you

7    repeat?

8          Q.     Yes.  Do you have Realtime Chat on your

9    old phone?

10         A.     I don't know what you mean by Realtime.

11   Yeah.  I mean, I did have.

12         Q.     You were also asked to produce all

13   electronically or video-recorded communications and --

14   well, actually let me break that question down.

15                You were asked to produce all

16   video-recorded communications between you and any

17   creditors.  Have you done any of those?

18         A.     I don't have any.

19         Q.     Do you have any audio recordings of

20   any -- of you and any creditor?

21         A.     No.

22         Q.     What happened to those?

23         A.     In the other phone.

24         Q.     We asked you to produce all corporate

25   books and minutes of meetings of the members or

1  meetings of the managers from SPD, debtor, from

2  inception to present.  Why haven't those been produced?

3          A.   Because we don't have any.

4          Q.   So you have absolutely no corporate

5  minutes?

6          A.   No.

7          Q.   Do you have any of the organizational

8  documents for SPD?

9          A.   I think we have produced the corporate

10  documents, that I have already.

11          Q.   Okay.  So if it's been produced, that's

12  all you have; correct?

13          A.   Yes.

14          Q.   Have you ever seen a signed operating

15  agreement for SPD?

16          A.   No.

17          Q.   Was there ever a signed operating

18  agreement?

19          A.   No.

20          Q.   Have you produced all the letters

21  written by any attorney to any creditors by SPD?

22          A.   I produced the ones that I had access to

23  in my computer, yes.

24          Q.   What about the marketing materials for

25  SPD that were used to host, promote any of the games

1  where I have the box, to make the scan, because

2  there's -- there's a lot of documents and wire

3  transferred proofs that I need to get to a place where

4  they can scan it.

5        Q.   When did you first move to Ecuador?

6        A.   I haven't moved to Ecuador.  I have been

7  traveling.

8        Q.   Okay.  When did you first travel to

9  Ecuador?

10        A.   Last week of August.

11        Q.   And before that were you at your house

12  in The Woodlands, Texas?

13        A.   Yes.

14        Q.   And so, prior to that time you could

15  have obtained those documents in that box; correct?

16        A.   Probably.

17        Q.   Did you know at that time that the wire

18  transfers had been requested?

19        A.   No.

20        Q.   You never saw any document requests

21  asking for wire transfers and payment information?

22        A.   No.  I saw that we have to send the bank

23  statements, which I did for the banks that we handle.

24        Q.   Well, let me ask you something.  Wells

25  Fargo Bank attaches check images.  You didn't produce

1  any of the check images, did you?

2        A.    No.

3        Q.    Why not?

4        A.    I don't have them.

5        Q.    Okay.  Did you ever go to Wells Fargo

6  and ask for the images?

7        A.    I didn't went because they were closed,

8  but I communicated and tried to get them from the

9  executive of the bank.

10       Q.    Okay.  And what did you do to try and

11 obtain them?

12       A.    Sent an email.

13       Q.    What did you do to try and obtain them?

14 How many times did you contact Wells Fargo to ask for

15 the check images?

16       A.    For the check images, I don't remember.

17 But I sent probably between five to eight emails

18 requesting bank statements and information.

19       Q.    In what time period?

20       A.    Between from probably May to July.

21       Q.    Was it pursuant to this bankruptcy or

22 was it pursuant to a state court action?

23       A.    For this, the bankruptcy.

24       Q.    Okay.  Can you tell me what your

25 educational level is?

1    Q.   You do have emails with Mr. Jambrina --

2    or I should say SPD has emails with Mr. Jambrina;

3    correct?

4    A.   Yes.

5    Q.   What is the SPD email address, please?

6    A.   Jcp.spd@gmail.com.

7    Q.   Has SPD used any other email?

8    A.   No.

9    Q.   Has that email address been turned over

10   in this case?

11   A.   Yes.  I produced the password and the

12   login information.

13   Q.   Who did you produce that do, please?

14   A.   To my lawyer, the SPD lawyer, Michael

15   Lebold.

16   MR. LEBOLD:  That was produced to the

17   trustee.

18   MS. RENNE:  The password has been

19   produced?

20   MR. LEBOLD:  The password has been

21   produced to the trustee.

22   THE WITNESS:  So, none of the

23   information has been reviewed then?

24   BY MS. RENNE:

25   Q.   No.  Some of it, the ones that were

1   downloaded were reviewed.

2              A.   So, we produced more than 4,000 pages

3   for nothing?

4              Q.   No.

5              MS. RENNE:  So, Mr. Lebold, I had the

6   password for AmEx in your letter, and the last

7   communication I had was your letter asking if they

8   would waive the attorney-client privilege.

9              MR. LEBOLD:  I have not included any

10  other information from the trustee.

11             MS. RENNE:  Okay.  Well, then we don't

12  have the password, because that letter said we can't

13  release the password until we get the agreement to

14  waive the attorney-client.  So, the only emails

15  produced were the ones that were in the file folder.

16             MR. LEBOLD:  Is that a question?

17             MS. RENNE:  Yeah.  I mean, is there

18  anything that's -- the Dropbox file folder has some

19  emails in it, but they're PDFs.  So, if the password

20  has been produced, when was it produced?  And how?

21             MR. LEBOLD:  It was produced to the

22  trustee in June.

23             MS. RENNE:  Okay.

24             MR. LEBOLD:  -- went to the trustee's

25  request, and then the trustee is the one who has

1 together?

2      A.   No.

3      Q.   So it was individually to each one?

4      A.   Correct.

5      Q.   Was it roughly around the same time?

6      A.   Yeah.

7      Q.   And was it roughly around the date of

8 March 1st?

9      A.   Yes.  It was before filing the

10 bankruptcy.

11      Q.   Okay.  So, and this bankruptcy was filed

12 May 8th, 2020; correct?

13      A.   I think, yeah.  I don't know.

14      Q.   So, but was your phone call with Joaquin

15 Beltran Vargas, was it on or about March 1st of 2020,

16 the date this document was signed?

17      A.   I don't remember the date, but it was

18 before filing the bankruptcy.

19      Q.   Okay.  And same question.  Do you recall

20 that this phone call took place on or about March 1st,

21 2020, with Mr. Aguayo?

22      A.   I don't remember the exact date, but it

23 was before the bankruptcy filing.

24      Q.   Well, if this document was filed

25 March 1st, 2020, you had talked with them already

1  court and to proceed with them.

2      Q.   And so, they were in agreement with this

3  and they signed this document?

4      A.   No.  I signed it with their

5  authorization.

6      Q.   Okay.  So they gave you their

7  authorization to sign for them?

8      A.   Correct.

9      Q.   Were Mr. Beltran and Mr. Aguayo, were

10 they involved in management of SPD during the time

11 frame of 1918 [sic] -- or to 2020?

12     A.   No.

13     Q.   Did you create reports for them?

14     A.   Well, we have at least one conversation

15 or two conversations every six months where I present

16 the upcoming games and the games that we have produced.

17 It was not like a special report.  It was more like a

18 presentation.

19     Q.   And did you tell them about all the

20 loans that you were taking out with the company?

21     A.   Yes.

22     Q.   So they knew about the loans?

23     A.   Yeah.  Actually they helped bring in

24 creditors as well.

25     Q.   Which creditors did Mr. Aguayo bring in,

1   please?

2           A.   No, they -- we couldn't close the deal

3   with any of the ones he brought, but he at least

4   presented four or five --

5           Q.   What about the same question for

6   Mr. Beltran Vargas, which creditors did he bring into

7   SPD?

8           A.   From the list that you have, none.

9   Because he brought one in -- wait, I think his was 2014

10  or '15, which has been paid already.  And I need a

11  minute to think if he brought one of the others.  No.

12          Q.   So you were responsible for bringing in

13  all the other individuals who lent or invested money

14  into SPD; correct?

15          A.   Correct.

16          Q.   And is it your testimony that they knew

17  about this bankruptcy prior to you filing it?

18          A.   Yes.

19          Q.   And that they agreed to this bankruptcy?

20          A.   Yes.

21          Q.   Do you have any emails related to that?

22          A.   I don't know.

23          Q.   Did you have any emails where they

24  actually gave you the authorization to sign for them?

25          A.   No.  It was by phone call.

1      Q.    And you don't recall what date that was?

2      A.    No.  It was March-something.

3      Q.    Is there a way you could look up the

4  date?  Can you get the records from AT&T?

5      A.    I can try.

6      Q.    That would have been on your old phone;

7  correct?

8      A.    No.  Actually I think it was in the new

9  line that I have right now.

10     Q.    I thought you said you lost your phone

11  in July of 2020?

12     A.    I did.  It was destroyed.  I didn't lost

13  it.  It was destroyed.  And I told you that I wasn't

14  able to pay and the AT&T line was disconnected at the

15  beginning of the year.  I keep that equipment, but now

16  it's not available.

17     Q.    Well, this was signed in March of 2020;

18  correct?

19     A.    Yeah.

20     Q.    And so the phone call would have taken

21  place prior to your signing March 1st; correct?

22     A.    No.  It was after.  We explained to

23  them -- well, I explained to them the date that we were

24  putting [sic] the document, but the phone call was

25  after March 1st.

1       Q.   And so, who prepared this document?

2       A.   I don't remember.  It was Phil or

3  Michael -- no, not Michael.  I think it was Phil.  I'm

4  not remembering 100 percent.  But it was one of the

5  people helping assisting.

6       Q.   When did you first decide to file

7  bankruptcy?

8       A.   It was when the COVID exploded and I

9  don't remember the date, but when we have to cancel two

10 games that we had prepared for March, that's when we

11 decide, the week after that.  That probably will be

12 February, late February.

13      Q.   That you decided to file bankruptcy?

14      A.   Correct.

15      Q.   And did you get this document on or

16 about March 1st?

17      A.   Can you repeat?

18      Q.   Did you get this document from

19 Mr. Livingston on or about March 1st?

20      A.   No.  After that.

21      Q.   Have you spoken with Mr. Beltran after

22 the filing of bankruptcy?

23      A.   Yes.

24      Q.   When was your first phone call after the

25 filing of bankruptcy May 8th?

1      A.   I don't remember the exact date, but it

2  was late May.

3      Q.   What was -- what was the conversation?

4      A.   That he was receiving phone calls of

5  creditors threatening him.  He wants to understand the

6  process, how we going with the bankruptcy, what are the

7  steps to follow, and basically that.

8      Q.   What did you tell him what were the

9  steps to bankruptcy?

10     A.   That we need to put together a lot of

11 documents, and there should be a hearing coming soon.

12 That's it.  And basically the procedures we need to

13 take.

14     Q.   Did you get any documents from

15 Mr. Beltran?

16     A.   No.

17     Q.   Did you ask him for documents, from

18 Mr. Beltran?

19     A.   No.

20     Q.   Does he have documents that are

21 responsive to this?

22     A.   I don't know.

23     Q.   What did you -- did you tell him that

24 the purpose of the bankruptcy was so that you could get

25 rid of the creditors?

1          A.   I never said I want to get rid of the
2    creditors.  That is not correct.
3          Q.   Well, what did you tell him about what
4    would happen during bankruptcy?
5          A.   I didn't say anything about it.
6          Q.   But you just said --
7          A.   I don't know what's going to happen.
8          Q.   Same question.  Did you have a phone
9    call with Mr. Aguayo after you filed bankruptcy?
10          A.   Yes.
11          Q.   How soon after filing?  Do you know?
12          A.   Probably a week, two weeks.
13          Q.   How many phone calls have you had with
14    him?
15          A.   Two or three, no more.
16          Q.   What were the purpose of the phone
17    calls?
18          A.   Basically the same situation as
19    Mr. Vargas, that he was receiving phone calls with a
20    lot of threats and a lot of uncomfortable situations.
21    And he -- at that point I can note that he was advised
22    with a lawyer, and he told me basically that he won't
23    be part of any documents or any situation, that the
24    lawyers is going to be involved from that point.
25          Q.   Have you had any recent -- other than

1  Q.   '19 or '20?

2  A.   No.

3  Q.   Okay.  Did you send Mr. Aguayo any

4  financial information from the years 2016 to 2020?

5  A.   No.

6  Q.   Did you make any payments to

7  Mr. Beltran?

8  A.   No.

9  Q.   Did you make any payments to Mr. Aguayo?

10  A.   No.

11  Q.   I want to show you -- has SPD filed

12  taxes for 2016?

13  A.   Yes.

14  Q.   So SPD has filed taxes for the year

15  2016?

16  A.   Correct.

17  Q.   Has SPD filed taxes for year 2017?

18  A.   Yes.

19  Q.   Has SPD filed taxes for the year 2018?

20  A.   I think we did.  I am not 100 percent

21  certain, but I am.

22  Q.   Has SPD filed taxes for 2019?

23  A.   No.

24  Q.   Why not?

25  A.   Because I don't have the money to pay

1    Jambrina, so they were not able to produce.

2            Q.   I want to show you now what I have

3    marked Exhibit 2I.  This was a record that has been

4    produced in this matter, and it's noted at the bottom

5    SPD BK 00131, as something filed in this case.

6            Can you tell me why this document

7    remains unsigned?

8            A.   No.

9            Q.   Are you aware that all of your tax

10   documents that were submitted in this bankruptcy case

11   are unsigned?

12           A.   No.

13           Q.   Who filed your taxes?

14           A.   Jambrina.

15           COURT REPORTER:  Is this document being

16   marked as an exhibit to this deposition?

17           MS. RENNE:  Yes.  This is going to be

18   marked as Exhibit No. 10 for purposes of the

19   deposition.

20           (Creditors' Exhibit 10 marked for

21   identification)

22   BY MS. RENNE:

23           Q.   If you will look at the very top of this

24   document, there is some small notations that says May

25   8th, 2020; correct?  Can you see that?

1          A.    Yes.

2          Q.    What is your understanding of what a K-1

3     is?

4          A.    A participation on each member.

5          Q.    And does that accurately reflect the

6     ownership interest in 2017?

7          A.    Yes.

8          Q.    When did Mr. Aguayo become a member?

9          A.    I think it was 2017 actually.

10         Q.    And you don't have any documents, any

11    corporate documents that show his becoming a member;

12    correct?

13         A.    No.

14         Q.    And you don't have any corporate

15    documents rescinding your membership interest and

16    giving it to Soccer Scouting International, do you?

17         A.    No.

18         Q.    And again, the date on this document,

19    which is part of the same tax return, is 05-08-2020 at

20    5:28 p.m.  Do you see that?

21         A.    Yes.

22         Q.    And now --

23         A.    I think that was the date everything was

24    filed.  I don't know, I could be wrong.  But I think

25    that day was the day everything was filed to the

1  members?

2          A.  You keep saying, did you.  Can you refer

3  to SPD, please?  Hello?  Hello?

4          Q.  Yes, you are cutting out for me.  I did

5  not hear your answer.

6          MS. RENNE:  Court reporter, can you

7  please read his answer back to me?

8          (Answer read back)

9  BY MS. RENNE:

10          Q.  Mr. Padilla, can you hear me?

11          A.  Yes.

12          MR. LIVINGSTON:  Ms. Renne, this is

13  Phillip Livingston again --

14  BY MS. RENNE:

15          Q.  Did SPD ever send --

16          MS. RENNE:  Yes?

17          MR. LIVINGSTON:  Yeah.  When you get to

18  a point where we can take a break, it's been like an

19  hour and a half.  If we can get -- you know, whenever

20  you get to point.

21          MS. RENNE:  Okay.

22          MR. LIVINGSTON:  Thank you.

23          MS. RENNE:  Okay.  Yes.

24  BY MS. RENNE:

25          Q.  So, Mr. Padilla, did SPD ever send these

1  K-1s to Mr. Beltran or Mr. Aguayo?

2           A.   I don't know.

3           Q.   How much money did Mr. Aguayo invest in

4  SPD?

5           A.   I think it was 100,000 and 10 --

6  $110,000.

7           Q.   And same question for Mr. Beltran.  How

8  much money did he invest?

9           A.   $125,000.

10          MS. RENNE:  I'm just going to have

11 marked now Exhibit No. 12, which would be Exhibit --

12 actually 2J on my list.

13          (Creditors' Exhibit 12 marked for

14 identification)

15 BY MS. RENNE:

16          Q.   I want to show you what has been

17 produced --

18          EXHIBIT CUSTODIAN:  2J what?

19          MS. RENNE:  Sorry.  Go down to 2J SPD, I

20 might have two 2Js.  I do.  The very next one down, the

21 cash flows for all years.

22 BY MS. RENNE:

23          Q.   So, this was another document that you

24 produced as being as part of your tax return, the

25 statement of cash flows, and in it I have highlighted

1  that he's listed as a negative 220.  Are you indicating

2  that he loaned SPD 220 on top of the 110 or this all

3  part and parcel?

4         A.   I don't know.

5         Q.   And then two down, you see loan from

6  third party, 3.4 millions dollars.  Is that just one

7  party or is that just a grouping of loans?

8         A.   I don't know.

9         Q.   What about this other loan liability,

10 1.959 million dollars, this other loan.  Is that from

11 one person or is that just some other lumping of loans

12 together?

13        A.   I don't know.  But my answer to both

14 it's going to be several lenders because no one put

15 that kind of money --

16        Q.   Okay.  And so, you don't know why it's

17 all just grouped together, do you?

18        A.   No, I don't.

19        Q.   Did you produce all of the documents

20 that support these figures to Jambrina?

21        A.   Yes, probably I did.

22        Q.   You didn't just give him the number, did

23 you?  You gave him the actual documents?

24        A.   Some of them, yeah.

25        Q.   Did you ever keep QuickBooks on your

1  draws?

2       A.   What do you mean?

3       Q.   Was she allowed to take draws from SPD?

4       A.   No.

5       Q.   Do you know why she's still listed as,

6  under financing activities, as getting 19 -- close to

7  20,000 in draws?

8       A.   Yeah.  Because my brother, we have a

9  loan from him in 20 -- can't remember the exact date.

10  I think it was 2015, again -- or 2016.

11       Q.   And has that loan document been

12  produced?

13       A.   No.  It's -- there is no document.

14       Q.   Did the other members know that you were

15  paying your ex-sister-in-law -- or SPD was paying the

16  ex-sister-in-law $20,000?

17       A.   I never paid her.

18       Q.   Well, it shows a draw.  So, there was no

19  cash that exchanged hands?  It was just --

20       A.   No, I never pay her.

21       Q.   Do you know why it's listed on this

22  document?

23       A.   No.  No, I really don't.

24       Q.   And did you get $13,522 in draws that

25  year?

1          A.    Yeah.   Probably some credit cards that

2    we used to pay, personal, of money that I put --

3    sometimes I need to lend money also.

4          Q.    And Soccer Scouting International, did

5    they receive 47,786 from SPD?

6          A.    I have to probably review, because I

7    stated in the previous hearing that we need to move

8    money from one company to another because of the

9    garnishments that you were having at that point.

10         Q.    Sir, is it your contention that you made

11   a loan of 113,000 to the company?

12         A.    Well, yeah.  Through the year, yeah.  I

13   put a lot of money there, my personal --

14         Q.    Was there any loan document drawn up for

15   that?

16         A.    No.  No, but for the records, I always

17   did that with a check or a wire transfer in the same

18   bank.  So everything is reflected in the bank

19   statements.

20         Q.    And same thing, startup costs.  How were

21   these startup costs, were there invoices, expenses,

22   reports that you could identify these startup costs?

23         A.    I don't know.

24              MS. RENNE:  I think now is probably a

25   good time to take a break.  If we want to do, what do

1            A.    No.

2            Q.    But you, sir, you got a draw in 2016 of

3    at least 13,000?

4            A.    Yes.

5            Q.    And Soccer Scouting International got a

6    draw of $47,786?

7                  MR. LEBOLD:   Objection.   I think you

8    have your lines confused.

9                  MS. RENNE:   Excuse me.   Thank you for

10   clearing that up.   Okay.   Let me rephrase the question.

11   BY MS. RENNE:

12           Q.    And Soccer Scouting International

13   received a draw of $43,210?

14           A.    I don't remember.

15           Q.    Why was Soccer Scouting International

16   getting a draw if they weren't even a member yet?

17           A.    I don't remember.   Because at that

18   point -- if I'm correct -- remembering correctly, I

19   don't -- we don't have bank account for Soccer Scouting

20   in 2016, so that's why I'm confused.   I honestly don't

21   know the answer.

22                 MS. RENNE:   Okay.   I'll now have marked

23   as Exhibit No. 15, which is my 2L.

24                 EXHIBIT CUSTODIAN:   2KA was 15.

25                 MS. RENNE:   Let's see.   Yeah, okay.   Is

1          A.    No.

2          Q.    Why just his?

3          A.    Because of it.

4          Q.    Because what?

5          A.    There is no reason.  Because it happened

6   with him.  That's it.

7          Q.    Okay.  Now, I'm looking too at the notes

8   that were produced in the Dropbox, and then I'm looking

9   at this list.  And, for example, who's Cruz Palafox?

10  It's the fourth down, after Gutierrez, which is the

11  first one highlighted.  There's a loan to Lara, a loan

12  to Carrera, a loan to Cosecsa, and Palafox.

13         A.    I'm sorry.  I don't see it.  Oh,

14  Palafox.  It's Cruz Palafox, yeah, it's -- Cruz

15  Palafox, that's one you're asking?

16         Q.    Yeah.  Do you have that promissory note?

17         A.    No, I don't have it.  He has the

18  original.

19         Q.    Did you pay it off?

20         A.    Not yet.

21         Q.    And what about -- two below Martinez,

22  you have Ezequiel Ortuno?

23         A.    Correct.

24         Q.    Do you have that loan document?

25         A.    No.  There's no document with him.

1      Q.   So, they just lent SPD $35,000 with no

2  documentation?

3      A.   Yes.

4      Q.   What about this Factorway LLC?  Do you

5  have those documents?

6      A.   I did have.  I should have those

7  documents in my email --

8      Q.   Now, when --

9      A.   -- have been paid off.

10      Q.   Now, when Factorway -- that's a company;

11  correct?

12      A.   Correct.

13      Q.   When you borrowed money from them you

14  had to provide them with financial information, didn't

15  you?

16      A.   Did you hear me?

17          COURT REPORTER:  No.

18          MS. RENNE:  No, we didn't.

19          THE WITNESS:  I said, no.

20  BY MS. RENNE:

21      Q.   You didn't provide a company with any

22  financial information; they just lent you money,

23  $212,000?

24      A.   No.  We presented -- we present the

25  games that were coming, with the projection of each

1 accounts SPD has had over the years?

2          A.   Wells Fargo and BBVA Compass Bank.

3          Q.   And is it your testimony that SPD has

4 never had any other bank accounts?

5          A.   No.  We have a recent one in Prosperity

6 Bank, which we already exposed and provided the bank

7 statements as well.

8          Q.   So, let me ask you a question.  Are you

9 still doing business as SPD?

10          A.   No.

11          Q.   So you never referenced for anybody and

12 used the term SPD?

13          A.   Not anymore.

14          Q.   I'm going to show you what I have as

15 Exhibit 2R, which will be --

16          MS. RENNE:  Are we on 18 now?  I know

17 there was some discrepancy on numbers.

18          EXHIBIT CUSTODIAN:  It will be 19, but

19 there's several 2Rs.  Which one are you referencing?

20          MS. RENNE:  2014 Teaming Agreement.

21          (Creditors' Exhibit 19 marked for

22 identification)

23 BY MS. RENNE:

24          Q.   Do you recognize this document?

25          A.   Yeah.

1        Q.    What is it?

2        A.    A teaming agreement.

3        Q.    With whom?

4        A.    With Austin Bold, Circuit of The

5   Americas.

6        Q.    Okay.  This is dated February 14, 2020?

7        A.    Correct.

8        Q.    Now, you represent that Soccer Builders

9   Pro is doing business as SPD, a Texas LLC; isn't that

10  correct?

11       A.    Yes.

12       Q.    And you actually, right under witnesses,

13  you said, whereas SPD is organizing.  So, you were

14  representing that SPD was still doing business;

15  correct?

16             MR. LIVINGSTON:  I'm objecting to the

17  question, to the form of the question.

18             COURT REPORTER:  What was your answer?

19             THE WITNESS:  No answer.  I heard the

20  objection and I stopped talking.

21  BY MS. RENNE:

22       Q.    You used the SPD name for this contract,

23  didn't you?

24       A.    Yeah, but that is February.  You said

25  I'm still doing SPD right now, and I said, no.

1          Q.    Okay.  But so, in February you still
2     were; correct?
3          A.    Before the COVID, yes.
4          Q.    Okay.  Now, you were paid 275,000 for --
5     to pay towards the team; correct?
6          A.    For only events.
7          Q.    Yes.  But you were paid 275,000 that was
8     supposed to go towards the payment to have the team
9     arrive; correct?
10         A.    Correct.
11         Q.    And you got that amount, didn't you?
12         A.    Correct.
13              MS. RENNE:  Okay.  And if we go to the
14    next Exhibit 2R, which is the 2-18.
15              (Creditors' Exhibit 20 marked for
16    identification)
17    BY MS. RENNE:
18         Q.    This is a document that was actually
19    produced in this bankruptcy matter, that the -- and
20    you'll see on 2-18, a $275,000 from Austin Bold, a wire
21    transfer, goes into Soccer Builders Pro's account;
22    correct?
23              MR. LEBOLD:  Objection.  This is not
24    dealing with the debtor.
25              MS. RENNE:  Well, except for he was

1    A.    I'm telling you this is Soccer Builders.
2  It has nothing to do --
3    Q.    You have already testified that you
4  transferred money in between the two because you needed
5  to get out from underneath SPD's --
6    A.    Correct.  But this is not the case.
7  This money didn't come from an account from Sports Pro.
8    Q.    That doesn't matter.  I am allowed to
9  ask questions about the interactions of the two
10  companies.
11    A.    You can ask whatever you want, and I --
12    Q.    Are you refusing to answer the question
13  as to whether or not --
14    A.    I'm not refusing.  This is out -- Soccer
15  Builders' bank account, and the deposits didn't come
16  from Sports Pro.  That's my answer.
17    Q.    Yes.  And it came from Austin Bold,
18  didn't it?
19    A.    Correct.
20    MS. RENNE:  Let's move on to Exhibit
21  2RA.
22    (Creditors' Exhibit 21 marked for
23  identification)
24  BY MS. RENNE:
25    Q.    This a document that says SPD Sports in

1  the corner, and this was the wire instructions that you

2  provided; correct?

3           A.    Probably is.

4           Q.    And the 6700 Woodlands Parkway, Suite

5  230-234, that's the address of SPD, isn't it?

6           A.    And also Soccer Builders.

7           Q.    Okay.  So, they used the same address,

8  they used the same letterhead, apparently; correct?

9  And you're giving instructions, wire instructions;

10 correct?

11          A.    Correct.

12          Q.    That game didn't go forward, did it?

13          A.    No.  We have to cancel because of COVID.

14          Q.    Okay.  What game was that supposed to

15 be?

16          A.    Rayados versus Toluca.

17          Q.    So who is Quinn Branson?

18          A.    I don't know.

19          Q.    Who's Morgan Waggoner?

20          A.    I don't know.

21          Q.    Who is Tim Prukop, P-R-U-K-O-P?

22          A.    I think he's one of the members that

23 we -- Austin Bold.

24                (Creditors' Exhibit 22 marked for

25 identification)

1   BY MS. RENNE:

2           Q.   Okay.  Now I'll show you what's marked

3   as Exhibit 2S, and it's an email from

4   jcp.spd@gmail.com.  And that's your email; correct?

5           A.   Yes.

6           Q.   And this email was not produced by you.

7   However --

8           A.   Because the relationship isn't with

9   Soccer Builders.

10          Q.   He just fell off the screen so I can't

11  see the witness.

12          A.   I'm here.

13          Q.   You are using SPD -- SPD's email?

14          A.   No.  That's a personal email with an SPD

15  letter.  It's a Gmail.  It's not a corporate email at

16  all.

17          Q.   I asked you at the beginning of this

18  2004 Examination what was SPD's email and this is the

19  address you gave me.

20          A.   That's one I use for everything on SPD,

21  but it's a personal email.  It's not a corporate email.

22          Q.   What is your personal email address?

23          A.   That's the one.

24          Q.   Okay.  And you look down here to how you

25  sign it:  Kind regards, Juan Padilla, President, Sports

1  Pro Development, LLC.

2          A.    That's correct.

3          Q.    And you still maintain that it was not

4  SPD?

5          A.    Come on, Ms. Renne.  There's a signature

6  in the email, but anyway, you can go forward.

7          Q.    Now I will turn your attention to

8  Exhibit 2T, which will be Exhibit --

9                MS. RENNE:  We're having the first one,

10 the one I just showed you, marked as Exhibit 20, and

11 then this one will be 21, 2T will be 21.

12                EXHIBIT CUSTODIAN:  Correction.  2T is

13 23.

14                MS. RENNE:  Thank you.

15                (Creditors' Exhibit 23 marked for

16 identification)

17 BY MS. RENNE:

18          Q.    Again, this is from Tim Prukop to you,

19 and he's asking Juan Padilla at jcp.spd@gmail.com to

20 get the money back from the Rayados game that was

21 cancelled.  Do you remember getting this email.

22          A.    Yes.

23          Q.    Did you return the money?

24          A.    No.

25                MS. RENNE:  Exhibit 2A -- sorry, 2U.

1    BY MS. RENNE:

2          Q.   We ready?  Thank you.  Okay.  Again, is

3    your phone face-down?

4          A.   It is.

5          Q.   And are you using your computer?

6          A.   Yes.

7          Q.   And that's the MacBook; right?

8          A.   Yes.

9          Q.   Okay.  So, I'm just going to clean up

10   one or two things, and then I can move on to your

11   filing with the bankruptcy court.

12               With regards to the written consent,

13   Soccer Scouting was a 20 percent member; correct?

14         A.   Correct.

15         Q.   Okay.  And Mr. Beltran was a

16   67.5 percent member?

17         A.   Correct.

18         Q.   And Mr. Aguayo was a 12.5 percent

19   member?

20         A.   Yes.

21         Q.   Okay.  So in order to file this

22   bankruptcy, you had to have their written consent prior

23   to filing; correct?

24         A.   Yes.

25         Q.   Because they were 80 percent members and

1  you were just a -- Soccer Scouting was just a

2  20 percent; correct?

3          A.   Yes.

4          Q.   I had asked you about games in '14 and

5  games in '15.  And how many games did you have in '16?

6          A.   Four.

7          Q.   How many games in '17?

8          A.   I think there were 13.

9          Q.   Okay.  And how many in '18?

10         A.   Twenty-one.

11         Q.   How many in '19?

12         A.   In '19?  None.

13         Q.   How many in 2020?

14         A.   None.

15         Q.   Are you looking at something,

16  Mr. Padilla?

17         A.   Yes.  Actually the games I want to

18  confirm.  In 2016 were four; 2015, three; 2017 --

19  sorry, was 11 in 2017.

20         Q.   What document are you referring to?

21         A.   An Excel sheet that is already in the

22  Dropbox, as usual, but you haven't seen it.

23         Q.   Okay.  And what median are you looking

24  on?

25         A.   I'm sorry.  2018 that was correct, and

1  you filed in the bankruptcy court.

2          Is Matthew on the screen?  Can you

3  share?

4          EXHIBIT CUSTODIAN:  I'm here.  What

5  document?

6          MS. RENNE:  Yes, it's actually 3,

7  Exhibit 3 assets.

8          (Creditors' Exhibit 27 marked for

9  identification)

10 BY MS. RENNE:

11         Q.  Okay.  Do you remember seeing this

12 document?

13         A.  Probably.

14         Q.  So, if you look, right under the form it

15 says declaration under penalty of perjury for

16 nonindividual debtors.  Did I read that correctly?

17         A.  Yes.

18         Q.  And if you scroll down on this first

19 page it's got a signature, and it's dated May 22, 2020;

20 correct?

21         A.  It has my name, not my signature.

22         Q.  Prior to filing, did you review this

23 document?

24         A.  Probably I did.

25         Q.  Can you -- you aren't sure, though?

1          A.    I don't remember.

2          Q.    And at the time you had counsel;

3    correct?

4          A.    No.

5          Q.    Did you know you had no counsel in 2019?

6          A.    Yeah, but not at the beginning of the

7    year.

8          Q.    Okay.  And so did you ever ask anyone to

9    look over this agreement?

10         A.    No.

11         Q.    Are they trying to collect this

12   agreement -- under this agreement?

13         A.    I don't know.

14         Q.    Have they filed any lawsuits against

15   you?

16         A.    Not that I know.

17         Q.    Okay.  Not that you know of.  Have they

18   threatened to file any lawsuits against you?

19         A.    Yes.

20         Q.    Do you know where Green is located?

21         A.    No.

22         Q.    And you say you don't know what the

23   amount of interest rate is?

24         A.    No.

25         Q.    Let's move to the next page.  Kalamata

1  Capital.  What is this secured by?

2          A.   It's the same.  It's actually the same

3  as the previous two.

4          Q.   And where is Kalamata based out of?

5          A.   New York, I think.

6          Q.   Okay.  And when did this agreement get

7  entered?

8          A.   The beginning of 2019.

9          Q.   And how much was this for?

10          A.   I don't remember exactly, but it was, I

11  think, 100 or 150.

12          Q.   You contend you now owe them 75,000?

13          A.   Right.  They take daily payments from

14  the account in Wells Fargo, and the bank statements are

15  in the records.

16          Q.   And why -- and so you haven't made any

17  payments to them since the bank records you've

18  produced?

19          A.   Correct.

20          Q.   Have they sued you?

21          A.   I think they did, but I don't know if

22  it's active or -- I don't remember, honestly.

23          Q.   Okay.  And do you remember the interest

24  rate on that agreement?

25          A.   All of them, they were between 36 and

1  45 percent, but I don't remember --

2          Q.   And did you ask your attorney to look

3  these over before you signed them?

4          A.   No.

5          Q.   When was the first lawsuit filed against

6  you?

7          A.   I don't remember.

8          Q.   Do you recall when you first retained

9  counsel?

10          A.   Yes.  I think the first one was in

11  December of 2018 by SM Monterrey.  That was not because

12  of a loan or any type of money owed.

13          Q.   We'll get to that.

14               And your counsel was not Mr. Livingston

15  at that time, was it?

16          A.   It was not.

17          Q.   When did you first get sued for money

18  owed?

19          A.   I think May or June.  Well, the first

20  one was back there in 20 -- 2014 or '15 by BG Capital.

21  But that was an arrangement we -- we made and they were

22  paid off.  And after that I think it was May or

23  June 2019.

24          Q.   If the records show it was actually

25  March of 2019, you don't have any documents that would

1    games and pay lenders that I have.  They understand how

2    the business works, so they know that I need to pay

3    some lenders back and I have to produce games in 2019.

4              Q.   Did you sign any addendums with them?

5              A.   I don't know.  I don't remember.

6              Q.   So with any of these entities, did you

7    sign any addendums that you would agree to pay them

8    from the sale of future receipts?

9              A.   Not with these companies.  I don't think

10   so.

11             Q.   Okay.  So in April of 2019 you did not

12   agree to any sort of addendum to the TVT Capital that

13   permitted them to purchase the sale of future receipts?

14             A.   I probably did.  Probably it says that

15   in the contract.  I cannot remember.  But probably it

16   says that they would cover or secure with the proceeds.

17             Q.   And did you turn over receipts to them?

18             A.   No.

19             Q.   Now, did you also have to sign judgments

20   for any of these companies, confessions of judgment?

21             A.   I think I did.

22             Q.   Did you actually sign those or did you

23   just read them?

24             A.   No.  No.  I read them and I sign them.

25   I read them and I sign them.

1          Q.    Did you tell any of the other people

2    from whom you were seeking money, that you had signed

3    all of these confessions of judgment?

4          A.    No.

5          Q.    Did you tell your members, the other

6    members, meaning Mr. Beltran and Mr. Aguayo, that you

7    had signed all these confessions of judgment?

8          A.    No.

9          Q.    Who gave you permission to sign these

10   confessions of judgment then?

11         A.    I don't need permission.

12         Q.    Why is it your opinion you don't need

13   permission to create debts for the company?

14         A.    Explain why do I need permission.

15         Q.    I'm just asking you, what gave you the

16   permission to --

17         A.    My knowledge.  My initiative.  I don't

18   know.

19         Q.    Do you know who Berkovitch & Bouskila

20   is?

21         A.    I think it's a law firm that represents,

22   if I'm not wrong, Kalamata.

23         Q.    And who is Supreme Recovery Services?

24         A.    It's the same.  I think it was part of

25   it.

1    Q.   Now, the next listing is Abiel Alfaro.

2  I may be pronouncing that wrong.  Entry number 32.

3    A.   Yes.

4    Q.   Okay.  And the amount of that claim is

5  66,429.79.  Was that pursuant to a promissory note?

6    A.   The actual amount was 40.  He charged me

7  25 percent every two months.  So, I owe -- and this is

8  like the fifth or sixth agreement that we made.  So, I

9  pay him back on time.  And then the last one was when

10  all the economic struggles start.  So, we were going to

11  renegotiate the loan.  But 66,400 is not the actual

12  amount that he lent.

13    Q.   Well, I pulled up the -- go ahead.

14    A.   Sorry.  No, sorry.

15    Q.   I pulled up the promissory note, and the

16  promissory note appears to be in the amount of $50,000?

17    A.   Correct.

18    Q.   Who wrote that promissory note?

19    A.   I did.  So as I mentioned, we start with

20  40 and it was 25 percent, so that's the 50.  And then

21  after that I think we -- we didn't sign another

22  promissory note.  It was by phone.

23    Q.   And that was in January of 2019?

24    A.   Probably, yes.

25    Q.   And you were the one that selected the

1 | interest rate; correct?

2 |       A.   No.

3 |       Q.   No?  You prepared the document; correct?

4 |       A.   Yeah.  But it is not that I select it.

5 | We negotiate and we came to that amount.

6 |       Q.   Okay.  So, it's your testimony that the

7 | 25 percent was a negotiated amount?

8 |       A.   Correct.

9 |       Q.   Did you show Mr. Alfaro any documents

10 | when you were requesting money from him?

11 |       A.   No.

12 |       Q.   Make any representations that some of

13 | the payment will come from proceeds of the game?

14 |       A.   No.

15 |       Q.   Moving on to Jack Antonoff, which is

16 | number 33.  Did you have a note with Mr. Antonoff?

17 |       A.   I honestly don't remember.  I think we

18 | don't have a note with Jack [sic].

19 |       Q.   How much was that for?

20 |       A.   What?

21 |       Q.   How much money did Mr. Antonoff lend

22 | SPD?

23 |       A.   So, he has been doing four or five

24 | transactions.  All the previous ones were paid, and

25 | then the final one was 50,000, and then 30.

1  reduced to a promissory note?

2      A.   Can you repeat?

3      Q.   Is this -- was this reduced to a

4  promissory note, this 350,000?

5      A.   Yes.

6      Q.   Who drafted that?

7      A.   I think he did.  I think he sent it to

8  me, because we had promissory note that, the one that I

9  produced.  But then the final negotiation that we have,

10 I think he sent it to me.  I don't remember.

11     Q.   And then the next one Ernesto Barrios.

12 Again, do you know when he lent SPD money?

13     A.   Yes, it was in, I think 2018, and I paid

14 him back -- well, we paid him back.  And then there was

15 another transaction in 2019 and that's the one that is

16 owed.

17     Q.   Okay.  And do you remember the interest

18 rate on that one?

19     A.   20 percent.

20     Q.   Has Mr. Barrios sued you?

21     A.   Not -- not that I know.

22     Q.   Are you trying to settle with any of the

23 parties that haven't sued you?

24     A.   Correct.

25     Q.   You are trying to settle with them?

1          A.    Yes.

2          Q.    Who out of the people so far that I have

3    discussed have you tried to settle with recently?

4          A.    All of them.

5          Q.    When is the last time you contacted

6    Mr. Barrios?

7          A.    Yesterday by text message.  He contacted

8    me actually.

9          Q.    And what about Arizmendi, Reynaldo

10   Arizmendi?

11         A.    Oh, that has been a while.

12         Q.    Have you made any payments to

13   Mr. Barrios in the last --

14               COURT REPORTER:  I'm sorry?

15   BY MS. RENNE:

16         Q.    Mr. Padilla, you muted yourself and you

17   also took the camera off.

18               MR. LEBOLD:  I think someone may have

19   walked into the room.

20   BY MS. RENNE:

21         Q.    Mr. Padilla, have you made any payments

22   to Mr. Barrios in the past six months?

23         A.    In the past six months?  No, I think

24   not.

25         Q.    In the past nine months, have you made

1    any payments to Mr. Barrios?

2            A.   I think I did.

3            Q.   How much?

4            A.   I don't remember.

5            Q.   How could you find out, that document?

6    How could you find out?

7            A.   Talking to him.

8            Q.   Out of what account did you pay him?

9            A.   I don't remember.

10           Q.   Was -- let me pull this up.  The

11   agreement with him was with SPD; correct?

12           A.   With Sports Pro, yeah.

13           Q.   Okay.  Arizmendi, have you made any

14   payments to him in the last six months?

15           A.   No.

16           Q.   Jack Antonoff, have you made any

17   payments to him?

18           A.   No.

19           Q.   Mr. Alfaro?

20           A.   No.

21           Q.   Mr. Hernandez?

22           A.   No.

23           Q.   How about Mr. Bassetti?

24           A.   He's not showing in the list.

25           Q.   If you look at number 36?

1          A.    I don't see it.

2          Q.    The next page, and go to the next page.

3          A.    No.

4          Q.    And who -- the note that -- well,

5    Mr. Bassetti has sued you; correct?

6          A.    I think it is.

7          Q.    Do you know where he sued you?

8          A.    Can you refer to SPD, please?

9          Q.    Okay.  Yes, SPD.  Mr. Bassetti has sued

10   SPD; correct?

11         A.    Yes.

12         Q.    Who prepared the promissory note?

13         A.    For whom?  For Bassetti?

14         Q.    Yeah, Mr. Bassetti.

15         A.    Their lawyers.

16         Q.    And the amount of that was 500,000?

17         A.    Yes, which we pay every month, pay

18   interest agreement for the entire 2019 --

19         Q.    Sorry.  What was the interest rate?

20         A.    I think it was 25 percent for the whole

21   year, divided in monthly payments which were --

22         Q.    Have you -- have you sued Mr. -- has SPD

23   sued Mr. Bassetti for usury?

24         A.    I don't know.  Probably.

25         Q.    Who represents SPD in this case?

1  terms of the settlement or have you defaulted?

2          A.   Default.

3          Q.   Did you make any of the payments?

4          A.   No.

5          Q.   When you entered into that settlement

6  agreement, did you have the money -- or did SPD have

7  the money to pay this settlement amount?

8          A.   No.

9          Q.   How, as manager, were you planning to

10 have SPD satisfy the terms of the settlement that SPD

11 signed?

12         A.   We didn't know that COVID was happening

13 so we had planned several games for the 2020 year.  So,

14 that was a plan.

15         Q.   The plan was to use the proceeds from

16 the 2020 games to satisfy the settlement?

17         A.   Part of it.

18         Q.   What is the other part?

19         A.   At some point we would have to

20 renegotiate as well.  It was going to depend on the

21 results of every tour that we provided, on every tour

22 or every game that we produced.

23         Q.   Was there anything in the settlement

24 agreement that evidences that Ms. Diaz was willing to

25 renegotiate as the year went on?

1          A.    No.

2          Q.    And at the time of filing, SPD had also

3    promised the proceeds of some of these games to others,

4    hadn't they?

5          A.    Probably, yes.

6          Q.    Do you know how many other people SPD

7    had promised the proceeds of the games to?

8          A.    No.

9          Q.    You weren't keeping track?

10         A.    No.

11         Q.    And the proceeds of the games were all

12   going into an SPD account, weren't they?

13         A.    Correct.

14         Q.    Which account was that?

15         A.    Wells Fargo.

16         Q.    Wells Fargo, the one that ends, it's

17   3077, I think.  Is that correct?

18         A.    Yeah.

19         Q.    And so the proceeds from these games

20   will go into Wells Fargo Bank account, and you had

21   already authorized at least four entities for automatic

22   withdrawals every week; correct?

23         A.    No, that is not correct.

24         Q.    No?

25         A.    No.

1          Q.   And you drafted it up on your MacBook;

2     correct?

3          A.   Correct.

4          Q.   Have you made any payments to him

5     recently within the last six month?

6          A.   No.

7          Q.   Have you spoken to him about trying to

8     settle?

9          A.   Yes.

10          Q.   When was the last time you spoke to him

11     about trying to settle?

12          A.   I think it was April or May 2010.

13          Q.   Was it before or after this bankruptcy?

14          A.   I don't remember.  Around that date.

15          Q.   How were you planning on paying

16     Mr. Dipchan?

17          A.   I'm talking to everyone.  At some point

18     when the COVID restrictions are gone -- because with

19     all of these, and your clients, I have performed for

20     four or five years without a problem.  The situation

21     started clasping last year.  So, they know that I pay

22     them.

23               So with everyone that I'm talking, that

24     is 85 percent of the list that you have, they know that

25     at some point -- we haven't committed to my date -- but

1  they know that at some point we will renegotiate with

2  them and start paying.

3          Q.   Have you reduced any of that to writing?

4          A.   No.

5          Q.   So these are just oral agreements?

6          A.   Correct.

7          Q.   Has anyone tried to send you a document

8  to get you to sign with regards to that?

9          A.   No.

10          Q.   The next entry is Mr. Etcharren.  Why

11  did you mark this as unliquidated?

12          A.   What do you mean?

13          Q.   Well, I'm just asking.  All of the other

14  ones are listed as just disputed.  This one is listed

15  as disputed and unliquidated.  Do you have any idea

16  why?

17          A.   No.

18          Q.   Now, I notice in the notes that you

19  produced, you didn't produce all the notes with

20  Mr. Etcharren, did you?

21          A.   I think -- notes were signed in his home

22  office and he kept the originals, so I don't have a

23  copy of that.  I remember asking him if he can provide

24  me a copy and he didn't.  And I know my lawyer has

25  request you to produce a lot of documents, which you

1  haven't done as well.

2           MS. RENNE:  I'm going to object to the

3  last part as nonresponsive, and the evidence will speak

4  for itself.

5  BY MS. RENNE:

6           Q.   Who drafted --

7           A.   Do you have a document that we can refer

8  to or put in the computer?

9           Q.   I'm asking the questions here.  This is

10 not a time for you to ask questions.

11          A.   Yeah, but we're talking about -- so if

12 we have communication, we can discuss it.

13          Q.   So is it your -- so let me just strike

14 that question and start again.

15               Who drafted the agreement with Mr.

16 Etcharren?

17          A.   I don't remember.  I remember sending

18 him the draft of this, but I think he made some notes.

19 I don't remember on this.  But we printed in his home

20 office.

21          Q.   And what was the interest rate on that

22 agreement?

23          A.   20 percent every two months.

24          Q.   That's your testimony as you sit here?

25          A.   Yeah.

1          Q.    20 percent every two months?

2          A.    Yes.

3          Q.    On the next page you have Fox Assets

4    Ventures.  Who is Fox -- who owns Fox Assets Ventures?

5          A.    It's a -- I think a guy named Bernardo.

6          Q.    Bernardo de Lagarzo (phonetic)?

7          A.    Yes.

8          Q.    And did you -- okay.  You did produce

9    those.  When did you enter into these agreements?

10          A.    Which ones?

11          Q.    Well, I'm just looking at the Fox Assets

12    Ventures.

13          A.    Uh-huh.  So with that one, that is not

14    only one person.  That's a group of creditors in

15    Mexico.  I think there are like eight or nine.  So each

16    one of them put different amounts of money, and they

17    put it together to respond to this company only.

18                So that was 36 percent a year.  And I

19    paid interest payments like for three years without a

20    problem.

21          Q.    Do you remember representing yourself as

22    the sole member of SPD to them?

23          A.    Probably, yes.

24          Q.    And that was in 2009?

25          A.    2009?

1          A.    Right.  No payment yet.

2          Q.    Okay.  You've made no payments.  What

3    was the amount of the promissory note?

4          A.    It was 350, I think, plus 20 percent, or

5    25 for the year, I think.

6          Q.    And the document that's produced is

7    unsigned.  Do you know why?  Do you actually remember

8    signing that promissory note?

9          A.    Yes.  That I remember signing with him,

10   at the Starbucks.

11         Q.    Okay.  And do you remember whether or

12   not SPD promised to make payments beginning in February

13   of 2020?

14         A.    Yes.  That was an agreement that we had,

15   and I talked to him in May, after the bankruptcy,

16   and -- because he has been part of this since the

17   beginning.  We had an arrangement that he's going to

18   wait for me to produce.

19         Q.    And so, that was not reduced to writing,

20   was it?

21         A.    No.

22         Q.    But nonetheless you guys have an

23   agreement that once you begin to produce, that you'll

24   resume payments to Mr. Salazar; correct?  Is that

25   correct?

1          A.    Yes.   Correct.

2          Q.    Okay.   What entity are you going to use

3    to produce?

4          A.    I don't know yet.

5          Q.    Santos Laguna, is -- that's a company;

6    correct?

7          A.    No.   That's a soccer team.

8          Q.    It's a Soccer team.   How do you owe

9    them -- how does SPD owe Santos Laguna $75,000?

10         A.    For the last game that we produced with

11   them .well, I was -- well, the company wasn't able to

12   make a payment.   It was for the last tour.

13         Q.    When was that last tour?

14         A.    It was 2019.

15         Q.    That wasn't the team that also canceled

16   in October of 2019, was it?

17         A.    No.   That was Tigres.

18         Q.    Tigres?

19         A.    Yeah.

20         Q.    Go ahead.

21         A.    You have it there like Sinergia

22   Deportiva.   That's Tigres.   There in the screen, 3.43,

23   Sinergia Deportiva, that's the club Tigres.

24         Q.    And it's your contention -- well, let me

25   stick with the Santos Laguna.   Do you have an agreement

1          Q.    Is that your understanding of what the

2    case is about?

3          A.    Yeah.

4          Q.    There's a breach of contract?

5          A.    I think there is -- in my personal

6    opinion, I have no obligation with them at all.

7          Q.    So, do you know why SM Monterrey and

8    World Soccer Enterprises are suing you?

9          A.    Yeah.  This is -- because of our work,

10   we put them out of the market.  They stay with no

11   teams, they stay with no stadiums.  They keep talking

12   trash and try to demolish SPD everywhere they go.  And

13   one of the teams that they were doing business with

14   under the table, decided to perform with a creditor

15   that we have, that is Cosecsa, and Cosecsa signed with

16   us to produce and perform their games.  So, they get

17   mad because they only have one team left and they're

18   trying to do all of this nonsense without justification

19   of anything.

20          MS. RENNE:  I'm just going to object as

21   nonresponsive.

22          THE WITNESS:  You asked me why.  You

23   asked me if I know.

24   BY MS. RENNE:

25          Q.    I asked you -- it was a yes-or-no

1            Q.   Did you SPD default on any of those

2    payments?

3                 MR. LEBOLD:   Objection and asks for a

4    legal conclusion.

5    BY MS. RENNE:

6            Q.   Did SPD fail to make some of those

7    payments?

8            A.   Yes.

9            Q.   So, is that lawsuit still active too?

10           A.   I don't know.

11           Q.   Who is the attorney who settled this

12   case for you -- for SPD?   Excuse me?

13           A.   Phil, Phil Livingston.

14           Q.   Were you personally part of that

15   settlement, if you know?

16           A.   I think I was.

17           Q.   Did part of that have to do with your

18   house?

19           A.   I think it was.

20           Q.   And you don't know if that's been

21   resolved yet?

22           A.   No.  I don't know if it's active right

23   now.  We made some payments, and I don't know the

24   status right now.

25           Q.   Is it your contention that SPD still

1  owes Tinker Road 350,000?

2          A.   No.  No, it's less than that.  I think

3  the final agreement was, if I'm not wrong, 140, 150.

4          Q.   So the next one, Toros Stadium.  Has

5  Toros sued you?

6          A.   Not that I know of.  I don't know.

7          Q.   You have listed that they are owed

8  110 -- over, in excess of 110,000 by SPD.  Is that

9  because Toros advanced money on ticket sales on one of

10  the games?

11          A.   No.  They advanced money for producing

12  one game, and that money -- and the money that it's

13  owed is for sponsor payments and the ticket sales that

14  were sold outside.

15          Q.   For which game?

16          A.   It was Rayados versus Santos.

17          Q.   I want to ask you, let's move to page

18  27.  Mirtha Villalba, is she a lender to SPD?

19          A.   Yes.

20          Q.   Okay.  And it's your representation that

21  Ms. Villalba is still owed 25,000?

22          A.   Correct.

23          MS. RENNE:  So, I went to the records,

24  and I'm going to ask that -- do you have the

25  supplement?  Mr. Carmichael, do you have the

1   supplement, part two sup?  Can you pull up Exhibit 65,

2   Villalba Complete?

3   BY MS. RENNE:

4           Q.   Do you know who put together the history

5   of creditors, this document here?  It was produced by

6   you all, by SPD?

7           A.   Yeah.  I did.

8           Q.   You put these together?

9           A.   Uh-huh.  Yes.

10          Q.   So, here it is.  It shows one loan

11  payment of 50,000; correct?

12          A.   Yeah.

13          Q.   And it shows a 20 percent interest every

14  three months; is that correct?

15          A.   Correct.

16          Q.   And 25,000 has already been paid;

17  correct?

18          A.   Yes.

19          Q.   And so, based upon that, is that how you

20  concluded 25,000 was owed to Ms. Villalba?

21          A.   No, because I talked to her and we get

22  to an agreement.  I had already paid 25,000, and she

23  only required that I completed the 50,000 and that's

24  it.

25          Q.   Okay.  So, even though SPD might have

1  quite sometime.  If you go down to page four --

2         A.   Yeah, but I don't -- I don't receive any

3  response from Wells Fargo.  I cannot obligate them to

4  do it, or tell me how can I do it.

5         Q.   That's for your attorneys to tell you.

6              Now, let's go down to page five.  Now,

7  we see where Vatesh has put in a wire transfer, but you

8  have a number of e-deposits.  Now I'm going to try to

9  find some on this particular one, but this just has

10 more checks on it.

11             E-deposit.  If we can go down to page 6.

12 An e-deposit on 7-30 of 13,000, another e-deposit of

13 15,000, another e-deposit of 3,000.  How can we tell

14 where that money came from?

15        A.   Some of them are -- I think the ones

16 that's there as deposit is cash.  These should be cash.

17 These should be cash deposits.

18        Q.   The e-deposits are going to be cash

19 deposits?

20        A.   I think.  Most of them, I think they

21 are.

22        Q.   Okay.  Well, on 7-30, where did this

23 $15,000 cash come from?

24        A.   Cash, I'm telling you.  It says here the

25 deposit is cash.

1          Q.   Okay.  So, but I'm asking where did the

2    $15,000 come from, if you know?

3          A.   I don't know.  Sales.  Sponsor payments.

4          Q.   Okay.  Concession stands?

5          A.   No, we never get that.

6          Q.   You never get concession stands?

7          A.   Ms. Renne, I explained to you the three

8    sources of income.

9          Q.   I know you did.  And I'm asking --

10          A.   I never said concessions, so why are we

11   repeating?

12          Q.   Okay.  And so, who pays you the ticket

13   sales?  The stadium?

14          A.   The stadiums.  And we have some other

15   tickets, consignment tickets that we sell outside.

16          Q.   Okay.  Tickets.

17          MR. LIVINGSTON:  I'm sorry.  Can we

18   catch a break here pretty soon?

19          MS. RENNE:  Yeah.

20   BY MS. RENNE:

21          Q.   And then after this 15,000 gets

22   deposited, and the 13,000, and then we can't really

23   tell where these checks go.  That's another 15,000 that

24   basically goes out on the same day that 15,000 gets

25   deposited; correct?  Unless you can tell me where those

1  some sort of accounting as for how much the ticket

2  sales are?

3           A.    Yeah, we have it.

4           Q.    Okay.  And the next day 11-6, which

5  would be page 12 of this document, you have another

6  10,000 in cash.  Do you know where that came from?

7           A.    The same.

8           Q.    Ticket sales?

9           A.    Ticket sales or sponsors.

10          Q.    Okay.  11-8 you have another 100,000 and

11  another 40,000, that's in cash.  Again, is that ticket

12  sales --

13          A.    Same thing.  I don't think those were

14  cash; I think those were checks.

15          Q.    And they just didn't get logged in as

16  checks?

17          A.    I don't know.  That's the bank problem

18  as it's reflected.  But I never deposit 100 in cash.

19          Q.    Did you deposit that 40,000 in cash?

20          A.    No, I don't think so.  I think that was

21  a check.

22          Q.    11-13 there's a group of 40,000, 4,000,

23  and 24,000 on 11-13, all in the same day, different

24  branches.  Is that cash?

25          A.    Probably some of it was cash, probably

1 others were checks.

2          Q.   And do you know where that came from?

3          A.   If they were checks, probably they were

4 some money from a lender.  And if it's cash, it's only

5 for ticket sales and sponsorship.  But if it was a

6 check, probably for a lender.

7          Q.   If you look down on 11-13, the company

8 was paying your Reliant Energy bill, weren't they?

9          A.   Okay.

10          Q.   And that was for your home?

11          A.   No.  That was the apartment office that

12 I mentioned that we had.

13          MS. RENNE:  Right now would be a good

14 time to take a break.  Ten minutes?

15          MR. LIVINGSTON:  Yes.

16          COURT REPORTER:  The time now 3:46 p.m.

17 and we're off the record.

18          (Recess)

19          COURT REPORTER:  We're back on the

20 record and the time is 4:06 p.m. Central Time.

21          MS. RENNE:  Can we pull up Exhibit

22 No. 20, it should say list of creditors?

23          (Creditors' Exhibit 29 marked for

24 identification)

25

1         A.    Yes.

2         Q.    Is that correct?  And then when we drop

3    down a little bit, on 5-2 we see that you transferred

4    7,500 into your everyday checking account.  And that

5    money goes back to SPD Entertainment and SPD Builders.

6         A.    Uh-huh.

7         Q.    You have any agreement --

8         A.    I don't see it.

9         Q.    Okay.  If you look at the last three

10   entries, actually last four entries on this page, you

11   transferred to your personal account, a transfer to

12   Sports Pro Builders, a transfer of 10,000 to SPD

13   Entertainment, and a transfer to your Cash Wise Visa?

14        A.    Correct.

15        Q.    First, have you produced that Cash Wise

16   Visa?

17        A.    I think we did send the bank statements.

18   I'm not sure.  I'm not 100 percent sure, but I think I

19   asked that to the executive at Wells Fargo.  I don't

20   know if they produced it, but I think they did.

21        Q.    And were there written agreements for

22   the money to be transferred between these entities?

23        A.    No.  I explained that to you in the 341

24   hearing, that we need to move money when we have these

25   amounts at this time, we started having all the threats

1  of the garnishments and that stuff.  So, we moved it,

2  but it returned.

3          If you'd move forward a little bit more

4  or the month, the money returned from my account from

5  SPD Entertainment, or there were payments made from SPD

6  Entertainment or Soccer Builders for one of the game

7  providers like hotels, stadiums, et cetera.

8          Q.  And that was to get out from underneath

9  the garnishment of the Wells Fargo account?

10          A.  Yeah.  That's the reason we move it.

11          Q.  Okay.  Now, if you go down to page three

12  of this, you'll see an May 3, Fox Capital made a

13  payment into SPD's account.  And that same day

14  apparently a wire transfer was made to a Juan Olvera.

15  Is that one of the creditors?

16          A.  Yes.  Correct.

17          Q.  Do you know the very next entry, do you

18  know what that check is for, that 7,500?

19          A.  No.  No, I don't remember.

20          Q.  And then we see those payments, those

21  are the daily payments you're talking about; correct?

22  To Kalamata, Fox, Green, and TVT?

23          A.  Yes.

24          Q.  And then three days later, is that the

25  same Claudia Olvera -- oh, no.  Is this -- is the

1          Q.    Is that because they were paid off?

2          A.    They were paid, but not totally.

3          Q.    Okay.  And how much did SPD pay to

4    Cosecsa in the year 2019?

5          A.    I don't know what that number, but you

6    can find it in all the banks statements.  You will find

7    it.  All of them were wire transfers so you can

8    identify them very well.

9          Q.    And how long had SPD been doing business

10   with Cosecsa?

11         A.    Three years.

12         Q.    Three years.  Since about 2017?

13         A.    Correct.

14         Q.    And were there a series of documents for

15   these transfers?

16         A.    Yeah.

17         Q.    So you would have no reason to dispute

18   if SPD paid to Cosecsa over $3.2 million over the

19   course of about three years, two years?  I'm sorry.

20   Let me ask that question again.

21              Over the course of two years would you

22   dispute if Cosecsa was paid $3.2 million by --

23         A.    What do you mean by dispute?

24         Q.    If there are payments to Cosecsa out of

25   these accounts in the amount of over $3.2 million,

1  between June of 2017 and June of 2019, would you have

2  any reason to deny that?

3          A.   No.

4          Q.   I'm looking in the notes and I don't see

5  any records of any agreements with Cosecsa.

6          A.   Look at the final documents that we put

7  in the Dropbox.

8          Q.   I am.  So, who are the -- who are the

9  people behind Cosecsa, the key people that you

10 communicate with regularly?

11         A.   It's only one guy -- well, two guys.

12 Miguel Fernandez, with an F, and his assistant Victor

13 Ourrieta, O-U-R-R-I-E-T-A.

14         Q.   And so, if you were -- if SPD was still

15 making payments to Cosecsa as late as -- well, the

16 records stop, off the Wells Fargo account, in June of

17 2019.  Has SPD made any payments since June 2019 to

18 Consecsa?

19         A.   No.

20         Q.   Does SPD still owe money to Cosecsa?

21         A.   We have an agreement now.

22         Q.   That reduced to writing?

23         A.   No.

24         Q.   Who is your agreement with?

25         A.   With Miguel Fernandez.

1          A.    That the PO box that I mentioned that we

2    have for two months only.  If you look at the address,

3    that's the address that you asked me before.  I don't

4    know why they list it like that.  They probably thought

5    I owned that building or something.  I don't know.

6          Q.    Okay.  But just -- with Kalamata

7    Capital, did you sign that?

8          A.    No.  I didn't sign anything with TW

9    Office Suites.  I don't know what that is or where that

10   come from.

11         Q.    Okay.  And on page 37 you list the total

12   liabilities just a little over 17 million; is that

13   correct?

14         A.    Well, that's all the money that we have

15   raised through the whole years.  It's not the real

16   amount that SPD owes.

17         Q.    Do you know what the real amount that

18   SPD owes is?

19         A.    No.

20         Q.    So, how did you come about just listing

21   certain creditors?

22         A.    Because we put the documents, the

23   amounts that the lawsuits have, and I can put an

24   example if you allow me, because then you get mad at

25   me.  Can I put an example?  Okay.

1    Q.    I --

2    A.    -- Kalamena (phonetic) is claiming

3  $2.8 million, and the actual money that I received from

4  him, or SPD, was 1.7, which we have paid 1.5.  So, he's

5  demanding 2.8, I don't know from where, so that's

6  why -- and that example is only one for like, 25 or 30.

7  So, I really think the amounts that is really owed is

8  no more than 4 or 5 for him.

9    Q.    Okay.  And what are -- you're basing

10 that on the records that you produced?

11   A.    And the payments we have made.

12   Q.    And the payments are reflected in the

13 bank statements that you produced; correct?

14   A.    Correct.  And some of the funds were

15 made in cash.  Like, for example, to your client Rene

16 Etcharrent, he requested to have cash payments to avoid

17 tax payments.

18       MS. RENNE:  I am just objecting.  That

19 is nonresponsive.

20       THE WITNESS:  -- and like that, there

21 are 35 cases.

22       MS. RENNE:  So, moving back to number

23 35, and I'm going to object to the last part of his

24 answer as nonresponsive.

25

1  BY MS. RENNE:

2       Q.   Again, when we go through this we just

3  see movement between SPD Entertainment, Soccer Builders

4  plus to make payment for SPD, insufficient funds.  And

5  then on 5-14, this 35 -- if you go down to page four of

6  this, on 5-14 there are two e-deposits; one for 19,680

7  and one for 50,000.  Was that for cash?

8       A.   I can't recall that.  Probably the

9  19,000, yeah, that may be cash.  The 50,000, no, for

10  sure.

11       Q.   So that could be a payment from an

12  investor; correct?

13       A.   There were no investors.  They are

14  lenders.  They don't invest.  They are serious lenders.

15       MS. RENNE:  I'm just going to object to

16  the last part of the answer as nonresponsive.

17       THE WITNESS:  Why do you --

18  BY MS. RENNE:

19       Q.   You aren't a lawyer.  You are not a

20  lawyer, are you, Mr. Padilla?

21       A.   No, I know that I am not, but I'm not

22  allowed -- you are supposed to do your work and do

23  right, the things the right way.

24       Q.   Mr. Padilla, you wrote a number of those

25  agreements, didn't you?

1          A.    I did.

2          Q.    And you knew that as of 2019 that you

3    were going to contend that those notes were usurious

4    because you were already using that as a defense in

5    some of the cases; isn't that correct?

6          A.    Probably is.

7          Q.    And as of March 2019 some of the

8    lawsuits have been filed, and as of April 2019 some

9    answers have been filed to those lawsuits; correct?

10         A.    I think so.

11         Q.    And in all of those answers -- for

12   example, in the Etcharren case you've made a claim of

13   usury; correct?

14         A.    Probably.

15         Q.    In the -- in the Alfaro case you made a

16   claim of usury?

17         A.    I don't know.  Probably.

18         Q.    Camarena (phonetic) you've made a claim

19   of usury?

20         A.    I think we did.

21         Q.    Diaz you made a claim of usury?

22         A.    I think we did.

23         Q.    Tinker Road you claimed usury?

24         A.    I think we did.

25         Q.    Ruben Lara, claim of usury?

1              A.    Probably is.

2              Q.    Walter Chavarria claim of usury?

3              A.    Probably is.

4              Q.    Jose Covero (phonetic), claim of usury?

5    I don't need to -- is that a yes?

6              A.    Probably is.

7              Q.    And yet despite this, you've written

8    agreements since those dates with interest rates well

9    over 20 percent, haven't you?

10             A.    Yes.

11             Q.    And you did this knowing that that's

12   what you were going to try and claim as a defense in

13   the case, isn't it?

14             A.    Probably is.

15             Q.    Going back to our exhibit, what were the

16   dates of the games in 2019?

17             A.    May I look at the file in my computer?

18             Q.    You don't know which games were held in

19   2019?

20             A.    Yeah, I know, but I don't remember the

21   exact date.  But I know that we produced games in July

22   and in September.

23             Q.    Okay.  So you probably had more than one

24   in July and more than one in September?

25             A.    If I'm correct, we had three in July and

1  the one he sent to me to fill out.

2         Q.   And so, you -- so, the next one I

3  believe, again, it's from you to Adrian Garibay, which

4  is on page two.  And again, somewhere in your email you

5  have 14,992 emails.  And you outline how much you need

6  to deposit for each of these games; isn't that correct?

7         A.   Correct.

8         Q.   And again, there -- attachment's not

9  there, but it's Chase, so I guess SPD must have

10  deposited this amount; is that correct?

11        A.   Yes.

12        Q.   And these figures are pretty specific.

13  This 12,641, it's based upon financial documents; isn't

14  it?

15        A.   And it's ticket sales.

16        Q.   And so, where is this information now,

17  if you were able to extrapolate how much you owed?

18        A.   So, for every game we have to present a

19  closeout and you have to put the receipts of the

20  payment, the IG report, and the final sales report from

21  the State.  That's how you back up these amounts.

22        Q.   And I'm asking where are all those

23  reports that were sent to the United States Soccer

24  Federation for all of these games?

25        A.   In the email.  I mean, I -- as you were

1  asking at the beginning, I sent all of this as PDFs,

2  but I didn't know that you cannot open them.  So, I

3  need to send separately all those reports for each

4  game.  We can do that without a problem.

5          Q.   Yeah.  Because it's your contention that

6  these games in 2019 were not profitable; isn't that

7  right?  Didn't you submit a statement saying that?

8          A.   Correct.  They were not.

9          Q.   And in 2020 there weren't any games; is

10  that correct?

11          A.   Correct.

12          Q.   2018, three games, were they profitable?

13          A.   Some of them, yes.  We produced 21

14  games.  We have the first semester of 2018, was a good

15  year, and then the second semester was not.

16          Q.   Okay.  And when you were making

17  presentations to lenders or investors, whichever you

18  want to call them, were you telling them about this

19  decline in revenue?

20          A.   Yes.

21          Q.   You were?  And you were telling them

22  that you had already pledged some of the game proceeds

23  to other lenders or investors?

24          A.   No.

25          Q.   Why didn't you tell them that?

1     A.   They didn't ask.

2          MS. RENNE:  I'm going to look now, again

3     it's in 87 USSF International, and have this one

4     marked.

5          (Creditors' Exhibit 35 marked for

6     identification)

7     BY MS. RENNE:

8          Q.   Again, this is just more documents that

9     were not actually attached.  And it's discussing, you

10    know, payments made to the USSF, and it's all based

11    upon how many -- you know, the bond is based upon what

12    you anticipate you're going to make; correct?

13         A.   No.

14         Q.   What --

15         A.   This email shows the documentation you

16    need to get the game approval and the money that you

17    have to pay.  That it's -- every single game you have

18    to pay a deposit of a bond, referees' fee and

19    application fee.

20         Q.   And so, what was the bond based upon?

21         A.   They have a straight number 7,500.

22         Q.   Okay.  So, it's a flat rate?

23         A.   Yes.

24         Q.   Okay.  Are you current with the U.S.

25    Soccer Federation?

1          A.   I think we are, yeah.

2               MS. RENNE:  Now, if we go to Exhibit 88.

3               (Creditors' Exhibit 36 marked for

4     identification)

5     BY MS. RENNE:

6          Q.   From you to Victor De La Garza.  Is that

7     who you were talking about, Cosecsa.

8          A.   No.  But he's kind of related to Cosecsa

9     a little bit, but not that much.  We have Victor.

10         Q.   Why are you sending him this information

11    and it's related to Cosecsa?

12         A.   As I mentioned this is related to

13    Cosecsa, but not that deep like the other Victor.

14         Q.   And again, we have information

15    attachments, six attachments not produced?

16         A.   Correct.

17         Q.   So, we don't know what those attachments

18    say, do we?

19         A.   I can tell you it's a note, a promissory

20    note with Cosecsa.  It's a personal guarantee of the

21    predictions of the games and the letters we send to the

22    stadiums.

23         Q.   Well, I understand that, but we don't

24    know the details of that?

25         A.   No, but I can send them without a

1  problem.

2      Q.   Now, and you will forward to us all of

3  the financial statements from the U.S. Soccer

4  Federation?

5      A.   Yes.

6      Q.   And that amount is going to show us the

7  profits and the -- or I should say the revenues and

8  expenses for all of those games; correct?

9      A.   No.  Only the ticket sales.

10     Q.   Okay.  Only the ticket sales.  Where do

11 you keep a listing of revenues and expenses for each

12 event?

13     A.   In the Excel file that we provided to

14 Jambrina.  There's a listing for every game.

15     Q.   Okay.  And that's the one you contend

16 that's been produced?

17     A.   It was produced from Jambrina because I

18 sent them all the Excel reports, so he should -- I know

19 that he sent more than 1,000 pages so it should be

20 there.

21          MS. RENNE:  I'm going to go back.  I

22 want to go back to the regular part two, Exhibit 40,

23 SPD Wells Fargo statement, and have this one marked as

24 exhibit next in order.

25          EXHIBIT CUSTODIAN:  Which one?

1          Q.   So, if there are a number of
2    unidentified Morgan Stanley --
3          A.   No.  There were only two people that I
4    sent -- what SPD sent money.  Guadalupe Paulina and
5    Natalie Davis.  That is another creditor that is
6    already paid off like two years ago.  So, those are the
7    only two that the company sent money to Morgan Stanley.
8          Q.   And so, even if Morgan Stanley appears
9    later on in the documents, 2019, 2020, it's still your
10   contention that was to Diaz then?
11         A.   It wasn't -- because I didn't make
12   payments to Morgan Stanley in 2020 or 2019.  Well,
13   probably 2019, probably there's one payment.  But
14   2020 --
15         Q.   And that's to Diaz; right?
16         A.   Correct.
17         Q.   Okay.  Go down to 8-17 and there is a
18   $65,000 payment to you with a bank account in Mexico?
19         A.   Uh-huh.
20         Q.   What was the purpose of that payment?
21         A.   Repayment for the Mexican group that I
22   mentioned before, the Fox Asset group.  I need to send
23   money to pay them via wire transfer from my account in
24   Mexico.
25         Q.   So, you sent SPD -- $65,000 sent SPD to

1  your bank account in Mexico; correct?

2          A.   Yes.

3          Q.   And that was for Cosecsa?

4          A.   No.  For the group of Mexico -- the Fox

5  Assets Venture.

6          Q.   And so, in August of 2017 you are

7  already doing business with Fox Assets?

8          A.   Yes.

9          Q.   Do you have any document that links this

10 payment to you in Mexico to Fox Assets?

11         A.   Not that I can remember, but I can try

12 to pull up in any account in Mexico and go back and

13 print after the money entered, print the payments that

14 were made.

15         Q.   Go down to the next page 8-18.  There's

16 a check for $50,000.  Do you remember what that is for?

17         A.   Oh, no.  But because of the amount it's

18 a lender.

19         Q.   Okay.  And the deposit on 8-21, $50,000?

20         A.   The same.

21         Q.   And on 8-21 another 10,000 that goes to

22 you; correct?

23         A.   Sorry.  Where -- yes.  8-21, yes.

24         Q.   What was your salary at SPD?

25         A.   At that point it was 10,000.

1          A.    No.

2          Q.    Is that -- what was your answer?

3          A.    No.

4          Q.    You have no information that motions for

5    sanctions have been brought against you?

6          A.    No.

7          Q.    Do you ever check your mail?

8          A.    Yes.

9          Q.    Okay.  And you're testifying that you

10   have gotten no letters from the courts, no letters from

11   counsel, and no notification of any kind of any of the

12   hearing notices or motions for sanctions?

13         A.    I didn't say that.

14         Q.    Well, I'm asking you.  Were you aware

15   that in the Dallas matter there were motions for

16   sanctions brought against you for failure to produce?

17         A.    I replied no to that question.

18         Q.    And same question with Mr. Etcharren's

19   case.  Were you aware that there have been motions for

20   sanctions brought against you for failure to produce?

21         A.    I don't know.  Everything I receive I

22   send it to Phil and we have two calls per week to see

23   what are the next steps that I need to do.

24         Q.    And you have not seen any document or

25   any paperwork requesting production of documents; is

1 that your testimony?

2          A.   I don't remember.

3          Q.   You don't remember getting the documents

4 or you don't remember getting documents that ask for

5 information?

6          A.   No, I do remember getting documents.  I

7 don't remember because there were a lot of documents,

8 so I don't remember what I received.  And again, I

9 forward everything to my lawyer.

10          Q.   Now, are you -- were you paid -- when

11 you were paid, were you paid bimonthly or were you paid

12 every month?

13          A.   Most of the time once a month.

14          Q.   And were payroll taxes taken out?

15          A.   Some years, yeah.

16          Q.   Did you use a service?

17          A.   I think ADP.  I think that's the name, I

18 don't know.  I think it's ADP.

19          Q.   Have you produced those records?

20          A.   No.

21          Q.   So if there were payments other than

22 just a $10,000 payment for payroll into your personal

23 and into your account in Mexico, what was the purpose

24 of those payments?

25          A.   To pay me back, because I make a lot of

1          A.    Right.

2          Q.    Or -- okay.

3          A.    Yes.

4          Q.    And you also gave him these checks,

5    telling him that, look, you're going to give him the

6    checks in advance so that he knows he can just go to

7    the bank and cash them; correct?

8          A.    Well, giving him the checks in advance,

9    that was the only way he was doing the deal.

10         Q.    And on the date that these checks were

11   actually written for, the money wasn't there, was it?

12         A.    Well, the date these checks were written

13   for, we were like three months before that.

14         Q.    And did you transfer money out of the

15   Wells Fargo account immediately before this and into

16   Sports Pro -- Sports Builders Pro?

17         A.    Soccers Builders Pro.

18         Q.    Oh, excuse me.  Let me re-ask the

19   question.  Sorry.  We're all getting tired.

20               So, in February, right around

21   February 27th or 28th, did you transfer money out of

22   Sports Pro Development and put it into Soccer Builders

23   Pro?

24         A.    Probably.  I don't remember.

25         Q.    And so, when these checks were presented

1          A.   You said a couple of questions, so it's
2    not a couple; right?
3               MR. HESS:  I'll pass the witness so that
4    some other people can also ask questions for the
5    moment.
6               THE WITNESS:  I have five minutes.  I'm
7    sorry, Ms. Renne, but if we can continue this on
8    another occasion, I'm open to doing it.  But for
9    respect, I have people waiting for me for the last 30
10   minutes.
11              MS. RENNE:  Well, with all due respect,
12   the court has ordered you to be here --
13              THE WITNESS:  -- that's why I'm asking
14   you the time frame.
15              MS. RENNE:  Okay.  I'm going to
16   introduce just one or two last exhibits next in order,
17   and I ask that Exhibit 82 Results be pulled up.
18              (Creditors' Exhibit 43 marked for
19   identification)
20              DIRECT EXAMINATION (Cont.)
21   BY MS. RENNE:
22        Q.   This appears to be a -- some sort of
23   summary from November 14, 2018.  Do you recognize this
24   document?
25        A.   Yes.  It was for a game in Albuquerque,

1  New Mexico.  It seems to be a settlement for a game

2  that we have in Albuquerque, New Mexico, but it's not

3  signed and that amount is not accurate.

4         Q.   Well, let me just go down then to the

5  next page, because this one is signed by you on

6  January 9th of 2019; correct?

7         A.   Correct.

8         Q.   And it shows net due to SPD Sports

9  $522,000?

10        A.   Correct.  But that wasn't -- later and

11  that was not the final, so they have mistake in their

12  system and we have to redo it.

13        Q.   Okay.  And did you produce the one that

14  was redone?

15        A.   No, but I have it.  I produced it to the

16  U.S. Federation, so I have it.

17        Q.   Okay.  Well, isn't it motivated --

18  aren't you -- wouldn't SPD be motivated to have a lower

19  amount to the U.S. Soccer Federation so that their

20  percentage is lower?

21        A.   It's not that I can -- they can call the

22  state at any time and compare the amounts.

23        Q.   Well, I'm looking at expenses of 33,000.

24  How far off are the expenses?

25        A.   Where was that?

1          Q.    Okay.  If you look on page two, the

2  expenses total expenses --

3          A.    Yes, that's one of the mistakes we have

4  in that settlement.

5          Q.    What's missing from there?

6          A.    I don't know.  I have to, I don't know,

7  remember by memory.

8          Q.    Okay.  What's wrong with any of the

9  revenue input?

10         A.    That they doubled it.  They put together

11  the consignment and the ticket sales in the ticket box

12  office.  So they double the amount and it was wrong.

13         Q.    Okay.  And you have that to produce?

14         A.    Yeah.  I can send it to you.

15         Q.    Let's go down to page three because now

16  we've got a Ticketon, I was able to find one Ticketon.

17  And the online sales are listed, box office sales are

18  listed, consignment stores --

19         A.    Yeah?

20         Q.    And it shows a net revenue of 390,000

21  for that game?

22         A.    I don't remember.  I don't see -- do you

23  have one that was signed?

24         Q.    I don't know if you've produced it or

25  not, but --

1    A.    No.  I think -- no, because that's a --
2  they produce that the day of the game, but then we have
3  to return the tickets that were not sold outside and
4  the amounts go down.

5    Q.    And where is that reflected?

6    A.    I have it -- I have to produced the one
7  that is -- normally the last one, so I can see the one
8  that I produced to the U.S. Soccer Federation and send
9  it to you without a problem.

10    Q.    Okay.  And, but you didn't go ahead and
11  redo it with Ticketon.  Ticketon didn't go ahead and
12  agree to redo it, didn't they?

13    A.    No, they -- as I said, they give me
14  these the day of the game.  So once the game is almost
15  done, I go to the box office and they give me these,
16  because it's like the preliminary settlement.  But then
17  we return the tickets that were not sold outside, so
18  obviously the amount goes down of revenue.

19    Q.    Well, tickets sold, that's -- they
20  wouldn't enter tickets that weren't sold in their
21  amount, and then take it back from you --

22    A.    Well, you see -- if you see there, it
23  says box office sales, online sales, and there is a
24  line that's consignment sales.  That are ones that we
25  need to wait like two weeks after we can pull all the

1  tickets that were outside selling in the different

2  outlets.  So we return it and instead of being 100,000,

3  it's probably 30.  And that game didn't -- didn't go

4  well in the consignment sales at all.

5           Q.   So, now let's go down to page four, and

6  I found an Event Settlement for Ecuador.  It appears to

7  be dated September 11, 2018.

8           A.   Correct.

9           Q.   -- gross ticket sales in the amount of

10  300 and some thousand, net ticket sales 274,000.

11  Again, expenses here for the game are listed at 49,000.

12           A.   Yeah.  But those are the expenses only

13  related with the stadium, not the total expenses on my

14  end.  So, this is a settlement with the stadium not a

15  settlement of the entire event.  Does that make sense?

16           Q.   Yeah.  Absolutely.  And so, the

17  settlement here with the stadium is -- is that, do you

18  owe 122,000 to the stadium or do they owe you 122,000?

19           A.   No.  They owe SPD that amount.  And it

20  says -- over there it says grand total due to promoter.

21           Q.   Here we have the Leon versus Toluca.

22  And again, we have the expenses and revenue, tickets

23  sold?

24           A.   I'm not seeing it.

25           Q.   Okay.  Sorry.  Go down to page five.  My

1  apologies.  I forgot to tell the handler.

2          A.   But that is not the settlement.  That is

3  an operation sheet.

4          Q.   So, that's operations?

5          A.   Yeah.  That is the form that we use to

6  project the events.  So, if you see the different

7  options or the different ticket sales amounts, and

8  that's what we can expect.

9          Q.   Okay.  And then over here in the -- over

10 here on the side, and it shows what's paid and hasn't

11 been paid; correct?

12         A.   Correct.

13         Q.   And it shows even after -- even if you

14 had paid the full amount of 353, it would be a profit

15 of 211; correct?

16         A.   If you sold 11,000 tickets.

17              COURT REPORTER:  He's froze.  It's

18 froze.

19              MS. RENNE:  I know.

20              MR. LIVINGSTON:  It looks like he's

21 back.

22 BY MS. RENNE:

23         Q.   Okay.  Where are the real numbers for

24 this then for the Leon versus Toluca game?

25         A.   Have them.

1      Q.   Go to page six and seven -- or rather

2  six first.  November 17th game 2018.  Are these numbers

3  accurate?

4           EXHIBIT CUSTODIAN:  We lost him.

5           MR. LIVINGSTON:  I think we lost him.

6           THE WITNESS:  It was disconnected.  Can

7  you hear me?

8           MS. RENNE:  Yes.

9           MR. LIVINGSTON:  You're back.

10 BY MS. RENNE:

11     Q.   So, on page six, are those numbers

12 accurate?

13     A.   All of these are predictions.

14     Q.   Okay.  Who put that together?

15     A.   I did.

16     Q.   What was the purpose of it?  Was it to

17 show investors?

18     A.   No.  I always produce this for my

19 control, for knowing how much we need to expect and how

20 much --

21     Q.   Okay.

22     A.   -- was the real revenue.

23     Q.   Where are the real numbers?

24     A.   I have them.  All of them I have.  I can

25 send it to you, the final numbers.

1      Q.   Why weren't they produced already?

2      A.   I don't know.

3      Q.   Okay.  Last page seven.  This appears to

4  be for November 17, 2018.  Are these the real numbers?

5      A.   No.  That's the settlement with the

6  stadium, again.  That is not real numbers for the

7  entire event.  And, yes, that's it.  What game was it?

8      Q.   The Tigres versus Pumas?

9      A.   Tigres versus Pumas, yes.

10     Q.   Okay.  And so, they owe you over

11  $41,000?

12     A.   Right.

13     Q.   And again, we can figure out the

14  expenses --

15     A.   These are only the expenses related with

16  the stadium.

17     Q.   And where were the other related to

18  everything --

19     A.   I have it in a file.  I have a file for

20  every single game that I send to Jambrina.  I explained

21  that to you before.

22     Q.   And that hasn't been produced yet;

23  correct?

24     A.   They should be.  Because I sent

25  everything to him and he sent everything he has.

1          A.    I don't remember.

2          Q.    Did you ever remember telling him that

3   you had a plan to get through this 17 million?

4          A.    I do remember, yeah.  Yeah.  We talked

5   on the phone and, yeah.

6          Q.    Did you tell Mr. Abaya that you had a

7   plan to get rid of this 17 million dollars worth of

8   debt that SPD owes?

9          A.    No, because like I told you before, it's

10  not 17 million dollars.

11         Q.    So you never had any text messages with

12  Mr. Abaya about 17 million dollars?

13         A.    He mentioned that because he saw that in

14  a lawsuit or in the public records, and I explained to

15  him by phone there is no 17 million, and I explained

16  the situation and all the creditors.

17         Q.    And you told him in advance of the

18  bankruptcy that you had a plan, didn't you?

19         A.    Correct.

20         Q.    Okay.

21               THE WITNESS:  Okay.  Please -- connect

22  [sic].  I'm sorry.  Phil, can you please let me know?

23               MR. LIVINGSTON:  Ms. Renne?

24               MS. RENNE:  Yeah.  Well, I mean, if he

25  has to go, he has to go.


**WOODFOREST®**
N A T I O N A L   B A N K
MEMBER FDIC

00000047 TW100T03012008171600 3 000000000  2097431158

SOCCER BUILDERS PRO LLC
** RETURNED MAIL

 **Account Information & Customer Service**
1-(877) 968-7962

 **P.O. Box 7889 The Woodlands, TX 77387**

 **Visit Us Online at www.woodforest.com**

Like Us On      Follow Us on 

## Summary of Accounts

| ACCOUNT TYPE AND NUMBER | BALANCE FORWARD | TOTAL DEBITS | TOTAL CREDITS | CLOSING BALANCE |
|---|---|---|---|---|
| Business Simple Checking 1315010643 | 0.15 | 271,929.68 | 275,118.00 | 3,188.47 |

## Business Simple Checking 1315010643

## Transactions

| Date | Credits | Debits | Balance | Description |
|---|---|---|---|---|
| 02-02 | 68.00 | | 68.15 | Online Transfer Credit        OL XFER |
| 02-04 | | 32.00 | 36.15 | INSUFFICIENT ITEM FEE |
| 02-04 | | 32.00 | 4.15 | INSUFFICIENT ITEM FEE |
| 02-05 | 50.00 | | 54.15 | Online Transfer Credit        OL XFER |
| 02-07 | | 32.00 | 22.15 | INSUFFICIENT ITEM FEE |
| 02-18 | 275,000.00 | | 275,022.15 | TRF WT Fed#=20200218K3B75B1C0001 WIRE CR |
| 02-18 | | 35,000.00 | 240,022.15 | Online Transfer Debit        OL XFER |
| 02-18 | | 8,000.00 | 232,022.15 | CASH CK  #Check |
| 02-18 | | 12,500.00 | 219,522.15 | CHECK |
| 02-18 | | 35,000.00 | 184,522.15 | CHECK 218 |
| 02-18 | | 30,000.00 | 154,522.15 | CHECK 219 |
| 02-18 | | 20.00 | 154,502.15 | TRF     0208004804 WIRE TRANS   FEE |
| 02-19 | | 366.67 | 154,135.48 | POS DB PAYPAL *REYESAL 4029357733 CA 000000000383148 |
| 02-19 | | 5,000.00 | 149,135.48 | POS DB PAYPAL *PUBLIOOSSDE 4029357733 CA 000000000382682 |
| 02-19 | | 10,000.00 | 139,135.48 | TRF WT Fed#= BNF=PHILLIP R. LIVI WIRE DB |
| 02-19 | | 20,000.00 | 119,135.48 | CHECK 238 |
| 02-19 | | 4,929.79 | 114,205.69 | ACH-ONLINE PMT 004939910127081 CAPITAL ONE |
| 02-19 | | 29,891.27 | 84,314.42 | ACH-ACH PMT Juan C Padilla AMEX EPAYMENT |
| 02-19 | | 50,000.00 | 34,314.42 | Check #234 |
| 02-19 | | 35.00 | 34,279.42 | TRF     0112095901 WIRE TRANS   FEE |
| 02-20 | | 15,000.00 | 19,279.42 | TRF WT Fed#= BNF=FRANCISCO DEL C WIRE DB |
| 02-20 | | 35.00 | 19,244.42 | TRF     0112221401 WIRE TRANS   FEE |
| 02-22 | | 3,750.00 | 15,494.42 | POS DB PAYPAL *CPROCTOR11 4029357733 CA 000000000190190 |
| 02-24 | | 10.00 | 15,484.42 | Return Mail Fee        RML FEE |
| 02-25 | | 1,000.00 | 14,484.42 | Check #239 |
| 02-26 | | 2,083.95 | 12,400.47 | POS DB EVI*L AUBERGE DU LAKE CHARLES LA 000000000698975 |
| 02-28 | | 9,000.00 | 3,400.47 | CASH CK  #Check |
| 02-28 | | 200.00 | 3,200.47 | CHECK 240 |
| 02-29 | | 12.00 | 3,188.47 | MAINTENANCE FEE        SVC CH* |

| | Total for This Statement | Total for This Year |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Insufficient Items Fees | $96.00 | $224.00 |

**EXHIBIT**

**20**

exhibitsticker.com

**MEMBER FDIC ⌂ EQUAL HOUSING LENDER • AN EQUAL OPPORTUNITY EMPLOYER**

00000047-10801-0001-0003-TW100T03012008171600-02-L

## Business Simple Checking 1315010643

### Checks Cleared

| Date | Check No | Amount | Date | Check No | Amount | Date | Check No | Amount |
|------|----------|--------|------|----------|--------|------|----------|--------|
| 02-18 | Check | 8,000.00 | 02-18 | 218 | 35,000.00 | 02-19 | 238* | 20,000.00 |
| 02-18 | Check | 12,500.00 | 02-18 | 219 | 30,000.00 | 02-25 | 239 | 1,000.00 |
| 02-28 | Check | 9,000.00 | 02-19 | 234* | 50,000.00 | 02-28 | 240 | 200.00 |

\* Denotes a break in check sequence      **9 Check(s) Paid for a Total of $165,700.00**

### Account Summary

| | | |
|---|---|---|
| Average Balance | $11,031.81 | Minimum Balance on 02/01/2020    $0.15 |
| Average Collected Balance | $11,031.81 | Number of Days in Cycle    29 |

### Daily Closing Balance Summary

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 02-01 | 0.15 | 02-18 | 154,502.15 | 02-25 | 14,484.42 |
| 02-02 | 68.15 | 02-19 | 34,279.42 | 02-26 | 12,400.47 |
| 02-04 | 4.15 | 02-20 | 19,244.42 | 02-28 | 3,200.47 |
| 02-05 | 54.15 | 02-22 | 15,494.42 | 02-29 | 3,188.47 |
| 02-07 | 22.15 | 02-24 | 15,484.42 | | |

### Account Item Images Total of 9



02/18/2020    Ck # 0    $8,000.00



02/18/2020    Ck # 0    $12,500.00



02/28/2020    Ck # 0    $9,000.00



02/18/2020    Ck # 218    $35,000.00



02/18/2020    Ck # 219    $30,000.00



02/19/2020    Ck # 234    $50,000.00



02/19/2020    Ck # 238    $20,000.00

02/25/2020    Ck # 239    $1,000.00

## Business Simple Checking 1315010643

### Account Item Images 9 (continued)



02/28/2020          Ck # 240          $200.00

---

## SIMPLE WAYS TO LOWER YOUR FEES

**Track your balance, deposits and spending habits carefully. Sign up for Daily Email Notifications.**
*We will send a daily message to your email account with transaction and balance information, including when you have overdrawn your account. There is no charge for this service.*

**Link a secondary account to your checking account.**
*When you overdraft your checking account, any available money will be automatically transferred first from your secondary account to avoid overdrawing your account. A sweep fee applies for each automatic transfer. Refer to the **Schedule of Fees** for complete details.*

**Consider opting-out of overdraft coverage for ATM and everyday debit card transactions.**
*ATM and everyday debit card transactions that would overdraw your account are declined and would not incur a fee. You can also request to opt-out of all overdraft coverage. **For complete details please speak with a Woodforest retail banker.***

---

### In Case Of Errors Or Questions About Your Electronic Transfers For Consumer Accounts Only

Telephone us at **877-968-7962** or write us at the address on the front of this statement as soon as possible, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you **no later than** 60 days after we sent you the FIRST statement on which the error or problem appeared.

- Tell us your name and account number.
- Describe the error transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

### Billing Rights Summary
### In Case Of Errors Or Questions About Your Revolving Credit

If you think there is an error on your statement, write to us at Woodforest National Bank, ATTN: Loan Dept., PO Box 7889, The Woodlands, TX 77387-7889. In your letter, give us the following information:

- Account information: Your name and account number
- Dollar amount: The dollar amount of the suspected error.
- Description of the problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement. You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question. While we investigate whether or not there has been an error, the following are true:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

### In Case Of Errors Or Questions About Your Statement

Please examine this statement upon receipt and report any differences in writing to the bank. If no differences are reported in writing within 30 days, the account will be considered correct.

Please notify us in writing of your change of address.



### ACCOUNT RECONCILIATION

THIS IS PROVIDED TO HELP YOU BALANCE YOUR STATEMENT.

| | CHECKS OUTSTANDING | | |
|---|---|---|---|
| $ _____ **YOUR BALANCE AS** SHOWN ON THIS STATEMENT | **NO.** | **AMOUNT** | $ _____ **CHECKBOOK BALANCE** (AT STATEMENT DATE) |
| $ _____ **ADD (+) DEPOSITS** NOT SHOWN ON THIS STMT (IF ANY) | | | $ _____ **SUBTRACT (-)** ACTIVITY CHARGE (IF ANY) |
| $ _____ **TOTAL** | | | $ _____ **SUB-TOTAL** |
| $ _____ **SUBTRACT (-) CHECKS** OUTSTANDING (IF ANY) | | | $ _____ **SUBTRACT (-)** OTHER CHARGES (IF ANY) |
| $ _____ **BALANCE** | **TOTAL** | $ | $ _____ **BALANCE** |

† SHOULD AGREE WITH YOUR CHECKBOOK BALANCE †

EXHIBIT D

**Account Title:** SOCCER BUILDERS PRO LLC    **Account Number:** XXXX0643

**Current Available:** $288.52    **Balance Date:** 3/18/2020 10:09:07 AM CST

Please note that pending transactions can post for a different amount than listed and may not include fees assessed today.

### Pending Transactions as of 3/18/2020 10:09:07 AM CST

There are no pending transactions at this time.

### Posted Transactions from 2/29/2020 to 3/18/2020

| Date | Code | Serial | Amount | Balance | Description |
|------|------|--------|--------|---------|-------------|
| 3/13/2020 | 935 | | -$783.95 | $288.52 | POS- EVI*L AUBERGE DU LAKE CHARLES LA 000000000703188 |
| 3/6/2020 | 706 | | -$700.00 | $1,072.47 | ONLINE TRANSFER DEBIT |
| 3/3/2020 | 935 | | -$1,416.00 | $1,772.47 | POS- WM SUPERCENTER # WOODLANDS TX 000000000775536 |
| 2/29/2020 | 76 | | -$12.00 | $3,188.47 | SERVICE CHARGE |


## *Wire Instructions*

**Beneficiary/Company: SOCCER BUILDERS PRO LLC**

Account Number: **1315010643**

Routing Number/ABA: **113008465**

Address: 6700 Woodlands Parkway suite 230-234 The Woodlands TX 77382 USA

Phone Number: (832)800-55-44

Bank Name: **Woodforest National Bank**

Bank Address: 10555 Kuykendahl Rd The Woodlands Texas 77382

SWIFT CODE: WONAUS44

6700 Woodlands Parkway suite 230-234 The Woodlands,
Texas, 77382.

Phone (832) 589 60 24

EXHIBIT

21



**Mail**

## Concerns

**Juan Carlos Padilla <jcp.spd@gmail.com>**
2/26/2020 10:01 AM

To: Quinn Branson; Morgan Waggoner; Tim Prukop

Hello Quinn hope is well

I was exploring Ticketmaster and I have some concerns that I want to ask for your help to solve:

1. The image online is not correct, actually there is one like in the home page, and another once you get in the event to buy tickets, can you please let us know the specs to modify?, it is my concern that in the one that is on the part of buying tickets another team logos appear and that is not good, please help on this!!
2. You can not see the Map and zoom in on the actual tickets you are buying, I think you can do it every time, but I tried to do it and is not possible
3. I need to have the sales report daily please, can you set up that for me?
4. Finally, at what time can we pick up te tickets on Friday

Sorry to bother you with this but this are items very very important

Thank you and have a great day


--
Kind regards,

*Juan C. Padilla*
*President*
*832-589-6024*


**Sports Pro Development LLC**

EXHIBIT

22

# Texas Franchise Tax Public Information Report



Comptroller
of Public
Accounts
FORM

05-102
(Rev.9-11/30)

■ Tcode 13196 Franchise

*To be filed by Corporations , Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

| ■ Taxpayer number | | | | | | | | | | ■ Report year | | | | *You have certain rights* under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381or (512) 463-4600. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 2 | 0 | 5 | 3 | 5 | 7 | 2 | 9 | 3 | 2 | | 2 | 0 | 1 | 9 | |

| Taxpayer name |
|---|
| SOCCER SCOUTING INTERNATIONAL, LLC |

| Mailing address | | | | Secretary of State (SOS) file number or Comptroller file number |
|---|---|---|---|---|
| 4008 GANDARA BND | | | | |
| City | State | ZIP Code | Plus 4 | |
| AUSTIN | TX | 78738 | | 0801959279 |

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| Principal office |
|---|
| 4008 GANDARA BND AUSTIN, TX 78738 7151 |
| Principal place of business |
| 4008 GANDARA BND AUSTIN, TX 78738 7151 |

*Please sign below!*

Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

3205357293219

**SECTION A** Name, title and mailing address of each officer, director or manager.

| Name | Title | Director | | m m d d y y |
|---|---|---|---|---|
| JUAN CARLOS PADILLA | MANAGER | ● YES | Term expiration | |
| Mailing address | City | State | | ZIP Code |
| 4008 GANDARA BND | AUSTIN | TX | | 78738 |
| Name | Title | Director | | m m d d y y |
| | | ○ YES | Term expiration | |
| Mailing address | City | State | | ZIP Code |
| Name | Title | Director | | m m d d y y |
| | | ○ YES | Term expiration | |
| Mailing address | City | State | | ZIP Code |

**SECTION B** Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C** Enter the information required for each corporation or LLC, if any, that owns an interest of 10 percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|

Registered agent and registered office currently on file. *(see instructions if you need to make changes)* ○ Blacken circle if you need forms to change the registered agent or registered office information.

| Agent: | JUAN CARLOS PADILLA | | | | |
|---|---|---|---|---|---|
| Office: | 4008 GANDARA BEND AUSTIN | City | AUSTIN | State | TX | ZIP Code | 78738 |

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ | MAXIMILIANO JAMBRINA | Title | Electronic | Date | 11-15-2019 | Area code and phone number ( 713 ) 574 - 2377 |
|---|---|---|---|---|---|---|

## Texas Comptroller Official Use Only

| VE/DE | ○ | PIR IND | ○ |
|---|---|---|---|

**EXHIBIT F.**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **In re** | § § § | **Case No. 20-32547** |
|  | § | **Chapter 7** |
| **SPORTS PRO DEVELOPMENT, LLC,** | § § |  |
| **Debtor.** | § |  |

## <u>DECLARATION OF CHRISTINE M. RENNE</u>

1.  My name is Christine M. Renne. I am over the age of years (21) years, have never been convicted of a felony or crime of moral turpitude, have personal knowledge of the facts to which I testify and know of no facts or circumstances which would disqualify me from making an oath or giving an affidavit. I understand that I am making the declaration under penalty of perjury.

2.  I am counsel for Creditors, Rene Etcharren, SM Monterrey, LLC and World Soccer Enterprises, LLC in the above-styled matter.

3.  On November 17, 2020 this Court entered an Order awarding $6,370.38 in fees and expenses to the undersigned against Debtor and Juan Carlos Padilla, jointly and severally. (ECF 80) To date, Juan Carlos Padilla has not complied with this Order. No attempt has been made to contact me or address this matter. On December 10, 2020 counsel for Mr. Padilla represented in an email that his client had been informed of the Court's Order.

4.  This Court also Ordered that Debtor comply with the Subpoena Duces Tecum that had been served. While some records were produced Debtor's representative testified to many documents that had been withheld and to which he had access. Aside from three boxes of random documents and unopened mail, the other information has not been produced as of the filing of this Declaration and was not produced in accordance with this Court's Order and prior to the 2004 Examination.

5.  Attached to the Motion are the following and with the exception of the Exhibit mark are true and correct copies of:

**Exhibit D** – Are true and correct excerpts from the 2004 Examination in this matter that was not completed. Three of the many exhibits are attached to the excerpts.

**Exhibit E** – This is a true and correct copy of a Public Information Report record that were pulled from the Texas Secretary of State by and through SOS Direct Login.

**Exhibit G** – This is a true and correct copy of a letter I received from Debtor's Counsel that has been admitted into evidence with the Motion for Sanctions.

**Exhibit H** – This is a true and correct copy of a document that Padilla produced pursuant to the Subpoena duces tecum.

**Exhibit I** – These are true and correct copies of photos of the three boxes produced after the 2004 Examination despite this Court's Order to produce records before the examination. The records were in no order and contained many unopened envelopes.

**Exhibit J** – This is a true and correct copy of a bank statement Debtor's representative produced in this bankruptcy matter and shared through Dropbox in July of 2020.

**Exhibit K** – This is true and correct copy documents that I pulled from the Texas Secretary of State kept in the ordinary course of business and by and through SOS Direct Login.

**Exhibit L** - This is true and correct copy of a statement from Woodforest Bank that the Debtor produced in July of 2020 and shared through Dropbox.

6.      My name is Christine Michele Renne. My date of birth is May 12, 1964, and my office address is 808 W. Dallas Street, Suite F, Conroe, TX 77301; 832-764-8660. I hereby swear under penalty of perjury under the laws of the United States that the foregoing is true and correct and is based upon my personal knowledge. Today's date is February 19, 2021

FURTHER AFFIANT SAYETH NOT.

Christine M. Renne



**RACUSIN & WAGNER, L.L.P.**
ATTORNEYS AT LAW
4900 WOODWAY Drive
Suite 510
HOUSTON, TEXAS 77056

BARRY L. RACUSIN, P.C.

TELEPHONE: (713) 626-1450
TELECOPIER: (713) 626-9313
E-MAIL:BLR@Racusinlaw.com

August 31, 2020

Ms. Christine M. Renne, Esq.                VIA EMAIL: crenne@crennelaw.com
RENNE LAW, PLLC
808 W. Dallas Street, Suite F
Conroe, Texas 77301

RE:   Case No. 20-32547 - IN RE: Sports Pro Development, LLC, Debtor - United States
      Bankruptcy Court, Southern District of Texas, Houston Division

      AMENDED NOTICE OF 2004 EXAMINATION OF JUAN CARLOS PADILLA
      AZARCOYA, REPRESENTATIVE OF SPORTS PRO DEVELOPMENT, LLC,
      AND AMENDED SUBPOENA DUCES TECUM ("Notice of 2004 Examination") -
      Response

Dear Ms. Renne:

    The undersigned is in receipt of the above referenced Notice of the 2004 Examination and
advises you as follows.

    This firm does not represent Juan Carlos Padilla ("JCP") in his individual capacity. This
firms represents the Debtor, Sports Pro Development, LLC.

    As of this date the Debtor has not engaged our firm to represent it in regards to the proposed
2004 Examination.

    We have provided a copy of the Notice of the 2004 Examination to Mr. Padilla and to his
State Court counsel, Phillip R. Livingston.

Ms. Christine M. Renne, Esq.
August 31, 2020
Page 2

       We do not know what the Debtor's position will be in regard to the 2004 Examination.

                Very truly yours,

                RACUSIN & WAGNER, L.L.P.

                Barry L. Racusin, P.C.

BLR/nw
Y:\Clients\Sports Pro Development, Ll.C\Letters\Renne-8-31-2020.wpd

cc:    Phillip R. Livingston, Esq.      Via email:

       Juan Carlos Padilla          Via email:

## SPD Sports (Tigres vs Santos) Settlement Statement

Isotopes Park

November 14 2018

### Already Paid by SPD Sports

| | |
|---|---|
| Stadium rental Fee | $ 25,000.00 |
| Deposit on field  conversion | $ 17,500.00 |
| **TOTAL** | $ 42,500.00 |

### Revenue due to SPD Sports

| | |
|---|---|
| Ticketmaster sales (net on fees) | $ 335,674.00 |
| Box Office sales (net of credit fees) | $ 105,468.02 |
| 40% of net consessions revenue | $ 75,633.50 |
| Sponsors | $ 40,000.00 |
| **TOTAL** | $ 556,775.52 |

### Expenses owed by SPD Sports

| | |
|---|---|
| City surcharge on rental fee | $ 2,500.00 |
| Bike rack rental | $ 486.79 |
| Servicemaster (pre and post event interior cleaning) | $ 800.00 |
| Victory Outreach (pre/during/post evetn cleaners) | $ 1,298.00 |
| Spectra - event staff meals expenses | $ 163.75 |
| Field Conversion Balance | $ 18,438.56 |
| Staff labor | $ 7,775.00 |
| Video Porduction | $ 723.00 |
| Emergency medical services | $ 500.00 |
| Police | $ 1,196.00 |
| **TOTAL** | $ 33,881.10 |

### Net due to SPD Sports          $ 522,894.42

Agreed by:

_____     Date

SPD Sports

_____     Date

Isotopes Park

**EXHIBIT**

**43**

**SPD Sports (Tigres vs Santos) Settlement Statement**

**Isotopes Park**
**November 14 2018**

**Already Paid by SPD Sports**

| | |
|---|---|
| Stadium rental Fee | $ 25,000.00 |
| Deposit on field conversion | $ 17,500.00 |
| **TOTAL** | $ 42,500.00 |

**Revenue due to SPD Sports**

| | |
|---|---|
| Ticketmaster sales (net on fees) | $ 335,674.00 |
| Box Office sales (net of credit fees) | $ 105,468.02 |
| 40% of net consessions revenue | $ 75,633.50 |
| Sponsors | $ 40,000.00 |
| **TOTAL** | $ 556,775.52 |

**Expenses owed by SPD Sports**

| | |
|---|---|
| City surcharge on rental fee | $ 2,500.00 |
| Bike rack rental | $ 486.79 |
| Servicemaster (pre and post event interior cleaning) | $ 800.00 |
| Victory Outreach (pre/during/post evetn cleaners) | $ 1,298.00 |
| Spectra - event staff meals expenses | $ 163.75 |
| Field Conversion Balance | $ 18,438.56 |
| Staff labor | $ 7,775.00 |
| Video Porduction | $ 723.00 |
| Emergency medical services | $ 500.00 |
| Police | $ 1,196.00 |
| **TOTAL** | $ 33,881.10 |

**Net due to SPD Sports**      **$ 522,894.42**

Agreed by:

_____      01/9/2019
SPD Sports                     Date

_____      1-9-2019
Isotopes Park               Date

EXHIBIT i







# AUSTIN HISPANIC MARKET

### AN INSIDE LOOK AT THE MARKET, OUR STATIONS, AND OUR LISTENERS

107.7 LA NUEVA


emmis austin radio

LATINO 102.7
KLZT-HD2

ALFREDO "AIM" GARCIA | EMMIS AUSTIN RADIO | KLZT-FM & KLZT-HD2 | (512) 832-4066
AGARCIA@EMMISAUSTIN.COM





Employee $39.00

Rodrigo Velazquez Perez Paid

Vidal Hernandez $131

Jose Ruiz $170

Francisco Duran $542

Cristo Torres $112

Guadalupe García $165

James Eisenhman

HYATT
HYATT REGENCY



Cira September
Flaco














# Wells Fargo Business Choice Checking

SPORTS PRO DEVELOPMENT, LLC
6700 WOODLANDS PKWY STE 230-234
THE WOODLANDS TX 77382-2575

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (808)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

Access complimentary resources and tools to help you create or revise your business plan - whether you're an experienced business owner or just starting out. Find out more at wellsfargoworks.com/plan.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ☑ |
| Online Statements | ☑ |
| Business Bill Pay | ☐ |
| Business Spending Report | ☑ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 5/1 | $488,368.61 |
| Deposits/Credits | 1,205,452.33 |
| Withdrawals/Debits | - 1,095,888.87 |
| **Ending balance on 5/31** | **$597,932.07** |
| Average ledger balance this period | $465,469.89 |

Account number: **2475980377**

**SPORTS PRO DEVELOPMENT, LLC**

*Texas/Arkansas account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 111900659

For Wire Transfers use
Routing Number (RTN): 121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.



## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 5/1 | | Wire Trans Svc Charge - Sequence: 180501182779 Srf# 0076000121319540 Trn#180501182779 Rfb# | | 30.00 | |
| 5/1 | | Wire Trans Svc Charge - Sequence: 180501182875 Srf# 0076000121120640 Trn#180501182875 Rfb# | | 30.00 | |
| 5/1 | | Recurring Payment authorized on 04/30 AT&T*Bill Payment 800-331-0500 TX S388120732797904 Card 1352 | | 260.36 | |
| 5/1 | | WT Fed#02996 Fidelity Bank /Ftr/Bnf=Juan Olvera Srf# 0076000121319540 Trn#180501182779 Rfb# | | 375,000.00 | |
| 5/1 | | WT Fed#03138 Fidelity Bank /Ftr/Bnf=American Flooring Services Inc. Srf# 0076000121120640 Trn#180501182875 Rfb# | | 25,000.00 | |
| 5/1 | 1318 | Check | | 1,388.00 | |
| 5/1 | 1317 | Check | | 9,722.00 | 76,938.25 |
| 5/2 | | Online Transfer From Soccer Builders Pro, LLC Business Checking xxxxxx0369 Ref #Ib04K65D6Y on 05/02/18 | 4,500.00 | | |
| 5/2 | | Online Transfer From Padilla Azarcoya J Everyday Checking xxxxxx4367 Ref #Ib04K65F5V on 05/02/18 | 7,500.00 | | |
| 5/2 | 1271 | Check | | 60,000.00 | |
| 5/2 | 1320 | Check | | 2,916.00 | |
| 5/2 | 1319 | Check | | 7,500.00 | 18,522.25 |
| 5/3 | | Deposit Made In A Branch/Store | 3,000.00 | | |
| 5/3 | | Online Transfer From Soccer Builders Pro, LLC Business Checking xxxxxx0369 Ref #Ib04K9Rgq2 on 05/03/18 | 800.00 | | |
| 5/3 | | Online Transfer From Padilla Azarcoya J Everyday Checking xxxxxx4367 Ref #Ib04K9Rhws on 05/03/18 | 4,500.00 | | |
| 5/3 | | Withdrawal Made In A Branch/Store | | 20,000.00 | 6,822.25 |
| 5/4 | | Edeposit IN Branch/Store 05/04/18 05:29:47 Pm 9901 Woodlands Pkwy The Woodlands TX 1352 | 15,000.00 | | |
| 5/4 | 1325 | Deposited OR Cashed Check | | 5,342.71 | |
| 5/4 | | Online Transfer to Padilla Azarcoya J Everyday Checking xxxxxx4367 Ref #Ib04Kj6Ty8 on 05/04/18 | | 1,500.00 | |
| 5/4 | 1323 | Check | | 5,000.00 | 9,979.54 |
| 5/7 | | Edeposit IN Branch/Store 05/07/18 02:08:20 Pm 9901 Woodlands Pkwy The Woodlands TX 1352 | 50,000.00 | | 59,979.54 |
| 5/8 | | Online Dep Detail & Images - Bob | | 3.00 | |
| 5/8 | | Wire Trans Svc Charge - Sequence: 180508053400 Srf# 0076000128859201 Trn#180508053400 Rfb# | | 30.00 | |
| 5/8 | | WT Fed#05279 Lone Star National /Ftr/Bnf=Humberto A Garcia Srf# 0076000128859201 Trn#180508053400 Rfb# | | 12,500.00 | |
| 5/8 | 1330 | Deposited OR Cashed Check | | 7,000.00 | |
| 5/8 | 1329 | Deposited OR Cashed Check | | 3,000.00 | |
| 5/8 | 1327 | Check | | 1,200.00 | 36,246.54 |
| 5/9 | | WT Fed#02508 Fidelity Bank /Org=Claudia Olvera Srf# 0611024000317446 Trn#180509053934 Rfb# | 375,000.00 | | |
| 5/9 | | Edeposit IN Branch/Store 05/09/18 03:17:42 Pm 9901 Woodlands Pkwy The Woodlands TX 1352 | 50,000.00 | | |
| 5/9 | | Wire Trans Svc Charge - Sequence: 180509053934 Srf# 0611024000317446 Trn#180509053934 Rfb# | | 15.00 | |
| 5/9 | | Wire Trans Svc Charge - Sequence: 180509144382 Srf# 0076000129822321 Trn#180509144382 Rfb# | | 30.00 | |
| 5/9 | | WT Fed#06625 Jpmorgan Chase Ban /Ftr/Bnf=Unidos Futbol Club LLC Srf# 0076000129822321 Trn#180509144382 Rfb# | | 25,000.00 | |
| 5/9 | 1337 | Deposited OR Cashed Check | | 25,000.00 | |
| 5/9 | | Online Transfer to Padilla Azarcoya J Everyday Checking xxxxxx4367 Ref #Ib04Kzqcr6 on 05/09/18 | | 10,000.00 | |
| 5/9 | | Online Transfer to Soccer Builders Pro, LLC Business Checking xxxxxx0369 Ref #Ib04Kzqdlf on 05/09/18 | | 5,000.00 | |
| 5/9 | 1336 | Check | | 367.15 | |
| 5/9 | 1335 | Check | | 10,144.75 | |
| 5/9 | 1334 | Check | | 34,144.75 | 351,544.89 |



## Transaction history (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 5/10 | | WT Fed#06029 Fidelity Bank /Org=American Flooring Services Inc Srf# 0611024000317924 Trn#180510154799 Rfb# | 225,000.00 | | |
| 5/10 | | Wire Trans Svc Charge - Sequence: 180510144234 Srf# 0076000130616431 Trn#180510144234 Rfb# | | 45.00 | |
| 5/10 | | Wire Trans Svc Charge - Sequence: 180510154799 Srf# 0611024000317924 Trn#180510154799 Rfb# | | 15.00 | |
| 5/10 | 1339 | Deposited OR Cashed Check | | 5,000.00 | |
| 5/10 | 1338 | Deposited OR Cashed Check | | 2,000.00 | |
| 5/10 | | WT 180510-144234 Bbva Bancomer SA IN /Bnf=Francisco Alberto Ituarte Egea Srf# 0076000130616431 Trn#180510144234 Rfb# | | 28,000.00 | |
| 5/10 | | Transfer to Salazar Cosme Ref #Pp04L4Zny7 xxxxxx6358 | | 2,500.00 | |
| 5/10 | < | Business to Business ACH Debit - Adp Tax Adp Tax 180510 R2Qlf 051103A01 Sports Pro Development | | 3,476.77 | |
| 5/10 | < | Business to Business ACH Debit - Adp Wage Pay Wage Pay 180510 422545608144Qlf Sports Pro Development | | 10,120.00 | 525,388.12 |
| 5/11 | 1322 | Check | | 6,000.00 | |
| 5/11 | 1326 | Check | | 35,000.00 | 484,388.12 |
| 5/14 | | Transfer to Salazar Cosme on 05/12 Ref #Pp04Ld4Dbf xxxxxx6358 | | 2,500.00 | |
| 5/14 | | Transfer to Salazar Cosme on 05/13 Ref #Pp04Lgq8Zb xxxxxx6358 | | 2,500.00 | 479,388.12 |
| 5/15 | | Edeposit IN Branch/Store 05/15/18 01:23:20 Pm 9901 Woodlands Pkwy The Woodlands TX 1352 | 100,152.33 | | |
| 5/15 | | Transfer to Rincon Marlon on 05/15 Ref #Pp04Lqzc3Y xxxxxx8016 | | 1,000.00 | |
| 5/15 | | Transfer to Salazar Cosme on 05/15 Ref #Pp04Lqzg6N xxxxxx6358 | | 2,500.00 | |
| 5/15 | 1340 | Check | | 3,357.00 | |
| 5/15 | 1321 | Check | | 9,000.00 | |
| 5/15 | 1341 | Check | | 35,000.00 | 528,683.45 |
| 5/16 | | Edeposit IN Branch/Store 05/16/18 10:18:15 Am 9901 Woodlands Pkwy The Woodlands TX 1352 | 120,000.00 | | |
| 5/16 | 1324 | Check | | 10,000.00 | |
| 5/16 | 1332 | Check | | 5,000.00 | |
| 5/16 | 1221 | Check | | 15,000.00 | 618,683.45 |
| 5/17 | | Edeposit IN Branch/Store 05/17/18 10:39:24 Am 9901 Woodlands Pkwy The Woodlands TX 1352 | 200,000.00 | | |
| 5/17 | 1344 | Check | | 50,000.00 | 768,683.45 |
| 5/18 | 1346 | Check | | 18,000.00 | 750,683.45 |
| 5/24 | | American Express ACH Pmt 180524 W0868 Juan Padilla | | 13,713.51 | 736,969.94 |
| 5/25 | | Wire Trans Svc Charge - Sequence: 180525105887 Srf# 0076000145874692 Trn#180525105887 Rfb# | | 45.00 | |
| 5/25 | | WT 180525-105887 Banco Santander (ME /Bnf=Sinergia Deportiva S.A. DE C.V. Srf# 0076000145874692 Trn#180525105887 Rfb# | | 70,000.00 | |
| 5/25 | 1349 | Check | | 9,750.00 | |
| 5/25 | 1342 | Check | | 20,000.00 | |
| 5/25 | 1351 | Check | | 21,650.00 | |
| 5/25 | 1348 | Check | | 11,000.00 | 604,524.94 |
| 5/29 | | Harland Clarke Check/Acc. 052818 00760007575482 Sports Pro Development | | 150.27 | |
| 5/29 | 1347 | Deposited OR Cashed Check | | 10,000.00 | |
| 5/29 | 1350 | Check | | 10,000.00 | 584,374.67 |
| 5/30 | | Edeposit IN Branch/Store 05/30/18 09:30:17 Am 9901 Woodlands Pkwy The Woodlands TX 1352 | 50,000.00 | | |
| 5/30 | | Transfer to Andalon Mario on 05/30 Ref #Pp04Ncq693 xxxxxx3109 | | 300.00 | 634,074.67 |
| 5/31 | 1352 | Check | | 25,000.00 | |
| 5/31 | 1354 | Check | | 1,388.88 | |



---

### *Transaction history* *(continued)*

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|--------------|-------------|-------------------|---------------------|----------------------|
| 5/31 | 1353 | Check | | 9,722.22 | |
| 5/31 | | Cash Deposited Fee | | 31.50 | 597,932.07 |
| **Ending balance on 5/31** | | | | | **597,932.07** |
| **Totals** | | | **$1,205,452.33** | **$1,095,888.87** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

< **Business to Business ACH:** *If this is a business account, this transaction has a return time frame of one business day from post date. This time frame does not apply to consumer accounts.*

### Summary of checks written   *(checks listed are also displayed in the preceding Transaction history)*

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|
| 1221 | 5/16 | 15,000.00 | 1327 | 5/8 | 1,200.00 | 1342 | 5/25 | 20,000.00 |
| 1271 * | 5/2 | 60,000.00 | 1329 * | 5/8 | 3,000.00 | 1344 * | 5/17 | 50,000.00 |
| 1317 * | 5/1 | 9,722.00 | 1330 | 5/8 | 7,000.00 | 1346 * | 5/18 | 18,000.00 |
| 1318 | 5/1 | 1,388.00 | 1332 * | 5/16 | 5,000.00 | 1347 | 5/29 | 10,000.00 |
| 1319 | 5/2 | 7,500.00 | 1334 * | 5/9 | 34,144.75 | 1348 | 5/25 | 11,000.00 |
| 1320 | 5/2 | 2,916.00 | 1335 | 5/9 | 10,144.75 | 1349 | 5/25 | 9,750.00 |
| 1321 | 5/15 | 9,000.00 | 1336 | 5/9 | 367.15 | 1350 | 5/29 | 10,000.00 |
| 1322 | 5/11 | 6,000.00 | 1337 | 5/9 | 25,000.00 | 1351 | 5/25 | 21,650.00 |
| 1323 | 5/4 | 5,000.00 | 1338 | 5/10 | 2,000.00 | 1352 | 5/31 | 25,000.00 |
| 1324 | 5/16 | 10,000.00 | 1339 | 5/10 | 5,000.00 | 1353 | 5/31 | 9,722.22 |
| 1325 | 5/4 | 5,342.71 | 1340 | 5/15 | 3,357.00 | 1354 | 5/31 | 1,388.88 |
| 1326 | 5/11 | 35,000.00 | 1341 | 5/15 | 35,000.00 | | | |

*\* Gap in check sequence.*

### Monthly service fee summary

For a complete list of fees and detailed account information, see the Wells Fargo Account Fee and Information Schedule and Account Agreement applicable to your account (EasyPay Card Terms and Conditions for prepaid cards) or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.

| Fee period 05/01/2018 - 05/31/2018 | Standard monthly service fee $14.00 | You paid $0.00 |
|-------------------------------------|--------------------------------------|-----------------|

The fee is waived (or discounted) by the bank for this fee period. For the next fee period you must meet an account requirement to avoid the fee, or receive the discount when applicable.

| How to avoid the monthly service fee | Minimum required | This fee period |
|--------------------------------------|------------------|-----------------|
| Have any **ONE** of the following account requirements | | |
| · Average ledger balance | $7,500.00 | $465,470.00 ☑ |
| · A qualifying transaction from a linked Wells Fargo Business Payroll Services account | 1 | 0 ☐ |
| · A qualifying transaction from a linked Wells Fargo Merchant Services account | 1 | 0 ☐ |
| · Total number of posted Wells Fargo Debit Card purchases and/or payments | 10 | 1 ☐ |
| · Enrollment in a linked Direct Pay service through Wells Fargo Business Online | 1 | 0 ☐ |
| · Combined balances in linked accounts, which may include | $10,000.00 | ☑ |
|   - Average ledger balances in business checking, savings, and time accounts | | |
|   - Most recent statement balance in eligible Wells Fargo business credit cards and lines of credit, and combined average daily balances from the previous month in eligible Wells Fargo business and commercial loans and lines of credit | | |



***Monthly service fee summary (continued)***

**How to avoid the monthly service fee**                                                    Minimum required          This fee period

- For complete details on how you can avoid the monthly service fee based on
  your combined balances please refer to page 7 of the Business Account Fee and
  Information Schedule at www.wellsfargo.com/biz/fee-information

wx/wx

## Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|---|---|---|---|---|---|
| Cash Deposited ($) | 18,000 | 7,500 | 10,500 | 0.0030 | 31.50 |
| Transactions | 54 | 200 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$31.50** |

 IMPORTANT ACCOUNT INFORMATION

_____

**Important information about legal process fees.**

The fee for legal order processing, which includes handling levies, writs, garnishments, and any other legal documents that require
funds to be attached, remains $125. The Bank will assess no more than a total of $250 in legal process fees per account, per calendar
month. Please note that the calendar month may not coincide with your statement cycle.



---

### General statement policies for Wells Fargo Bank

■ **Notice:** Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies. If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at: Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation. In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

---

### Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.

2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3. Use the chart to the right to list any deposits, transfers into your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . $ _____

**ADD**

**B.** Any deposits listed in your $ _____
register or transfers into $ _____
your account which are not $ _____
shown on your statement. + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**SUBTRACT**

**C.** The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . . . - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . . $ . _____

| Number | Items Outstanding | Amount |
|--------|-------------------|--------|
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        | Total amount $    |        |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

# TEXAS SECRETARY of STATE
# RUTH R. HUGHS

**BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY**

| | | | |
|---|---|---|---|
| **Filing Number:** | 801959286 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | March 25, 2014 | **Entity Status:** | Forfeited existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32053572916 | **FEIN:** | |
| **Duration:** | Perpetual | | |

**Name:** Soccer Builders Pro, LLC
**Address:** 433 NORTH LOOP W
HOUSTON, TX 77008-2029 USA

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES |
|---|---|---|---|---|---|

| View Image | Document Number | Filing Type | Filing Date | Effective Date | Eff. Cond | Page Count |
|---|---|---|---|---|---|---|
| 🔖 | 535850730002 | Certificate of Formation | March 25, 2014 | March 25, 2014 | No | 2 |
| 🔖 | 653132725671 | Tax Forfeiture | January 29, 2016 | January 29, 2016 | No | 1 |

[ Order ]  [ Return to Search ]

Instructions:
🔴 To place an order for additional information about a filing press the 'Order' button.

EXHIBIT L



**WOODFOREST®**
N A T I O N A L   B A N K

MEMBER FDIC

 **Account Information & Customer Service**
1-(877) 968-7962

 **P.O. Box 7889 The Woodlands, TX 77387**

 **Visit Us Online at www.woodforest.com**

Like Us On     Follow Us on 

00000047 TW100T03012008171600 3 000000000 **2097431158**

SOCCER BUILDERS PRO LLC
** RETURNED MAIL

## Summary of Accounts

| ACCOUNT TYPE AND NUMBER | BALANCE FORWARD | TOTAL DEBITS | TOTAL CREDITS | CLOSING BALANCE |
|---|---|---|---|---|
| Business Simple Checking 1315010643 | 0.15 | 271,929.68 | 275,118.00 | 3,188.47 |

## Business Simple Checking 1315010643

### Transactions

| Date | Credits | Debits | Balance | Description |
|---|---|---|---|---|
| 02-02 | 68.00 | | 68.15 | Online Transfer Credit      OL XFER |
| 02-04 | | 32.00 | 36.15 | INSUFFICIENT ITEM FEE |
| 02-04 | | 32.00 | 4.15 | INSUFFICIENT ITEM FEE |
| 02-05 | 50.00 | | 54.15 | Online Transfer Credit      OL XFER |
| 02-07 | | 32.00 | 22.15 | INSUFFICIENT ITEM FEE |
| 02-18 | 275,000.00 | | 275,022.15 | TRF WT Fed#=20200218K3B75B1C0001 WIRE CR |
| 02-18 | | 35,000.00 | 240,022.15 | Online Transfer Debit      OL XFER |
| 02-18 | | 8,000.00 | 232,022.15 | CASH CK  #Check |
| 02-18 | | 12,500.00 | 219,522.15 | CHECK |
| 02-18 | | 35,000.00 | 184,522.15 | CHECK 218 |
| 02-18 | | 30,000.00 | 154,522.15 | CHECK 219 |
| 02-18 | | 20.00 | 154,502.15 | TRF      0208004804 WIRE TRANS   FEE |
| 02-19 | | 366.67 | 154,135.48 | POS DB PAYPAL *REYESAL 4029357733 CA 000000000383148 |
| 02-19 | | 5,000.00 | 149,135.48 | POS DB PAYPAL *PUBLIOOSSDE 4029357733 CA 000000000382682 |
| 02-19 | | 10,000.00 | 139,135.48 | TRF WT Fed#= BNF=PHILLIP R. LIVI WIRE DB |
| 02-19 | | 20,000.00 | 119,135.48 | CHECK 238 |
| 02-19 | | 4,929.79 | 114,205.69 | ACH-ONLINE PMT 004939910127081 CAPITAL ONE |
| 02-19 | | 29,891.27 | 84,314.42 | ACH-ACH PMT Juan C Padilla AMEX EPAYMENT |
| 02-19 | | 50,000.00 | 34,314.42 | Check  #234 |
| 02-19 | | 35.00 | 34,279.42 | TRF      0112095901 WIRE TRANS   FEE |
| 02-20 | | 15,000.00 | 19,279.42 | TRF WT Fed#= BNF=FRANCISCO DEL C WIRE DB |
| 02-20 | | 35.00 | 19,244.42 | TRF      0112221401 WIRE TRANS   FEE |
| 02-22 | | 3,750.00 | 15,494.42 | POS DB PAYPAL *CPROCTOR11 4029357733 CA 000000000190190 |
| 02-24 | | 10.00 | 15,484.42 | Return Mail Fee      RML FEE |
| 02-25 | | 1,000.00 | 14,484.42 | Check  #239 |
| 02-26 | | 2,083.95 | 12,400.47 | POS DB EVI*L AUBERGE DU LAKE CHARLES LA 000000000698975 |
| 02-28 | | 9,000.00 | 3,400.47 | CASH CK  #Check |
| 02-28 | | 200.00 | 3,200.47 | CHECK 240 |
| 02-29 | | 12.00 | 3,188.47 | MAINTENANCE FEE      SVC CH* |



| | Total for This Statement | Total for This Year |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Insufficient Items Fees | $96.00 | $224.00 |

**EXHIBIT**

**20**

## MEMBER FDIC ⌂ EQUAL HOUSING LENDER • AN EQUAL OPPORTUNITY EMPLOYER

## Business Simple Checking 1315010643

### Checks Cleared

| Date | Check No | Amount | Date | Check No | Amount | Date | Check No | Amount |
|------|----------|--------|------|----------|--------|------|----------|--------|
| 02-18 | Check | 8,000.00 | 02-18 | 218 | 35,000.00 | 02-19 | 238* | 20,000.00 |
| 02-18 | Check | 12,500.00 | 02-18 | 219 | 30,000.00 | 02-25 | 239 | 1,000.00 |
| 02-28 | Check | 9,000.00 | 02-19 | 234* | 50,000.00 | 02-28 | 240 | 200.00 |

\* Denotes a break in check sequence       9 Check(s) Paid for a Total of $165,700.00

### Account Summary

| | | | |
|---|---|---|---|
| Average Balance | $11,031.81 | Minimum Balance on 02/01/2020 | $0.15 |
| Average Collected Balance | $11,031.81 | Number of Days in Cycle | 29 |

### Daily Closing Balance Summary

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 02-01 | 0.15 | 02-18 | 154,502.15 | 02-25 | 14,484.42 |
| 02-02 | 68.15 | 02-19 | 34,279.42 | 02-26 | 12,400.47 |
| 02-04 | 4.15 | 02-20 | 19,244.42 | 02-28 | 3,200.47 |
| 02-05 | 54.15 | 02-22 | 15,494.42 | 02-29 | 3,188.47 |
| 02-07 | 22.15 | 02-24 | 15,484.42 | | |

### Account Item Images Total of 9



02/18/2020     Ck # 0     $8,000.00



02/18/2020     Ck # 0     $12,500.00



02/28/2020     Ck # 0     $9,000.00



02/18/2020     Ck # 218     $35,000.00



02/18/2020     Ck # 219     $30,000.00



02/19/2020     Ck # 234     $50,000.00



02/19/2020     Ck # 238     $20,000.00



02/25/2020     Ck # 239     $1,000.00

## Business Simple Checking 1315010643
### Account Item Images 9 (continued)



02/28/2020          Ck # 240          $200.00

---

**SIMPLE WAYS TO LOWER YOUR FEES**
Track your balance, deposits and spending habits carefully. Sign up for Daily Email Notifications.
*We will send a daily message to your email account with transaction and balance information, including when you have overdrawn your account. There is no charge for this service.*

**Link a secondary account to your checking account.**
*When you overdraft your checking account, any available money will be automatically transferred first from your secondary account to avoid overdrawing your account. A sweep fee applies for each automatic transfer. Refer to the Schedule of Fees for complete details.*

**Consider opting-out of overdraft coverage for ATM and everyday debit card transactions.**
*ATM and everyday debit card transactions that would overdraw your account are declined and would not incur a fee. You can also request to opt-out of all overdraft coverage. For complete details please speak with a Woodforest retail banker.*

---

**In Case Of Errors Or Questions About Your Electronic Transfers
For Consumer Accounts Only**

Telephone us at **877-968-7962** or write us at the address on the front of this statement as soon as possible, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you **no later than** 60 days after we sent you the FIRST statement on which the error or problem appeared.

- Tell us your name and account number.
- Describe the error transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you have use of the money during the time it takes us to complete our investigation.

**Billing Rights Summary
In Case Of Errors Or Questions About Your Revolving Credit**

If you think there is an error on your statement, write to us at Woodforest National Bank, ATTN: Loan Dept., PO Box 7889, The Woodlands, TX 77387-7889. In your letter, give us the following information:

- Account information: Your name and account number
- Dollar amount: The dollar amount of the suspected error.
- Description of the problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement. You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question. While we investigate whether or not there has been an error, the following are true:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**In Case Of Errors Or Questions About Your Statement**



Please examine this statement upon receipt and report any differences in writing to the bank. If no differences are reported in writing within 30 days, the account will be considered correct.

Please notify us in writing of your change of address.

**ACCOUNT RECONCILIATION**

THIS IS PROVIDED TO HELP YOU BALANCE YOUR STATEMENT.



† SHOULD AGREE WITH YOUR CHECKBOOK BALANCE †

**Account Title:** SOCCER BUILDERS PRO LLC   **Account Number:** XXXX0643

**Current Available:** $288.52   **Balance Date:** 3/18/2020 10:09:07 AM CST

Please note that pending transactions can post for a different amount than listed and may not include fees assessed today.

## Pending Transactions as of 3/18/2020 10:09:07 AM CST

There are no pending transactions at this time.

## Posted Transactions from 2/29/2020 to 3/18/2020

| Date | Code | Serial | Amount | Balance | Description |
|------|------|--------|--------|---------|-------------|
| 3/13/2020 | 935 | | -$783.95 | $288.52 | POS- EVI*L AUBERGE DU LAKE CHARLES LA 000000000703188 |
| 3/6/2020 | 706 | | -$700.00 | $1,072.47 | ONLINE TRANSFER DEBIT |
| 3/3/2020 | 935 | | -$1,416.00 | $1,772.47 | POS- WM SUPERCENTER # WOODLANDS TX 000000000775536 |
| 2/29/2020 | 76 | | -$12.00 | $3,188.47 | SERVICE CHARGE |